## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOHN DOE,

           Plaintiff,

    v.

WILLIAMSPORT AREA SCHOOL
DISTRICT and LYCOMING
COUNTY,

           Defendants.

No. 4:22-CV-01387

(Chief Judge Brann)

## MEMORANDUM OPINION

### OCTOBER 19, 2023

A disturbing series of events unfolded when the chaperones for an out-of-state high school baseball tournament in Myrtle Beach, South Carolina, left the students in their hotel rooms unsupervised. The students sexually assaulted a freshman team member in his sleep, recorded it, and sent the video around the school. After the freshman was bullied about the assault for months on end, he transferred schools. The school administrators covered up the abuse, did little to punish it, and withheld it from appropriate law enforcement authorities for months.

The case now returns to this Court with a startling new allegation; these hazing practices had festered unaddressed for years at the annual Myrtle Beach trip. School officials knew about them and turned a blind eye. Unfortunately, the plaintiff

provides no specific details about these incidents, so his allegation is implausible. But some of his claims will nevertheless survive dismissal.

## I.      BACKGROUND

On September 6, 2022, John Doe filed a complaint against various defendants, including Williamsport Area School District ("WASD") and Lycoming County.[1] This Court granted the defendants' motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim in April 2023, and gave Doe leave to amend.[2] In June 2023, Doe filed a second amended complaint against Defendants WASD and Lycoming County for violations of Title IX of the Civil Rights Act of 1964, the Equal Protection and Due Process Clauses of the United States Constitution under 42 U.S.C. § 1983, vicarious liability, various negligence claims, and civil conspiracy.[3] This Court has subject matter jurisdiction over Doe's Federal claims under 28 U.S.C. §§ 1331 and 1343, and supplemental subject matter jurisdiction over his related state claims under 28 U.S.C. § 1367.

In July 2023, WASD and Lycoming County filed motions to dismiss for failure to state a claim pursuant to Rule 12(b)(6).[4] These motions are now ripe for disposition; for the reasons that follow, WASD's motion is denied as to Doe's Title IX (Count I), negligence (Count IV), negligence infliction of emotional distress

---

[1]    Doc. 1
[2]    Doc. 62.
[3]    Doc. 92.
[4]    Docs. 94, 95.

(Count VI), and negligent failure to rescue (Count VIII) claims. WASD's motion is granted with leave to amend as to the Section 1983 equal protection and due process (Count II) and negligence per se (Count VIII) claims, and granted with prejudice as to Doe's Title IX claims for punitive and emotional distress damages (Count I), and his vicarious liability (Count III) and civil conspiracy (Count IX) claims. Lycoming County's motion is granted in full; Doe is given leave to amend as to the Section 1983 equal protection (Count II), negligence (Count V), negligent infliction of emotional distress (Count VI), and negligence per se (Count VIII) claims.

## II.    DISCUSSION

### A.    Facts in the Amended Complaint

This case involves complex and bitterly contested allegations against WASD and Lycoming County stemming from WASD's response to Doe's sexual assault on a school-sponsored baseball trip. The facts alleged in the amended complaint, which this Court must accept as true for the purposes of this motion, are as follows.

In the Fall of 2017, John Doe was a freshman student at Williamsport Area High School ("WAHS"), which is operated by WASD. Doe was a member of the Millionaires, the high school baseball team.[5] Each year, the Millionaires attended a country-wide baseball tournament in Myrtle Beach, South Carolina; Doe received approval to attend.[6] That year's trip occurred from March 23 to March 30, 2018.[7]

---

[5]   Docs. 92 ¶¶ 7, 19.
[6]   *Id.* ¶19.
[7]   *Id.* ¶21.

Forty team members were accompanied by Head Coach Ryan Miller and five assistant coaches.[8] Athletic Director Sean McCann had a son on the team, and Principal Brandon Pardoe had both a son and a nephew on the team; both attended the trip as well, but stayed in beach houses.[9] George E. Lepley, Jr., a local attorney, also attended to watch his grandson play.[10] The team reserved ten bedrooms "scattered" around the Myrtle Beach Atlantica Resort.[11] WASD Chaperones assigned students to bedrooms.[12] One evening during the trip, the chaperones were absent, leaving Doe and his teammates unsupervised. Some chaperones brought a few team members to a party in Garden City, South Carolina; others were "out in Myrtle Beach."[13]

That night, Doe was asleep in his hotel room with B.M. While Doe slept, B.M. sat on Doe, placing his penis and bare buttocks on Doe's face, lips, and mouth.[14] A team member, Videographer #1, took videos of the assault with his phone.[15]  At least two other teammates, including Pardoe's nephew, are heard laughing.[16] B.M. and others had previously directed racial slurs at Doe, who is black; after the incident, they told Doe that they would "lynch him" if he told anyone.[17] Another video depicts

---

[8]    *Id.*
[9]    *Id.* ¶¶21-22, 25.
[10]   *Id.* ¶23.
[11]   *Id.* ¶24.
[12]   *Id.* ¶25.
[13]   *Id.* ¶27.
[14]   *Id.* ¶28.
[15]   *Id.* ¶¶33-34.
[16]   *Id.*
[17]   *Id.* ¶31.

Doe's teammate, Male Victim #1, during the same trip.[18] Male Victim #1 is shown being held down by several teammates, screaming while B.M. "sodomize[s]" him "with a television remote" by attempting to insert it into his rectum.[19] Doe alleges that WASD had "turned a blind eye" to such incidents for "years, if not decades."[20]

Doe alleges that a "cover-up" followed. Later that night, Head Coach Miller repeatedly placed calls to assistant coach Randy Zangara, who had not attended the trip.[21] When WASD chaperones and administrators found out about the videos, Pardoe instructed students to delete them, but did not report the assault "or take control of the situation in any way."[22]  Doe also alleges that a settlement payment was made to Male Victim #1.[23]

Doe was removed from the baseball team after the team returned.[24] Despite Pardoe's initial instructions to delete the videos, they were sent around the school.[25] B.M. shared the videos on his phone with other students in the WAHS cafeteria after the team returned.[26] He "bragged about what had occurred."[27] Classmates harassed, bullied, and tormented Doe about the incident during the school year, calling him

---

[18] *Id.* ¶34.
[19] *Id.*; Doc. 92-3 at 2.
[20] Doc. 92 ¶20.
[21] *Id.* ¶35.
[22] *Id.* ¶36.
[23] *Id.* ¶¶16, 71
[24] *Id.* ¶37.
[25] *Id.* ¶¶36, 39.
[26] *Id.* ¶39.
[27] *Id.*

"dick lips" and other derogatory names.[28] During the time after the Myrtle Beach trip ended on March 30, 2018, WASD administrators did nothing.[29]

Nothing until May 18, 2018, when a report was made to Lycoming County Children and Youth Services ("CYS") about the assaults on Doe and Male Victim #1.[30] CYS employees immediately made a report to Child Line and contacted the Chief County Detective for Lycoming County, William Weber, who had previously been a member of the Lycoming County Child Abuse Investigation Team.[31] Along with being Chief County Detective, however, Weber was also "intimately familiar with WAHS and personal friends with several of its employees."[32] Weber lived within feet of Pardoe and Zangara on the same street.[33] His son had previously been a member of the Millionaires, and he himself had attended the Myrtle Beach tournament for three years.[34] Weber informed CYS in mid-May 2018 that he would look into the matter due to his "familiarity" with the WAHS baseball program.[35]

After being contacted by CYS, Weber communicated with Pardoe; his notes state: "a youth had 'tea bagged' another youth . . . I told Mr. Pardoe that I had no jurisdiction about what happened in Myrtle Beach, but would assist and make

---

[28]   *Id.* ¶40.
[29]   *Id.* ¶¶36, 41.
[30]   *Id.* ¶42.
[31]   *Id.* ¶43, 45.
[32]   *Id.* ¶45.
[33]   Pardoe, Weber, and Zangara live at 43, 53, and 56 Keyser Circle in Williamsport. *Id.* ¶44.
[34]   *Id.* ¶47.
[35]   *Id.*

referrals if need be. I also told him I was aware of the trip and what usually goes on during the annual trip."[36] Doe alleges that Pardoe approached Weber around this time, asking him to intervene in any investigation "to shut said investigation down."[37] Weber gained possession of at least one of the videos, but did not contact the Williamsport City Police Department, the Pennsylvania State Police, the Myrtle Beach Police Department, or any other Lycoming County officer.[38]

After the CYS Report, Pardoe held a series of meetings. On May 21, 2018, Doe's parents called WASD because WASD had still not reached out about the incident, but Assistant Principal Freed denied any knowledge.[39] On May 30, 2018, Pardoe emailed WASD Superintendent Dr. Timothy Bowers to inform him that the investigation had begun.[40] That day, Pardoe, Weber, and Freed met with Doe's family in Pardoe's office; Weber later falsely wrote in his report that Doe did not feel that the video of his assault was passed around much, and concluded, "[c]learly this is a hazing/bullying issue that the school properly handled . . . there was no referral to be made."[41] Pardoe, Weber, and Freed also spoke with Videographer #1 and suspended him from two baseball games on May 30.[42] After suspending Videographer #1 from two baseball games, Pardoe visited the student's home and

---

36   *Id.* ¶48; Doc. 92-3 at 3.
37   *Id.* ¶46.
38   Doc. 92 ¶50-51.
39   *Id.* ¶53.
40   *Id.* ¶62.
41   *Id.* ¶¶55-56.
42   *Id.* ¶54-56.

personally apologized to his mother that her son had to miss two baseball games. He asked her to not talk about what happened because the case was "not going to go anywhere."[43]

Pardoe had also suspended B.M. from two baseball games, and asked to speak with him as well.[44] The next day, Lepley—the attorney who attended the Myrtle Beach tournament to watch his grandson—wrote a letter, titled "Misconduct Myrtle Beach," to Pardoe and McCann, stating that he was now representing B.M.[45] Lepley stated that because "a substantial number of players engaged in the exact same conduct," his goal was to "make sure that one person is not singled out for conduct committed by a substantial number of team members."[46] An "investigation" telephone call took place between Pardoe, Lepley, and WASD Solicitor Fred Holland that day.[47] The WASD school board was formally notified of the assaults on June 5, 2018.[48] That same day, Pardoe and Lepley had a meeting regarding a voicemail from Doe's family.[49]

After months of ridicule from his peers because of the Myrtle Beach assault, Doe left WAHS.[50] On August 24, 2018, the "Millionaire Mayhem" story was

---

[43]  *Id.* ¶60.
[44]  *Id.* ¶¶66, 75.
[45]  *Id.* ¶63.
[46]  *Id.* ¶64.
[47]  *Id.* ¶68.
[48]  *Id.* ¶69.
[49]  *Id.* ¶70.
[50]  *Id.* ¶136.

published by journalist Todd Bartley on TalkWilliamsport.com, detailing this course of events.[51] On September 28, 2018, Myrtle Beach Police Department ("MBPD") Detective Glenn Porter indicated in a report that Bartley had contacted him about the story—which was the first time MBPD had been informed about the assault.[52] That same day, MBPD Detective Tiffany Whitmire emailed Weber requesting further information; Sargent Jeanne Reeder of the Williamsport Police Department confirmed that it never took a report on the assault; and multiple WAHS school resource officers confirmed that they too had no knowledge of the incident.[53] In mid-September 2018, Lycoming County Assistant District Attorney Jeff Yates, the lead attorney responsible for prosecuting juvenile cases at this time, informed MBPD that he, too, had no knowledge of the incidents.[54]

A series of misrepresentations followed from the parties involved in the initial "cover up." Yates contacted Weber, who indicated that he had no knowledge of the allegations.[55] Weber admitted to MBPD Detective Porter on October 3, 2018, that he did have knowledge of the assault after it was reported via Child Line, but stated that he "facilitated the handling of this incident along with the school" instead of completing a report because he believed nothing criminal had happened "based on

---

[51]   *Id.* ¶81.
[52]   *Id.* ¶82.
[53]   *Id.* ¶85-87.
[54]   *Id.* ¶88.
[55]   *Id.*

Pennsylvania standards."[56] Weber then wrote a report based on his recollection, and sent it to MBPD, who received it on October 16, 2018.[57]

On January 9, 2020, WASD made its first official statement, stating that the information had not been previously reported to any employee; that the district first became aware of the incident after law enforcement had already been contacted; that "a prompt investigation was completed and appropriate discipline was issued;" that the matter was investigated by "outside agencies;" that "the high school principal had no personal conflict of interest or personal relationships with the students involved;" that Weber's actions were "appropriate and thorough;" and that the District had "communicated with the families of all students involved in the incident to the full extent" possible.[58] A school board member moved to have an unbiased third party investigate the Myrtle Beach assaults, but his motion was unsuccessful.[59]

On May 8, 2020, newly-elected Lycoming County District Attorney Ryan Gardner referred the investigation to the Pennsylvania Office of the Attorney General ("OAG"), who assumed jurisdiction on May 27, 2020 and obtained several search warrants.[60] In February 2021, B.M. pled guilty to criminal charges as a result of the MBPD's investigation into the events at Myrtle Beach.[61] The OAG then ended

---

[56]  *Id.* ¶89.
[57]  *Id.* ¶92.
[58]  *Id.* ¶¶98-99; Doc. 99-2.
[59]  Doc. 92 ¶100.
[60]  *Id.* ¶¶103-105, 106.
[61]  *Id.* ¶102.

its investigation on July 1, 2021 without filing any charges.[62] According to Gardner's statement, the OAG concluded its investigation because, after it determined that Lycoming County had failed to enforce policies to govern the conduct of county detectives, the issue had been identified and corrected in January 2020, before Gardner assumed office.[63]

Gardner reviewed the search warrants when they were unsealed in September 2021.[64] Gardner asked to meet with Weber on September 28, 2021; Weber then stated he was retiring.[65] WASD issued a subsequent press release on or about October 1, 2021, stating that it stood by the position that its administrators followed all proper procedures and protocols to appropriately respond to the incident.[66]

### B.   Motion to Dismiss Standard

Under Federal Rule of Civil Procedure 12(b)(6), courts dismiss a complaint, in whole or in part, if the plaintiff fails to "state a claim upon which relief can be granted." Following the landmark decisions of *Bell Atlantic Corp. v. Twombly*[67] and *Ashcroft v. Iqbal*,[68] "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

---

[62]  *Id.* ¶109.
[63]  *Id.* ¶110.
[64]  *Id.* ¶112.
[65]  *Id.*
[66]  *Id.* ¶113.
[67]  550 U.S. 544 (2007).
[68]  556 U.S. 662 (2009).

on its face.'"[69] The United States Court of Appeals for the Third Circuit has instructed that "[u]nder the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps": (1) "take note of the elements the plaintiff must plead to state a claim"; (2) "identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth"; and (3) "assume the[] veracity" of all "well-pleaded factual allegations" and then "determine whether they plausibly give rise to an entitlement to relief."[70]

### C.   Doe's Allegations of Historical Fact

Doe's second amended complaint alleges a pattern of similar assaults to his own in prior years, and he argues that such knowledge on Weber and WASD's part can be inferred. Without this fact, many of these claims crumble. It is therefore bitterly disputed by the parties. Because Doe's case again hinges on the plausibility of this allegation, the Court sets out its reasoning in more detail.

Doe provides information supporting an inference that such conduct may have occurred in the past. But he fails to allege any detail about these past incidents other than stating that they had occurred, and WASD had been aware of them, for "years, if not decades."[71] Returning to our bedrock Motion to Dismiss precedents, WASD labels this an "outlandish allegation of historical fact [] only entitled to 'a

---

[69]   *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).
[70]   *Connelly v. Lane Construction Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (internal quotations and citations omitted).
[71]   Doc. 92 ¶¶13, 20, 131, 151, 157.

presumption of truth except to the extent they resembled a 'formulaic recitation of the elements of a . . . claim' or other legal conclusion."[72] The Court finds that Doe's allegation is not plausible because he fails to allege the details of any prior incidents with particularity, and his proffered circumstantial evidence is not strong enough to compensate for this failing.

Circumstantial evidence of relevant actors' conduct during or after a plaintiff's injury can inferentially support the plausibility of allegations that similar incidents had happened in the past. In *Alexander v. Bucks County*, for example, the plaintiff-prisoner was unlawfully restrained to a chair and assaulted by numerous officers.[73] The Eastern District of Pennsylvania found that the following facts supported the plausibility of the plaintiff's allegation that similar incidents had happened in the past:

> [T]he number of officers that participated in the assault on [plaintiff], the involvement of *two* supervisors, the assault's occurrence in full view of other inmates and staff members, [the nurse's] refusal to document the injuries, and [the] Warden['s] attempts after the fact to stop [plaintiff] from filing grievances, suggest that this type of assault is "not an anomaly, but the norm."[74]

Doe offers a host of similar circumstantial evidence: Male Victim #1's similar assault at Myrtle Beach makes it more likely that Doe's hazing was part of a preexisting pattern; the administrators' post-incident "cover up" and underwhelming

---

[72] Doc. 104 at 13 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 790 (2009)).
[73] No. 21-CV-4633-KSM, 2023 U.S. Dist. LEXIS 76883, at *19-20 (E.D. Pa. May 2, 2023).
[74] *Id.* at *19-20 (quoting *Garcia v. Cnty of Bucks*, Civil Action No. 17-3381, 2018 U.S. Dist. LEXIS 124779, at *7 (E.D. Pa. July 25, 2018)).

response to Doe's complaints, along with WASD's misrepresentations in its official statements, makes it more plausible that WASD would have swept similar incidents under the rug in the past; and the interrelationship between the Millionaires and administrators such as Pardoe and McCann makes it more reasonable to infer that WASD would have had actual knowledge of such prior incidents.

But all that evidence is merely *consistent with* showing that such hazing practices are "not an anomaly, but the norm." Something more is needed to minimize the "obviously alternative explanation"[75] that WASD's misconduct is limited to its response to Doe's incident. The Court is not aware of any case in which a plaintiff has plausibly alleged a pattern of conduct without describing with some specificity the date, location, victim's name, and/or details of at least one prior incident.[76]

This does not necessarily mean that plausibly alleging the historical fact of recurring conduct always requires such specificity. But as shown by the dearth of case law on this point, the circumstantial evidence must be particularly strong to "nudge[] claims across the line from conceivable to plausible,"[77] and this is not such a case. The only evidence which directly supports Doe's allegation of historical fact

---

[75] *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 567 (2007).

[76] In *Alexander v. Bucks County*, the plaintiff also pointed to the fact that he had been subjected to the same conduct once before, that other inmates had made similar complaints, and to lawsuits and media reports containing similar allegations. No. 21-CV-4633-KSM, 2023 U.S. Dist. LEXIS 76883, at *19-20 (E.D. Pa. May 2, 2023). *See also Boyden v. Twp. of Upper Darby*, 5 F.Supp. 3d 371, 743 (E.D. Pa. 2014); *Johnson v. City of Paterson*, No. 21cv19907 (EP) (JSA), 2022 U.S. Dist. LEXIS 199099, at *4-5 (D.N.J. Nov. 1, 2022).

[77] *Twombly*, 555 U.S. at 570.

is Weber's statement. In the context of Weber's report describing how "a youth had 'tea bagged' another youth" and Weber's dismissal regarding Doe's incident as a "bullying/hazing issue," "what usually goes on" during the Myrtle Beach trip could conceivably refer to similar incidents of sexual assault. But the statement can also be read as stating that "bullying/hazing" usually goes on at Myrtle Beach, or simply that Weber knew the format of the Myrtle Beach tournament, such as hotel room arrangements amongst students.

The plausibility issues prompted by these competing interpretations are compounded by the effort required to connect the dots between this statement and WASD.[78] Weber's statement was obtained from the Attorney General Office's warrant of probable cause. The warrant reproduced only part of a special agent's reading of Weber's notes which were an October recollection of his May investigation involving a general description of what he believed "usually goes on" at a tournament. Weber had attended this trip an unspecified number of years ago to watch his nephew. This is then connected to the school because administrators Pardoe and McCann, as parents of Millionaires athletes, would also know "what usually goes on." Although the Court must take all reasonable inferences in favor of the non-moving party, dismissal is warranted where that chain of inferences is simply too tenuous to remain plausible.

---

[78] *See* Doc. 61 at 21-22.

Under less tenuous circumstances, a similar statement with less ambiguity and less distance between the speaker and the administrators might push a case over the line from conceivable to plausible.  But Weber's statement, together with the other evidence available, is simply too speculative to support Doe's allegation of historical fact absent any specifically allege prior incidents. The Court will grant Doe one more opportunity to amend his pleadings to reflect such prior instances of similar conduct. These claims will accordingly be dismissed with leave to amend. With this context in mind, the Court turns to the merits of Doe's claims.

### D.    Title IX Claims

The Federal government provides schools across the United States with federal funding. As a condition of receiving federal funds, Title IX of the Civil Rights Act of 1964 requires funding recipients not to discriminate against any person based on sex.[79] This prohibition can be enforced by private victims through suit for money damages.[80] One such cause of action allows victims of student-on-student sexual assault or harassment to sue "where the funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities."[81]

Under this theory, plaintiffs must plead that: (1) the defendant receives federal funds; (2) sexual harassment occurred; (3) the harassment occurred under 'circumstances wherein the recipient exercise[d] substantial control over both the

---

[79]   20 U.S.C. § 1681 (LEXIS 2023).
[80]   *Cannon v. Univ. of Chicago*, 441 U.S. 677, 688-89 (1979).
[81]   *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 632 (1999).

harasser and the context in which the known harassment occur[red]," (4) the funding recipient, or an "appropriate person," had "actual knowledge" of the harassment; (5) the funding recipient was "deliberately indifferent" to the harassment; and (6) the harassment was "so severe, pervasive, and objectively offensive that it [could] be said to [have] deprive[d] the victims of access to the educational opportunities or benefits provided by the school."[82] Here, it is undisputed that WASD receives federal funds, and Doe was sexually assaulted. While Doe has not plausibly alleged WASD's deliberate indifference to a history of similar incidents, liability can be had based on WASD's post-assault conduct because "[w]hen a sexual assault triggers a course of harassment, the total course of events can be considered sexual harassment."[83] Therefore, the Court will analyze whether Doe's Title IX claim is cognizable based on WASD's post-assault conduct.

Aside from one bullet-point in its Reply Brief,[84] WASD does not contest its actual knowledge of the harassment prompted by the dissemination of the videos of Doe's assault. It is beyond dispute that at least Pardoe had notice of the videos' existence on the night of the incident, because he ordered the students to delete them. Doe also described the contents of the videos when he and his parents met with Weber, Pardoe, and Freed on May 30, 2018, which put these individuals on actual notice of the videos' dissemination. Weber himself mentions that the videos were

---

[82]   *Id.* at 643.
[83]   *Goodwin v. Pennridge Sch. Dist.*, 389 F.Supp. 3d 304, 314 (E.D. Pa. 2019).
[84]   Doc. 113 at 2-3.

discussed during that meeting. While Weber wrote that Doe did "not feel that the video was passed around much,"[85] Doe's allegation that "this is an outright lie" is plausible based on the other misrepresentations surrounding Weber's investigation. Plausibly alleging that at least the principal and vice principal of a school were on notice of harassment is sufficient to show actual notice on a motion to dismiss.[86]

WASD's argument that it lacked "substantial control" over Doe's assault lacks merit. As to the trip itself, schools frequently exercise control over students on field trips and other off-campus outings. WASD controlled Doe's hotel room by instructing students as to which hotel room to use.[87] And the Millionaires' Myrtle Beach trip was funded, organized, and chaperoned by WASD personnel, rendering it a school function under WASD's control.[88] As to the videos, administrators' knowledge of the videos of Doe's assault, both immediately after the assault and after Doe's return to school, supports WASD's control over Doe's subsequent harassment at school after his assault.[89]

---

[85]   Doc. 92 ¶55-56; 92-3 at 3.

[86]   *See Warren v. Reading Sch. Dist.*, 278 F.3d 163, 171 (3d Cir. 2002) ("[A] school principal who is entrusted with the responsibility and authority normally associated with that position will ordinarily be an 'appropriate person' under Title IX.").

[87]   *See A.H. v. Minersville Area Sch. Dist.*, 408 F.Supp. 3d 536, 563 (M.D. Pa. 2019) (control over public restroom on field trip when chaperones told students which restrooms to use).

[88]   *See Doe v. Hamilton Cnty Bd. of Educ.*, 329 F.Supp. 3d 543, 551-52, 556-67 (E.D. Tenn. 2018) (substantial control of private cabin students slept in during a week-long, school-sponsored, chaperoned basketball trip); *Brown v. Arizona*, No. 20-15568, 2023 U.S. App. LEXIS 25276, at *32-33 (9th Cir. Sept. 25, 2023) (en banc) (discussing circumstances in which off-campus harassment can support Title IV claims).

[89]   *Butters v. James Madison Univ.*, 145 F.Supp. 3d 610, 619-20 (W.D. Va. 2015); *Goodwin v. Pennridge Sch. Dist.*, 389 F.Supp. 304, 316 (E.D. Pa. 2019).

WASD next opposes the "deliberate indifference" element based on its subsequent investigation of Doe's assault and B.M.'s two-game suspension. The Supreme Court has cautioned that "courts should refrain from second guessing the disciplinary decisions made by school administrators."[90] Yet courts may find deliberate indifference where the school's response is "clearly unreasonable in light of the known circumstances."[91]

WASD chaperones only instructed students to delete videos in the immediate aftermath of Doe's assault,[92] and took no further action until twelve days after the CYS report, suggesting a motive to perhaps privately resolve the incident rather than promptly address it. Pardoe and other WASD personnel knew that Weber had no jurisdiction over B.M.'s case and yet continued to intentionally limit police contact to Weber rather than contacting other law enforcement authorities, which were unaware of the investigation until the Attorney General alerted them.

B.M.'s parents threatened WASD with a lawsuit if B.M. was "singled out" for the hazing conduct, so after the report, the only remedial action was suspending B.M. from two baseball games; the same punishment was doled out to Videographer #1,

---

[90]  *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648 (1999).
[91]  *Id.*
[92]  WASD contends that the simultaneous assertion that the chaperones first tried to cover up the videos, and then did nothing when they later circulated, is so self-contradictory that it renders the allegations implausible. It is not; it could very well be possible that the chaperones' immediate response was to wipe evidence in the panic following the incident, but upon the later belief that the incident had been contained, lowered their guards enough to be indifferent to the video's dissemination amongst the student body.

along with Pardoe's personal apology to his parents for doing so. The result was a school environment in which students attached no seriousness to Doe's abuse, circulating videos of the assault and hurling insults at him. It is readily plausible based on this backdrop of post-assault behavior that WASD's response to Doe's assault was "clearly unreasonable."[93]

Finally, Doe has plausibly alleged that his sexual assault was sufficiently severe or pervasive to deprive him of the benefit of his education. The ultimate decision "to transfer schools following [sexual assault] necessarily inserts a factual question regarding whether the deprivation was causally related to his harassment."[94] Doe felt forced to transfer school districts at the end of the year because other students had shared videos of his sexual assault—had WASD responded to Doe's assault and harassment by imposing harsher punishments, disciplining students who bullied Doe or disseminated the video, or otherwise going through more effort to stop the dissemination of the videos, Doe would never been the subject of ridicule, and never have transferred school districts. Doe's membership on the baseball team also ended following the assault, which terminated his access to educational

---

[93]   *See Butters v. James Madison Univ.*, 145 F.Supp. 3d 610, 619-20 (W.D. Va. 2015) (university's "wink and a nod punishment," failure to take further action in absence of formal complaint, and failure to stop dissemination of videos among students depicting victim's off-campus sexual assault displayed deliberate indifference).

[94]   *Doe v. Hamilton Bd. of Educ.*, 329 F.Supp. at 562. *See also Roe v. Pa. State Univ.*, CIVIL ACTION No. 18-2142, 2019 U.S. Dist. LEXIS 24870, at *15 (E.D. Pa. Feb. 15, 2019) (citing *Nungesser v. Columbia Univ.*, 244 F.Supp. 3d 345, 368 (S.D.N.Y. 2017)).

benefits.[95] Nor does Doe's attendance at WASD until the end of the school year show that his assault was insufficiently severe to deprive him of the benefit of education under Title IX.[96]

Accordingly, Doe has plausibly pled a Title IX claim against WASD; the motion to dismiss in this respect is denied. However, any such claims based on punitive or emotional distress damages are barred under Title IX;[97] those claims are dismissed with prejudice.

### E.    Section 1983 Claims

Doe also sues WASD and Lycoming County under 42 U.S.C. § 1983. In *Monell v. Department of Social Services of New York*, the Supreme Court set out a framework for municipal liability under Section 1983.[98] The Court must determine if Plaintiff plausibly alleges the deprivation of a constitutional right at all[99] and then analyze whether this injury is attributable to WASD or Lycoming County through an official municipal policy[100] which was the "moving force" behind the violation.[101]

---

[95]   *See, e.g.*, *Doe v. Lincoln Pub. Sch.*, 4:20-CV-3102, 2021 U.S. Dist. LEXIS 106594, at *5-6, *11 (D. Neb. Jun. 7, 2021); *Goodwin*, 389 F.Supp. at 319.

[96]   *Hall. v. Millersville Univ.*, 22 F.4th 397, 412 n.5 (3d Cir. 2022); *Roe*, 2019 U.S. Dist. LEXIS at *15 (citing *Nungesser,* 244 F.Supp. at 367).

[97]   *Reed v. Mount Carmel Sch. Dist.*, No. 4:23-cv-0890, 2023 U.S. Dist. LEXIS 178523, at *8-9 (M.D. Pa. Oct. 3, 2023); *Banes v. Gorman*, 536 U.S. 181, 189-90 (2002); *Cummings v. Premier Rehab Keller, P.L.L.C.*,  142 S.Ct. 1562, 1549 (2022).

[98]   436 U.S. 658 (1978).

[99]   *Cnty of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998).

[100]   *Monell*, 436 U.S. at 692.

[101]   *Telepo v. Palmer Twp.*, 40 F.Supp. 2d 596 (E.D. Pa. 1999).

The Court need not reach this second question, however, as neither of Doe's alleged Constitutional violations have merit.

###### 1. Equal Protection

The Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."[102] This provides no constitutional right to police protection or investigation.[103] However, it does establish a right to be provided state "services in a nondiscriminatory manner" which is "violated when a state actor denies such protection to disfavored persons."[104] To state a claim for a violation of equal protection, plaintiffs must allege that defendant's actions had a discriminatory effect and were motivated by discriminatory purpose.[105] Establishing discriminatory effect requires showing that the plaintiff is a member of a protected class and that he was treated differently from similarly situated individuals in an unprotected class,[106] to whom he is alike "in all relevant aspects."[107]

The only actions alleged against Lycoming County are Weber's insufficiently thorough investigation of Doe's assault, his failure to report the assault to law enforcement who had jurisdiction, and Lycoming County's failure to investigate or

---

[102]   US Const. amend. xiv.

[103]   *Burella v. City of Phila.*, 501 F.3d 134, 140 (3d Cir. 2007).

[104]   *Estate of Macias v. Ihde*, 219 F.3d 1018, 1028 (9th Cir. 2000); *Burnett v. Springfield Twp.*, No. CIV.A. 13-1646, 2014 U.S. Dist. LEXIS 92216, at *4 (E.D. Pa. July 8, 2014).

[105]   *Bradley v. United States*, 299 F.3d 197, 205 (3d Cir. 2002).

[106]   *Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985).

[107]   *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 271 (3d Cir. 2014).

prosecute the dissemination of videos depicting Doe's assault. Doe does not allege that Lycoming County was involved in any investigation or settlement payment related to Male Victim #1. With Doe's failure to identify any non-black comparator or class receiving more favorable treatment, racial discrimination drops out of the claim, relegating Doe to a "class of one."[108] As Lycoming County's alleged denial of protection or inadequate provision of services is then unmoored from class-based discrimination, it ceases to be unconstitutional.

As to WASD, Doe has plausibly alleged that he is similarly situated to Male Victim #1 in many respects, and Doe has technically alleged that he and Male Victim #1's investigations ended differently, with Male Victim #1 receiving a settlement payment and a more thorough investigation. But Doe provides insufficient detail regarding WASD's handling of Male Victim #1's complaints to compare it to his own, other than the alleged settlement payment. So the Court cannot compare the two investigations to assess whether any racially-motivated difference occurred. No allegation appears to link the different results to a discriminatory purpose.[109] This is fatal to this claim because without more, the mere existence of disparate impact does not prove purposeful discrimination.[110] While a variety of circumstantial evidence

---

[108] *See Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam).

[109] The only tinge of racial animus came from other WASD students' racially charged comments towards Doe, which have nothing to do with WASD's intentions.

[110] *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-65 (1977); *Ashcroft v. Iqbal*, 556 U.S. 662, 680-81 (2009) (stating that government action with a discriminatory effect was "on account of . . . race" without supporting evidence is conclusory).

can be relevant to the equal protection analysis, stating that a difference in treatment was discriminatory does not make it so, and Doe only supports his claim with conclusory statements of discriminatory intent.[111]

On the face of the second amended complaint and without any additional circumstantial evidence, it is not plausible to infer that this difference in outcome was racially motivated. Accordingly, Doe's equal protection claims against WASD and Lycoming County are dismissed without prejudice.

## 2. Due Process

Doe next alleges a violation of his procedural due process rights. The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law."[112] But "without the presence of a protected interest, a § 1983 due process claim simply cannot stand."[113] Two interests are alleged: Doe's right to education, and his right to be free from unjustified private violence under the "state-created danger" theory. The former claim is insufficient under any set of alleged facts; the latter is insufficient because Doe's allegation that similar hazing incidents had happened in prior years is not plausible.

---

[111] *See Burnett v. Springfield Twp.*, No. CIV.A. 13-1646, 2014 U.S. Dist. LEXIS 92216, at *17-18 (E.D. Pa. July 8, 2014) ("Allegations about other people's mental states are conclusory unless they are linked to facts from which the relevant mental state might be inferred").

[112] U.S. Const. amend. XIV, § 1.

[113] *Diaz v. Canino*, 502 F. App'x 214, 217 (3d Cir. 2012) (unpublished) (citing *Sample v. Diecks*, 885 F.2d 1099, 1113 (3d Cir. 1980) (unpublished)).

### a.   Procedural Due Process

Doe states several times that, as a result of WASD and Lycoming County's failure to conduct an adequate investigation, he suffered bullying and harassment which caused him to leave the school at the end of the school year. Because Pennsylvania guarantees the right to education, denial of access to education can be a cognizable right.[114] But a school's failure to prevent bullying is insufficient to find that the school deprived a student of his right to education without due process.[115] And Plaintiff provides no detail regarding his removal from the baseball team after he came forward about his assault, which prevents the Court from assessing what process was given, and what process was due, before the removal occurred.[116] The second amended complaint therefore fails to state a claim upon which relief may be granted.

### b.   State-Created Danger

In *Deshaney v. Winnebago*, the Supreme Court held that there is no substantive due process right to be free from private violence, but noted that the state had not, in that case, created the danger faced by the plaintiff.[117] Seizing on this dictum, our Court of Appeals developed a body of case law establishing when a

---

[114] *See Shuman v. Penn Manor Sch. Dist.*, 422 F.3d 141, 149 (3d Cir. 2005); 22 Pa. Code § 12.8(a) (LEXIS 2023).

[115] *Williams v. Jersey Shore Area Sch. Dist.*, No. 4:22-CV-00473, 2023 U.S. Dist. LEXIS 86791, at *19-20 (M.D. Pa. May 17, 2023).

[116] *See Shuman*, 422 F.3d at 150.

[117] 489 U.S. 189, 201 (1989).

state-created danger can cause a due process violation.[118]  This is an outgrowth of the right to procedural due process, premised on the deprivation of a person's liberty interest in personal bodily integrity.[119] Plaintiff now alleges that WASD and Lycoming County violated his due process rights by failing to "provide a safe custodial setting for Plaintiff."[120] Under the state-created danger theory, four elements must be satisfied: (1) foreseeable and fairly direct harm; (2) actions marked by "a degree of culpability that shocks the conscience;" (3) a relationship with the state making the plaintiff a foreseeable victim; (4) an affirmative use of state authority in a way that created a danger, or made others "more vulnerable than had the state not acted at all."[121]

The fourth element of affirmative conduct "is typically the most contested."[122] As to Lycoming County, it is clear that no affirmative act created a danger to Doe. Focusing on Weber's post-assault actions loses sight of what a state-created danger theory vindicates: invasion of a personal liberty interest. And there is no allegation that the County assumed any responsibility over Doe's safety or was involved in

---

[118] *See Johnson v. City of Phila.*, 975 F.3d 394, 398-400 (3d Cir. 2020) (tracing this Circuit's development of the state-created danger theory).

[119] *See Kneipp v. Tedder*, 95 F.3d 1199, 1204-05 (3d Cir. 1996) (citing *Deshaney*, 489 U.S. at 199-200); *Phillips v. Cnty of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008).

[120] Doc. 92 ¶147.

[121] *Johnson v. City of Phila.*, 975 F.3d 394, 398-400 (3d Cir. 2020).

[122] *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 242 (3d Cir. 2016).

organizing the Myrtle Beach trip. Nor would any failure to investigate prior incidents be considered an "affirmative act."[123]

As to WASD, it correctly cites to Third Circuit precedents applying *Deshaney*'s basic holding that a state-created danger does not arise from "failures to act."[124] That standard requires that the state's conduct "create[] or increase[] the risk of danger to the plaintiff"[125] because "[i]t is misuse of state authority, rather than a failure to use it that can violate the Due Process Clause."[126] Case law is therefore clear that something more than Doe's simple attendance at WASD is required for the school to affirmatively increase the danger of assault by classmates.[127] While disciplining students is an affirmative act, failing to do so is merely a maintenance of the status quo.[128] As such, a bevy of cases decline to find a state-created danger merely from a school district failing to prevent bullying or sexual abuse, or leaving children unsupervised.[129]

---

[123] *Burella v. City of Phila.*, 501 F.3d 134, 140-41 (3d Cir. 2007); *Pazici v. Miller*, No. 17-117, 2017 U.S. Dist. LEXIS 85336, at *10-15 (E.D. Pa. June 5, 2017); *Lambert v. Casteel*, No. 1:22-CV-01220, 2023 U.S. Dist. LEXIS 113961, at *10-14 (M.D. Pa. June 30, 2023) (Mehalchick, M.J.).

[124] *See Kaucher v. Cnty of Bucks*, 455 F.3d 418, 433 n.11 (3d Cir. 2006).

[125] *L.R.*, 836 F.3d at 242.

[126] *Bright v. Westmoreland Cnty*, 443 F.3d 276, 282 (3d Cir. 2006).

[127] *Morrow v. Balaski*, 719 F.3d 160, 177-179 (3d Cir. 2013) (en banc); *D.R. v. Middle Bucks Area Vocational Sch.*, 972 F.2d 1364 (3d Cir. 1992) (en banc).

[128] *Morrow*, 719 F.3d at 177-179.

[129] *See, e.g.*, *Williams*, No. 4:22-CV-00473, 2023 U.S. Dist. LEXIS 86791, at *19-20; *Bridges v. Scranton Sch. Dist.*, 644 F.App'x 174 (3d Cir. 2016) (unpublished); *J.R. v. Greater Latrobe Sch. Dist.*, No. 2:21-cv-01088-RJC, 2022 U.S. Dist. LEXIS 154686, *18-21 (W.D. Pa. Aug. 29, 2022) (student hazed in the time between the end of classes and the beginning of wrestling classes because gym was unsupervised; school did not require student to be in the gym at that time, so it created no danger).

Had WASD been aware of prior incidents of assault, Doe may have had a cognizable claim. Although WASD contends that any failure to prevent Doe's assault is not a state-created danger, "action" and "inaction" is often an inadequate metric for detecting a state-created danger.[130] The Third Circuit has found that, where the state "undertakes" responsibility for a vulnerable person's wellbeing and then abandons it, abandoning that responsibility is an affirmative act if the state actor had reason to know that the abandonment created a risk of private violence to the plaintiff.[131] Under these circumstances, "[g]iving and then taking away support is more than 'failure to provide protection' or 'to warn of a threat.' It is active conduct."[132] But because this Court finds Doe's allegations that the Millionaires' hazing practices are recurring is conclusory, he has no plausible claim under the state-created danger theory. Doe's Section 1983 Due Process claims are therefore dismissed with leave to amend.

### F.    Immunity from State Law Claims

The Pennsylvania State Tort Claims Act ("PSTCA") codifies the Commonwealth's sovereign immunity, providing that "no local agency shall be liable for any damages on account of any injury to a person or property by any act

---

[130]  *L.R.*, 836 F.3d at 242-43.
[131]  *Kneipp v. Tedder*, 95 F.3d 1199, 1211 (3d Cir. 1996); *L.R.*, 836 F.3d at 244; *see also Horton v. Flenory*, 889 F.2d 454, 458 (3d Cir. 1989) (delegating authority to private actors who pose risk of violence is an "affirmative act").
[132]  *Mears v. Connolly*, 24 F.4th 880, 885 (3d Cir. 2022) (Bibas, J.).

of the local agency or an employee thereof or any other person."[133] That statute

provides for a limited waiver of sovereign immunity where a municipal body acts

negligently to cause one of nine enumerated injuries.[134] Accordingly, the first step

in determining whether sovereign immunity bars a tort claim in Pennsylvania is to

determine whether one of these enumerated injuries has been plausibly alleged. The

second step is to determine whether that enumerated injury was caused by the

applicable local actor's conduct.

Doe's complaint brings six state-law claims against WASD and Lycoming

County: vicarious liability, negligence, negligence per se, negligent infliction of

emotional distress, vicarious liability, and civil conspiracy.[135] WASD and Lycoming

County allege that these claims are barred by sovereign immunity; Doe contends that

they fall under the PSTCA's enumerated "sexual abuse" exception. That exception

applies here, but only some of Doe's claims fall under its purview.

### 1.    Sexual Abuse Under 42 Pa.C.S. § 8542(b)(9)

One of the PSTCA's narrow waivers of sovereign immunity applies where a

municipal body's actions or omissions result in "sexual abuse."[136] "Sexual abuse" in

turn cross-references various criminal statutes, including "institutional sexual

---

[133]  42 Pa.C.S. § 8541 (LEXIS 2023).
[134]  42 Pa.C.S. § 8542(a) (LEXIS 2023).
[135]  Doc. 92 at 36, 38, 52-54.
[136]  42 Pa.C.S. § 8542(a) states that the exceptions in § 8542(b) permit liability against political
   subdivisions. 42 Pa.C.S. § 8542(b) sets out nine exceptions to PSTCA immunity, one of which
   is the "sexual abuse" exception under § 8542(b)(9). In turn, that section cross-references the
   crimes enumerated under 18 Pa.C.S. § 5551(7).

assault" under 18 Pa.C.S. § 3124(a.2) and "involuntary deviate sexual intercourse" under 18 Pa.C.S. § 3101. As this Court held recently in *Reed v. Mount Carmel Area School District*, institutional sexual assault under 18 Pa.C.S. § 3124.2(a.2) is inapplicable to school students, and therefore, provides no grounds for waiver of immunity under the PSTCA.[137] But because Doe's second amended complaint sufficiently alleges that B.M. engaged in "penetration, however slight" of his mouth, Doe validly pleads involuntary deviate sexual intercourse, and thus, validly pleads a waiver of the PSTCA's immunity for a limited set of state law claims relating to this act.

Pennsylvania law defines "deviate sexual intercourse" as "[s]exual intercourse per os or per anus between human beings."[138] Sexual intercourse is further defined, "[i]n addition to its ordinary meaning," to include "intercourse per os or per anus, with some penetration *however slight*; emission is not required."[139]

Doe's original complaint alleged that B.M. "placed his penis on Plaintiff's *face*" and "placed his bare buttocks on Plaintiff's *face*."[140] This Court held that he did not allege penetration.[141] Doe's second amended complaint now alleges that "B.M. sat on Plaintiff and placed his penis on Plaintiff's face and on and/or in his

---

[137] No. 4:23-cv-0890, 2023 U.S. Dist. LEXIS 178523, at *16 (M.D. Pa. Oct. 3, 2023).
[138] 18 Pa.C.S. § 3101 (LEXIS 2023).
[139] *Id.* (emphases added).
[140] Doc. 1 ¶31 (emphases added).
[141] Doc. 61 at 31.

mouth, making skin-to-skin contact with his face, lips, and mouth."[142] WASD describes this as "an obvious and apparent Hail Mary attempt" to survive dismissal and contends that "there was only mere placement of B.M.'s penis on Plaintiff's face and lips."[143] WASD asks this Court to weigh the evidence on a motion to dismiss—it cannot do so. But even WASD's preferred version of the facts establishes involuntary deviate sexual intercourse under Pennsylvania law.

While the Pennsylvania Supreme Court has not clearly opined on this issue, intermediate Pennsylvania courts have consistently found that contact between an attacker's genitalia and a victim's lips is "penetration" under Pennsylvania criminal law.[144] Because Pennsylvania lower courts have set clear precedent regarding the meaning of "penetration" under 18 Pa.C.S. § 3101, this Court will follow that precedent,[145] and therefore finds that Doe alleges penetration.

---

[142] Doc. 92 ¶28.

[143] Doc. 104 at 25.

[144] *See Commonwealth v. McIlvaine*, 560 A.2d 155 (Pa. Super. 1989), *rev'd on other grounds*, 603 A.2d 1021 (1992) (finding "penetration" when attacker forced victim to kiss his penis); *Commonwealth v. Wilson*, 825 A.2d 710, 714 (Pa. Super. 2004) (applying *McIlvaine*); *Commonwealth v. L.N.*, 787 A.2d 1064, 1071 (Pa. Super. 2001) ("[A]ny involuntary contact by the mouth, including the tongue as well as the lips, [with the sexual organ of another person] . . . meet[s] the test of involuntary deviate sexual intercourse"); *Commonwealth v. Wilson*, 825 A.2d 710, 714 (Pa. Super. 2003) (applying *McIlvaine* and stating that "to establish penetration, some oral contact is required); *Commonwealth v. Cavanaugh*, 2021 Pa. Super. Unpub. LEXIS 2760, at *10-11 (Pa. Super. 2021) (penetration when victim put her mouth on abuser's penis); *Commonwealth v. Almanzar*, 2016 Pa. Super. Unpub. LEXIS 2594, at *6 (Pa. Super. 2016) (abuser "penetrated" victim's vagina by licking it).

[145] *See Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938) (Federal courts sitting in diversity jurisdiction must apply substantive state law); *Baptiste v. Bethlehem Landfill Co.*, 965 F.3d 214, 225 (3d Cir. 2020) (explaining that in absence of binding precedent from the highest state court, a federal court sitting in diversity jurisdiction must still apply state law as it believes the highest state court would).

But pleading cognizable "sexual abuse" does not open the floodgates to any state law negligence claims under the PSTCA's waiver; that sexual abuse must result from the municipality's "acts or omissions." Because Doe's vicarious liability claims against both defendants, his negligence, negligent infliction of emotional distress ("NIED"), and negligence per se claims against Lycoming County, and his negligence per se claim against WASD are not based upon an act or omission causing sexual abuse, none fall within the waiver.

### 2. Doe's Vicarious Liability Claim

Vicarious liability is a derivative basis for imputing an actor's negligence onto his employer where he acts within the scope of his employment. It is a "policy-based allocation of risk" to a principal for his agent's act although the principal "has played no part in it, has done nothing whatever to aid or encourage it, or indeed has done all that he possibly can to prevent it."[146] "The PSTCA precludes imposition of liability upon a governmental unit based upon the theory of vicarious liability" unless the statute specifies otherwise.[147]

In subsections (a) and (b), the PSTCA provides a two-part test for municipal liability. The second part of the test, subsection (b), states that "[t]he following acts by a local agency *or any of its employees* may result in the imposition of liability on

---

[146] *Scampone v. Highland Park Care Ctr., LLC*, 57 A.3d 582, 597 (Pa. 2012) (quoting *Crowell v. City of Phila.*, 613 A.2d 1178, 1181 (Pa. 1992)).

[147] *Dean v. Commonwealth*, 715 A.2d 1130, 1133 (Pa. 2000); *Marshall v. Port Auth.*, 106 Commw. 131, 135-36 (1987) (no vicarious liability for the acts of a contractor under subsection (3)'s "real property" waiver).

a local agency," invoking vicarious liability for Section (b)'s enumerated "acts." Those "acts" are the nine enumerated waivers of sovereign immunity, including Section (b)(9), which involves negligently causing sexual abuse. Yet, sexual abuse's definition states only that liability can be had "if the injuries [sexual abuse] to the plaintiff were caused by actions or omissions *of the local agency* which constitute negligence."[148] This narrows subsection (b)'s broader language.

The most straightforward reading of the PSTCA is that vicarious liability for a municipal employee's negligent acts is unavailable under Section (b)(9)'s sexual abuse waiver. If there is a conflict between a general provision and a specific provision, the specific provision should prevail.[149] As subsection (b)(9) is the more specific section, the Court applies its narrower language to the scope of cognizable torts, not Section (b)'s broader language. Additionally, while subsections (b)(1)-(8) were enacted as part of the original PSTCA and do not clash with Section (b)'s overarching language, subsection (b)(9) was added to the PSTCA in a subsequent, 2019 amendment.[150] A successive statute contradicting its predecessor effectively repeals it where such contradictions arise. And the PSTCA's waivers are to be "strictly construed and narrowly interpreted"[151] "because the legislature's intent . . . is to shield government from liability, except as provided for in the statute

---

[148] 42 Pa.C.S. § 8542(b)(9) (LEXIS 2023) (emphasis added).

[149] ANTONIN SCALIA & BRYAN A. GARNER, READING LAW 158 (2012).

[150] Act of Nov. 26, 2019, P.L. 641, No. 87 (2019) (https://www.legis.state.pa.us/cfdocs/legis/li/uconsCheck.cfm?yr=2019&sessInd=0&act=87).

[151] *Weaver v. Franklin Cnty*, 918 A.2d 194, 200 (Pa. Cmwlth. 2007).

themselves."[152] Taken together, there is no room for doubt; it is the municipal body itself whose negligence must cause sexual abuse under subsection (b)(9), and Doe's vicarious liability claims therefore fail.

### 3.   Civil Conspiracy under 42 Pa.C.S. § 8542(b)(9).

Doe pleads a state law "civil conspiracy" against WASD and Lycoming County.[153] Section 8542 of the PSTCA explicitly states that its waiver extends only to "negligent acts," which "shall not include acts or conduct which constitutes a crime, actual fraud, actual malice or willful misconduct."[154] The Pennsylvania Supreme Court has defined "willful misconduct" as including "conduct whereby the actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow."[155] "[P]roof of malice, i.e. an intent to injure, is essential in proof of a conspiracy."[156] Such claims therefore fall outside of the PSTCA's municipal liability waiver, [157] as none of the PSTCA's nine waivers, including "sexual abuse," includes any intentional tort.[158] Doe also does not allege

---

[152] *Jones v. SEPTA*, 772 A.2d 435, 440 (Pa. 2001).

[153] Doc. 92 at 52-57.

[154] 42 Pa.C.S. § 8542(a)(2) (LEXIS 2023). The PSTCA includes an exception for the willful misconduct of an employee, but only where "it is judicially determined that the act of the employee . . . constituted a crime, actual fraud, actual malice, or willful misconduct." 42 Pa.C.S. § 8550 (LEXIS 2023). No such judicial determination is alleged.

[155] *King v. Breach*, 540 A.2d 976, 981 (Pa. 1988) (citing *Evans v. Phila. Transp. Co.*, 212 A.2d 440 (Pa. 1965)). *Cf. Renk v. City of Pittsburgh*, 641 A.2d 289, 292 (Pa. 1994).

[156] *Church Mut. Ins. Co. v. All. Adjustment Grp.*, 708 F.App'x 64, 70 (3d Cir. 2017) (quoting *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466 (1979)); *see also Phillips v. Selig*, 959 A.2s 420, 437 (Pa. Super. 2008).

[157] *See, e.g.*, *Milbourne v. Baker*, 2012 U.S. Dist. LEIS 71014, at *49 (E.D. Pa. May 23, 2012) (barring municipal liability for civil conspiracy because it is premised on acts constituting a crime, actual fraud, actual malice or willful misconduct).

[158] *York v. Kanan*, 298 A.3d 533, 542 (Pa. Commw. Ct. 2023).

that a civil conspiracy caused his sexual abuse. So the claim is barred as a matter of law three times over. It is dismissed with prejudice.

### 4.    Doe's Negligence, NIED, and Negligence Per Se claims against Lycoming County

Doe pleads negligence, NIED, and negligence per se against Lycoming County.  But none of these claims demonstrates how Doe's sexual abuse was "caused by" Lycoming's breach, as required under the PSTCA.

To plead a negligence claim in Pennsylvania, a plaintiff must allege that the defendant breached a duty owed to the plaintiff, causing an injury resulting in actual damages.[159] Lycoming County's primary objection is that it owed no duty to Doe. Doe alleges three duties on Lycoming County's part: the duty to investigate reports of criminal activity involving WASD students; the duty to take reasonable steps and implement reasonable safeguards to prevent Weber from his dereliction of duties; and the duty to refer Doe's case to the appropriate prosecuting authority.[160]

The problem with each of these proposed duties is that none of them could possibly have caused injuries that fall within PSTCA's waiver. As already discussed, the PSTCA limits its waiver to situations where the sexual abuse was "caused by" the municipal body's negligence.[161] Each of Lycoming County's alleged duties arose

---

[159] *Brewington for Brewington v. City of Phila.*, 199 A.3d 348, 355 (Pa. 2018).
[160] Doc. 92 ¶191; Doc. 118 at 41.
[161] 42 Pa.C.S. §§ 8542(b), 8542(b)(9) (LEXIS 2022).

after the sexual abuse. So breach cannot have been "caused by" the County's conduct.

NIED is a doctrinal outgrowth of basic negligence law awarding emotional distress damages.[162] Doe concedes that this claim, too, is premised on Lycoming County's post-assault conduct.[163] Negligence per se is likewise an outgrowth of negligence law, tracing the applicable duty from statutory law.[164] The duty here is similar: a statutory duty to report suspected child abuse, as well as purported violations regarding various evidence tampering statutes.[165] A failure to report sexual abuse and tampering with evidence cannot cause sexual abuse, unless the failure to report a prior string of abuses, or a preexisting practice of evidence tampering, foreseeably enabled the subsequent abuse. Doe makes no such plausible allegation. Because no alleged conduct of Lycoming County could possibly have caused plaintiff's sexual abuse, the negligence, negligent infliction of emotional distress, and negligence per se claims against Lycoming County are dismissed without prejudice.

---

[162] *Poetere v. City of Phila.*, 112 A.2d at 104.

[163] Doc. 118 at 43.

[164] *See Cabrioy v. Scipione*, 767 A.2d 1078, 1079 (Pa. Super. Ct. 2001); *Mest v. Cabot Corp.*, 449 F.3d 502 (3d Cir. 2006) (establishing elements of a negligence per se claim).

[165] *See* Doc. 92 ¶¶209-210 23 (citing 23 Pa.C.S. §§ 6311 (failure to report under Child Protective Services Law), 24 P.S. § 2070.1 (mandatory reporter duties under the Educator Discipline Act), 18 Pa.C.S. §§ 4904 (unsworn falsification), 4910 (tampering with evidence), 4952 (intimidation of witnesses), 5101 (obstructing administration of law), 5301 (official oppression)).

### 5.     Doe's negligence per se claim against WASD

Doe's negligence per se claim is dismissed for the same reasons as those against Lycoming County. He alleges that various actors failed to report Doe's sexual abuse pursuant to statutory mandatory reporter duties, and that they unlawfully tampered with evidence.[166] None of the alleged statutory violations could plausibly have caused Doe's assault. This claim is dismissed without prejudice.

### G.     Doe's remaining state law claims

### 1.     Lycoming County's Negligent Failure to Rescue

Doe further pleads a negligent failure to rescue claim against Lycoming County and WASD. Doe's claim does fall within the PSTCA's waiver, as he alleges that his sexual abuse was caused by Lycoming County's failure to rescue. But this is plainly implausible, so the claim is nevertheless dismissed.

Generally, there is no duty to rescue under Pennsylvania law. As Doe notes, limited duties arise under the Second Restatement of Torts, as adopted by Pennsylvania, under sections 314A and 322.[167] Section 314A is inapplicable, as it applies when a defendant "takes custody of another."[168] No allegation is made that Lycoming County, or Weber, was involved in that year's Myrtle Beach trip.

Section 322 provides for a limited duty to rescue when an actor "knows or has reason to know that by his conduct . . . he has caused such bodily harm to another as

---

[166]  *Id.*

[167]  *See Webb v. Zern*, 200 A.2d 853 (Pa. 1966) (adopting the Second Restatement of Torts).

[168]  Rest. 2d Torts § 314A.

to make him helpless and in danger of further harm."[169] In *Morris v. Musser*, the trial court explained this rule's interaction with the "no-duty rule" in the police protection context:

> The no-duty rule provides that a police officer's obligation to protect the citizenry is a general duty owing to the public at large, and not a specific duty owing to particular persons . . . . If the police enter into a special relationship with an individual, however, the general duty owing to the public is narrowed into a specific duty owing to that person, the breach of which can give rise to a cause of action for damages.[170]

That court outlined two "limited" situations in which that rule would impose a duty to rescue on police: informants who are imperiled by aiding law enforcement, and specific individuals whom the police "expressly promise to protect . . . from precise harm."[171] Neither applies here, and no other basis for a special relationship is alleged.

Doe fails to allege any facts which could support a negligent failure to rescue claim against Lycoming County, and the Court cannot conceive of a set of facts plausibly substantiating such a claim. Accordingly, Doe's failure to rescue claim against Lycoming County is dismissed, with prejudice.

---

[169] Rest. 2d Torts § 322.

[170] *Morris v. Musser*, 478 A.2d 937, 939-40 (Pa. Cmwlth. 1984); *see also Peak v. Petrovitch*, 636 A.2d 1248, 1252 (Pa. Cmwlth. 1994) (applying *Morris*); *Boniscavage v. Borough of Gilberton*, No. 1318 C.D. 2009, 2010 Pa. Commw. Unpub. LEXIS 788, at *15 (Nov. 19, 2010).

[171] *Id.* at 174.

###### 2.        Remaining Negligence claims against WASD

The PSTCA does not bar Doe's negligence, NIED, and negligent failure to rescue claims against WASD, but only insofar as they allege that WASD's negligence caused his sexual abuse. WASD only briefly addresses Doe's negligence claim in the alternative by focusing on its duty to Doe.[172]

Doe mostly alleges duties relating to WASD's failure to report prior instances of sexual abuse, which are not plausibly alleged. However, Doe also alleges that WASD breached its duties to ensure that its chaperones would protect plaintiff from harm by supervising WASD students during the Myrtle Beach trip. The present circumstances involve the application of existing statutory and common law duties of care, requiring no discussion of the *Althaus* factors.[173] WASD "took custody of" Doe, a minor, freshman high school student,[174] during the Myrtle Beach trip, and maintained a duty to care for his safety until Doe "passe[d] out of the orbit of the school district's authority."[175] This includes WASD's duty to ensure that its chaperones are able to care for Doe's safety. Doe next alleges that the WASD

---

[172]  Doc. 104 at 27; Doc. 113 at 8.

[173]  *Dittman v. UPMC*, 196 A.3d 1036, 1038 (Pa. 2018).

[174]  *Cf. Alumni Ass'n v. Sullivan*, 572 A.2d 1209, 1212 (Pa. 1990) (comparing a school's duty to care children under its care with a university's lack of duty to care for adult students); *Bradshaw v. Rawlings*, 612 F.2d 135, 138 (1979) (Aldisert, J.) (same);

[175]  Rest. 2d Torts § 314A; *Wartluft v. Milton Hershey Sch. & Sch. Trust*, 1:16-cv-2145, 2020 U.S. Dist. LEXIS 46617, at *31-32 (M.D. Pa. Mar. 18, 2020) (quoting *Atias v. Trocki Hebrew Acad.*, No. CV 05-6102, 2007 U.S. Dist. LEXIS 103986, at *2 (E.D. Pa. Feb. 14, 2007)), *aff'd*, 844 F. App'x 499, 504 (3d Cir. 2021) (school's duties by standing *in loco parentis* "depend[] on physical custody of a child").

chaperones neglected their duties by leaving the hotel premises, and that this resulted from WASD's breach of its duty to properly supervise or train its chaperones.

As WASD only disputes the issue of duty and addresses neither the remaining elements of Doe's negligence claim nor the viability of Doe's other negligence theories, the Court declines to discuss the plausibility of Doe's negligence claims further. However, it notes that Doe must develop WASD's breach with more specificity for these negligence claims to remain viable.

## III.   CONCLUSION

Defendant WASD's Rule 12(b)(6) motion to dismiss Plaintiff's Title IX, negligence, negligent infliction of emotional distress, and negligent failure to rescue claims is denied.

WASD's motion to dismiss Plaintiff's Section 1983 equal protection, Section 1983 due process, and negligence per se claims is granted, with leave to amend. Defendant Lycoming County's motion to dismiss Plaintiff's Section 1983 equal protection, negligence, negligent infliction of emotional distress, and negligence per se claims is also dismissed, with leave to amend. The law in the Third Circuit is clear that leave to amend should be "freely given."[176] As these claims mostly hinge on Plaintiff's allegation of prior similar hazing incidents, Doe will have a final opportunity to make out this allegation.

---

[176] *Id.* (quoting Fed. R. Civ. P. 15(a)).

Plaintiff's Section 1983 due process, civil conspiracy, and negligent failure to rescue claims against Lycoming County are dismissed with prejudice; his claims for Title IX punitive and emotional distress damages against WASD are also dismissed with prejudice. "Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility."[177] A complaint is "futile" if even, as amended, it would fail to state a claim upon which relief could be granted.[178] Although there is a "liberal pleading philosophy of the federal rules" no amendment will be permitted because another opportunity to plead a case would be futile.[179]

As such, Plaintiff will be given twenty-one days to file an amended complaint. If no amended complaint is filed, Plaintiff's Section 1983 due process, Section 1983 equal protection, and negligence per se claims against WASD, together with his Section 1983 equal protection, negligence, negligent infliction of emotional distress, and negligence per se claims against Lycoming County, will be dismissed with prejudice.

An appropriate Order follows.

BY THE COURT:

s/ Matthew W. Brann
Matthew W. Brann
Chief United States District Judge

---

[177] *Id.* (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997).
[178] *Id.*
[179] *See Bjorgung v. Whitetail Resort, LP*, 550 F.3d 263, 266 (3d Cir. 2008).