Exhibit 1:  Transcript of Miller ( Vol. I,
5/21/2025)

Deposition of Ryan Miller                                    John Doe v. Williamsport Area School District, et al.

1      A.    Yes, I was.

2      Q.    **And if I told you that we had like job**

3   **evaluations for you from Williamsport in 2016-17,**

4   **would that change your recollection of the timeline**

5   **of things?**

6      A.    Yeah, it could.  I -- I was with

7   Williamsport for three years.

8      Q.    **Okay.**

9      A.    I don't remember the exact years, but I

10  went from -- from Montoursville for three years.

11  Then I went right to Williamsport for three years

12  roughly.  So 2016 I think to 2018 would have been my

13  time at Williamsport.  It could be 2015 to '18.  I'm

14  not -- I just don't remember exactly the years I

15  started there, but it would have been the previous

16  three years would have been at Montoursville because

17  I went right after my last year at Montoursville to

18  Williamsport.

19     Q.    **Okay.  So if I said that you left in 2018**

20  **in Williamsport, you're sure it's three years.  So**

21  **that would mean it was the 2018 season, '17, and '16?**

22     A.    Yeah.

23     Q.    **Okay.**

24     A.    If that's when I left, yes.

1    Q.    Yeah, and we'll look at some documents.

2    A.    Yeah, just -- yeah.

3    Q.    Okay.  So then fair to say just clarify for

4    the record then it sounds like you were at

5    Williamsport between 2016 and 2018, and then backing

6    up three years, you were at Montoursville, what,

7    2014 -- 2013, '14 and '15?

8    A.    Correct.

9    Q.    Okay.

10   A.    To the best of my memory.  I'm not sure of

11   the date and the years.  Obviously we can confirm

12   them.

13   Q.    Yeah.

14   A.    Yeah.

15   Q.    And the entire time you were at

16   Montoursville, were you -- were you a paid coach like

17   working for the school district?

18   A.    I was a paid coach for my final year at

19   Montoursville.  I was a pitching coach, assistant

20   varsity coach there.  The first two years I was a

21   volunteer assistant.

22   Q.    So no pay for the first two?

23   A.    No pay.

24   Q.    And were you just an assistant coach for

Deposition of Ryan Miller                                John Doe v. Williamsport Area School District, et al.

1    of the liaison for the school to be on the staff to

2    allow like just communicate like administrative

3    stuff, you know.  All those kind of things that

4    helped out to, you know, being that I was not a

5    member of the school district where I was able to be

6    in the office or be in the school to communicate with

7    the athletic director all the time and the principals

8    and those kinds of things.

9            To basically just -- just communicate those

10   things throughout the day while I'm working because

11   I'm --

12        Q.   Okay.

13        A.   -- not in the school district every day.

14        Q.   All right.  He's -- he's an administrator

15   who's there?

16        A.   Yeah.

17        Q.   He's already there?

18        A.   He was a volunteer as well and he would

19   bounce with the JVs as well.

20        Q.   Okay.  All right.  So I know that you're

21   the head coach of the varsity, Tariq is the head

22   coach of the JV.  At the end of the day though, are

23   you as the head coach responsible for all of the kids

24   on both teams?

1    A.    Yeah, I would make the decisions in terms

2    of what -- like all of the logistics of the team.  In

3    other words, what guys were going to be where, all

4    those kinds of things for JV and varsity, who is

5    going to be down at JV, who is going to be at

6    varsity.

7         Essentially I have -- we all discuss, but I

8    would have the final say in those things.  Obviously

9    I don't have the final say over our athletic director

10   Sean McCann or the principal at the time, which was

11   Brandon Pardoe, in terms of logistical things and all

12   the administrative decisions, but as far as the team

13   operation and what we do and how the program's being

14   run, that -- that would essentially be my decision,

15   yeah.

16   **Q.    So you're the head decision maker for team**

17   **operations?**

18   A.    Yeah, correct.

19   **Q.    And the chain of command would be Principal**

20   **Pardoe, AD McCann, you as far as administrative**

21   **things?**

22   A.    Probably Randy -- I would say Randy Zangara

23   even before me even though he was volunteer, he -- he

24   was kind of that connection point between all of us.

1    after practice go to his house, let's go here, or

2    something as simple as a text chain that we're all in

3    texting, making sure that we're on the same page with

4    decisions for the next game or things along those

5    lines or any issue that would come up.

6        Q.    Is that text chain with all the assistant

7    coaches, is that something that you used throughout

8    your time there?

9        A.    A text chain would -- I mean, it would have

10    just been me simply texting a guy like if -- or

11    texting the group of the varsity coaches that day or

12    the JV coaches just to make sure we're all on the

13    same page with the next day what's happening, but it

14    wasn't an app.  It wasn't something like that where

15    we all were signed into it, logged in, all that kind

16    of stuff, yeah.

17        Q.    Yeah, just like on Apple --

18        A.    Just a normal --

19        Q.    -- iMessage?

20        A.    Yeah, normal type of message, yeah.

21        Q.    The reason I ask -- I'm just asking is that

22    something that you used as head coach in the 2017 and

23    '18 seasons, like a group chat with you guys?

24        A.    Potentially, yeah.  I mean, I don't know

1    necessarily that every single one of those coaches

2    that were listed there would have been addressed in

3    every one of them.  I could have created one for the

4    varsity one day and I just would have been texting

5    those guys.  Then the next day I might have texted

6    the other coaches just because they're doing

7    something else, but we frequently would text --

8         Q.    Right.

9         A.    -- throughout the -- the seasons, yes.

10        Q.    **Do you still have access to messages that**

11   **would have been sent and received in March of 2018?**

12        A.    I mean, possibly.  I don't have -- I

13   certainly don't have the conversations anymore.  I

14   don't have the same phone, but -- so I would say

15   probably don't have access to those at this point.

16        Q.    Okay.  **Did anyone up before today before**

17   **I'm about to ask you ask you if you could look for**

18   **texts from that time period?**

19        A.    Yes.  Probably three or four years ago

20   maybe.

21        Q.    **Okay.**

22        A.    Back when this whole -- I'm not sure when

23   this all started, but many -- many years ago they at

24   some point -- I believe Wanda, Wanda Erb.  I don't

```
 1   had -- had marijuana.  We were in South Carolina in a

 2   hotel, and we had a report from a parent that one of

 3   the players within the room because they were in

 4   rooms together.  Multiple kids were in different

 5   rooms together, but this one parent had mentioned to

 6   us that there was marijuana in the toilet.

 7           So when that got brought to our attention,

 8   that was actually Nick Caringi, the assistant coach,

 9   whose son was playing and he was in the room with one

10   of the players, and that he came to my door, knocked

11   on the door and told me what it was and what had

12   happened.  So what I did immediately is I called

13   Brandon Pardoe.  He was on the trip because his son

14   was playing.  And I gave him a phone call, discussed

15   with him the situation.  And at this point Nick

16   Caringi had actually handed me the evidence of what

17   was in this room.

18           So when Brandon -- I talked to Brandon.  He

19   came over to my room.  I handed him the evidence of

20   the situation.  And I had at that point handed it to

21   him as the administrator to handle it.  He spoke with

22   the child's father, related to, you know, being a

23   tier one and what you did and -- and he -- he was

24   told that he had -- his father -- the child who did
```

 1    it his father was on the trip as well.  So he had

 2    to -- he was kicked off the team and he had to leave

 3    Myrtle Beach that day -- the -- I think there was --

 4    I don't remember the time of when -- it was like

 5    probably dinnertime when I found this out.

 6            So I believe the next morning, the child

 7    stayed with his father that evening, and then he had

 8    to drive him home from Myrtle Beach the next day and

 9    he was no longer part of the team.

10        Q.    Okay.  So to back up, the evidence that

11    Nick Caringi found and then gave to you, what was

12    that?

13        A.    I believe it was a -- and I'm going -- it

14    was a bag -- I didn't -- I'm not a -- I've never been

15    involved in drugs, so I'm not really sure.  It was a

16    bag with what looked like a cigar that had marijuana

17    or some type of marijuana in it.  You could tell from

18    the smell and just kind of the look of it.

19        Q.    Okay.

20        A.    And it got confirmed in what it was because

21    when the child -- the father and Brandon Pardoe met

22    or discussed this, the player admitted to -- admitted

23    to it.

24        Q.    Okay.

1    A.    So I don't know exactly what it was, but

2    that -- but, in other words, that -- that's how this

3    would go when you're asking about this.  The small

4    tier ones, we -- we handle internally with our

5    coaching staff and with the players, and we have

6    meetings with them to explain what the repercussions

7    are.

8         The only incident I've ever had while I was

9    there that was something that had to be brought to

10   the administration was that scenario and it was

11   handled immediately through Brandon.

12   **Q.    That player, that was MH?**

13   A.    Yes.  Correct.

14   **Q.    And you're telling me that what was**

15   **recovered and provided to Principal Pardoe was like a**

16   **cigar that actually had weed in it?**

17   A.    It was a -- it was a plastic bag that was

18   like -- it was like in the -- so they had gotten it

19   out of the toilet or something.  It was either in the

20   toilet or the -- or the trash can right beside it.

21   I'm trying to remember the best of my ability, but

22   they brought it, and I believe from what I remember

23   it was just a -- it looked like a crumbled up

24   cigar --

1    Q.    Uh-huh.

2    A.    -- that wasn't like in the shape of a cigar

3    at this point.  It was just like the flakes of the

4    outer side mixed -- intermixed with I believe just

5    like marijuana.  Like when I say marijuana, like just

6    like broken up.

7    Q.    Like stem -- stems?

8    A.    Yeah, like it was just -- like something

9    like that and again it was in a plastic bag.  It was

10   like -- like pretty worn.  It wasn't like a clear

11   where you could just see right through it.

12   Q.    Uh-huh.

13   A.    It had been -- somebody had -- either it

14   was in the toilet -- it just didn't look like a

15   normal plastic bag, but, yeah, that was handed over

16   to Brandon when he came to my room.  At that point, I

17   don't know what was done with it.

18   Q.    Okay.  But as far as you can recall because

19   you saw it, like there was some sort of actual like

20   drugs that were in that bag?

21   A.    I be -- my -- my belief is that it was

22   drugs.

23   Q.    Right.  And -- and consistent obviously we

24   all know what it smells like.  It smells --

```
 1       A.   Sure.

 2       Q.   -- like marijuana; right?

 3       A.   Sure.

 4       Q.   Okay.  I mean, it did?  It did smell that

 5   way?

 6       A.   I believe so, yeah.

 7       Q.   All right.  And then after you provided

 8   that to Principal Pardoe, you know, he had a

 9   conversation with the family as you said.  The

10   decision to kick him off the team and send him home,

11   was that yours, Principal Pardo's, both of yours?

12   Like how did you reach that?

13       A.   It was mine.  In other words, when I say it

14   was mine, I told Brandon that this is an immediate

15   dismissal from our team based on our code of conduct

16   and Brandon agreed.  He made the -- I never spoke

17   with MH ever or his father.  That was handled with

18   Brandon.  As soon as I passed that on to him, he took

19   full responsibility in handling that with the father

20   and the son.

21       Q.   How about the decision -- and just to

22   correct me if I'm wrong, I believe you said that you

23   were all -- the family was also instructed to leave

24   Myrtle Beach; correct?
```

Case 4:22-cv-01387-MWB    Document 167-1    Filed 10/29/25    Page 13 of 34

Deposition of Ryan Miller                                John Doe v. Williamsport Area School District, et al.

```
 1        A.    Correct.  Yeah.

 2        Q.    Was that something that you had decided as

 3   well --

 4        A.    No.

 5        Q.    -- like you also can't stay here?

 6        A.    No, I didn't decide.  That was something

 7   that Brandon said he was going to have -- that he

 8   couldn't be a part of the team, so he was no longer

 9   going to be able to be in the rooms.  And, you know,

10   you can do -- you can stay in Myrtle Beach if you

11   stay with him, your dad, but you're not going to be

12   involved in it at this point with -- with the

13   baseball team.

14        Q.    And your recollection is that MH and his

15   father did leave Myrtle Beach?

16        A.    I believe so.  I believe I was told that

17   his father was taking him the morning home.

18        Q.    Okay.  Either way, I mean, he didn't play

19   any more games for you; right?

20        A.    I never -- I actually never saw him -- I

21   didn't even see him since -- when it was -- since it

22   was brought to my attention.  Like Brandon handled

23   the entire like discussion and stuff.  So after it

24   had been brought to my attention and reported that, I
```

Deposition of Ryan Miller                     John Doe v. Williamsport Area School District, et al.

1   no longer -- I hadn't seen MH.  I haven't seen him,

2   so...

3          Q.   Okay.  And you said Brandon was on the

4   trip, we'll talk about this, but he was there, you

5   know, not -- originally not as a principal --

6          A.   Correct.

7          Q.   -- but as a parent; right?

8          A.   He was there as a parent, yes.

9          Q.   And then you called him in to help the

10  situation and then he was acting as principal?

11         A.   Yes, because to my knowledge Randy Zangara

12  was not there who typically would be someone that I

13  could just report this to and Sean McCann I believe

14  was there as well because his son was on the team,

15  but I just chose to go to the -- you know, I believe

16  in my -- in my opinion that Brandon was the proper

17  person to go to because he was kind of the head of

18  the school and not the athletic director.  So that

19  was the way to go with that.

20         Q.   So he was your first call?

21         A.   Yes.

22         Q.   Is there anybody else you called regarding

23  the MH situation other than Brandon?

24         A.   Yeah, Randy Zangara I spoke with as well.

Deposition of Ryan Miller                                    John Doe v. Williamsport Area School District, et al.

1   The discussions I had with him were basically what

2   got brought to my attention, what happened.

3   Basically Randy is not there.  He was a close friend.

4   I was just filling him in on like what's going on,

5   you know, what had happened.

6       Q.   Is that something that you called him about

7   after the situation resolved like hey, FYI, this

8   happened, Brandon handled it, it's over?

9       A.   Yeah.  I don't remember if it was right

10  away or when it was, but it -- honestly I don't

11  remember the time of day that this got brought to my

12  attention either.  It could have been the next

13  morning, but at some point along the line I remember

14  specifically talking to Randy, not just about that

15  because we had had baseball games going on and he was

16  very vested -- you know, a vested interest in how we

17  were doing, what was going on.

18           And so there was numerous things, you know,

19  along those lines baseball wise just that we were

20  talking about, but obviously that situation was

21  brought up to him that this had happened and

22  Brandon -- you know, I let Brandon know and -- and

23  Brandon was handling it, so...

24      Q.   Okay.  So other than the MH situation, no

1    off-season training, weightlifting --

2         A.    Yeah.

3         Q.    -- things like that?  So fair to say you're

4    in pretty good communication with your team members

5    throughout the school year?

6         A.    Yes.

7         Q.    During the time that you were a coach, both

8    assistant and head coach, did kids ever come to you

9    to talk about any kind of personal problems or issues

10   they might have been having at school or at home?

11        A.    No, not that I believe.

12        Q.    Is that something that you ever in talking

13   with the team told them that they could do, like if

14   they ever needed someone to talk to?

15        A.    Yeah, I said door-open policy.  We had a

16   locker room over at Logue Field where our field was,

17   had a coach's room that had a door on it, but it was

18   never shut, it was just -- unless we had private

19   conversation with coaches.  But, yeah, we -- we made

20   it very clear, me specifically, that if there was

21   something that, you know, this is more than just

22   baseball, if there's anything that you need to

23   discuss or communicate with us to please, please do

24   and we can work through that.

1      Q.    So you literally had a door-open policy?

2      A.    Yes.  Yep.

3      Q.    And -- and no one took advantage of that?

4      A.    No.  I mean, to be honest with you, I --

5  we -- so when you pick a team, it -- it wasn't just

6  about skill level.  I mean, for the most part it is,

7  you know, 90 percent of it is, but you try to pick

8  players that show positive academics, people that are

9  willing to be good community members, be people that

10 you know that -- that are part of a program that

11 you're building.  You want them to all be on the same

12 wavelength in terms of what you're trying to

13 accomplish.

14        So for the most part, I believe, you know,

15 other than those one or two kids that you get maybe

16 in a typical year that just kind of they just aren't

17 buying in, you -- you -- you hope to not have a ton

18 of problems.  I mean, I -- I believe that everyone

19 was really tight.

20        The group of boys that I coached when I was

21 there for the most part were all boys that had played

22 together all the way up through this district little

23 league system, all the way up through West End

24 Baseball, which is a system right before you get to

Deposition of Ryan Miller                                    John Doe v. Williamsport Area School District, et al.

```
 1        A.    Yeah, it's not -- when I -- like it's --
 2   like it's not uncommon, but I don't -- I'm not an
 3   everyday drinker, but if I were -- if I were to do
 4   it, I would just go home and have just like one
 5   cocktail, like something like that, and that would be
 6   it.
 7        Q.    What do you drink, are you a bourbon guy, a
 8   gin guy?
 9        A.    I'm -- I fluctuate.  I'm a guy that goes
10   back and forth.  I mean, typically I'll be like -- if
11   I had a drink like a cocktail, I'd be like a Tito's
12   and with club soda.
13        Q.    Okay.  And do you -- when you say you don't
14   recall specifically that day, but that wouldn't have
15   been out of the ordinary for you to do before a game?
16        A.    I -- I wouldn't say -- honestly this was
17   the first game after this whole thing happened with
18   Ricky Stryker.  Like I said, there was a lot of just
19   anxiety and -- like in general and I was going to be
20   going to this game.  I'm like, you know -- so I -- I
21   was just preparing kind of for that, like not -- when
22   I'm preparing, not like drinking heavily to like
23   get in a -- get in a different mood.
24              It was just to take the edge off there, but
```

1    qualifications, and things like that, was that at

2    that meeting with everybody or was that a separate

3    meeting with --

4         A.    No, that was after it had been pushed from

5    Randy to one of the school members or Brandon or

6    Sean, they had reached out to call me and gauged my

7    interest, you know, based on the recommendation from

8    Randy.  And then I think -- I don't remember if it

9    was Sean or Brandon, I really don't, and then just

10   have a discussion with them about, you know, those

11   things.

12        Q.    So was there any sort of administrative

13   process other than kind of just kind of like, you

14   know, gone -- you know, figuring out if you had

15   interest and then on their side seeing if that would

16   be a good fit, was there any other like hoops you had

17   to jump through to become head coach?

18        A.    No.  No, but just to that point just was

19   recommended to the board and they put it through.

20        Q.    How about when you first got hired, is

21   there anything you had to -- hoops you had to jump

22   through that we didn't talk about, like was there a

23   panel interview, was there a background check?

24        A.    There -- there was no -- yeah, I had to do

1   background checks naturally to work within the school

2   district anyway, but they -- so Corey Twigg when he

3   initially became head coach, had brought me on and I

4   addressed him, you know, when I was in Montoursville,

5   I had a past record with DUI.  So it was addressed to

6   them, you know, Montoursville there, and then when we

7   went to Williamsport, I -- you know, I wanted to make

8   sure that they were aware of the situation as well

9   even though I had a background check.

10          When I was 19 years old I think -- 19 or 20

11  years old was when I had it -- I shouldn't say.  It

12  was probably 2011 maybe.  So it was actually, you

13  know, 14 years ago.  So I would have been 21 or 22,

14  but when I went there, I said I need to have a con --

15  I wanted to make sure they're aware before I even

16  consider this because if they're not going to approve

17  of this, you know, based on my situation, I would

18  like, you know, I -- I would take myself out of the

19  conversation right away.

20          So I remember specifically having a meeting

21  with -- and this is before I knew Randy Zangara

22  because when I came to Williamsport, I didn't know

23  anybody.  I was from Montoursville.  So in that same

24  locker room at the field in the coaches meeting room

1    area, I met with Corey Twigg, Sean McCann and Randy

2    Zangara.

3          And Corey had mentioned that Ryan wanted to

4    speak to you about a situation that happened in his

5    past, and so then I explained to them my past

6    situation prior to being hired there about it.  And,

7    you know, I said if this is going to be an issue

8    within your school district like, you know, this is

9    going to come up on a background check and they

10   didn't -- they made it seem as if it wouldn't be an

11   issue on the background check, that I should apply,

12   and I did.  And then obviously with the background

13   checks, I had gotten cleared and approved by the

14   board.

15       Q.    The DUI that you had in your past, that was

16   a conviction for DUI?

17       A.    Yes, correct.

18       Q.    How many convictions for DUI have you had?

19       A.    So when I was 19 I believe that's the

20   initial.  So when I -- I had -- I have one DUI

21   conviction.  When I was in -- in college in New

22   Jersey, I was underage and it -- it's different

23   there.  It doesn't go on your criminal background

24   when you get a driving under the age if you have like

```
 1   alcohol or an open container in your car.  If you're

 2   underage in New Jersey, it's an automatic DWI is what

 3   it's listed as, but it does not go out on your

 4   record.

 5            So I never had it on my record.  It went on

 6   my motor vehicle record, but when I got my DUI in

 7   Pennsylvania here, I brought that to -- obviously

 8   you're not going to conceal anything that happened in

 9   the past.  I brought that to their attention, and so

10   when I was tried for that situation, Pennsylvania

11   wouldn't allow me for an ARD program because

12   technically that situation wouldn't allow -- because

13   you can't have a past history or anything I believe

14   with any -- with any type of situation with alcohol

15   as a minor.

16            So technically I have one DUI conviction.

17   The DW -- the DWI underage that it's listed in New

18   Jersey is not on my record and it's -- it's been

19   cleared for a motor vehicle violation.  And I was

20   not -- so technically I have one, but I do have a

21   past with that prior, and that was when I was under

22   age.  I believe I was 19 years old I believe.

23       Q.   The -- the one in New Jersey just to be

24   clear where the circumstances were I know you said
```

 1    you were underage, but was it because you had an open

 2    container or because you were --

 3         A.    Because I -- because was an underage

 4    drink -- I had drank alcohol.

 5         Q.    Okay.

 6         A.    Yeah.  So regardless of my BAC and those

 7    kind of things in that -- in that -- the level --

 8         Q.    Yeah.

 9         A.    -- it doesn't matter.

10         Q.    Any amount?

11         A.    It could be anything, so...

12         Q.    Do you have any idea -- I know it's a long

13    time ago.

14         A.    Yeah, that would have been 15 years ago.  I

15    don't know what my -- I've even tried to look for it

16    to find it so that I could provide it to whenever I

17    do back -- because I have to do backgrounds every

18    year still for little league and all that stuff.  And

19    I always just want to cover myself, so I always put

20    that stuff on there and obviously it's always gotten

21    cleared.

22              When I say cleared like they -- they've

23    seen the -- I have to write it on my backgrounds that

24    I fill out.  I can't provide documentation of that.

```
 1    So I don't even have documentation of what that
 2    actually was at the time.
 3         Q.    Yeah, my question was going to be do you
 4    have any -- I know -- so in Pennsylvania there's like
 5    a tier system --
 6         A.    Yeah.
 7         Q.    -- of different types of DUI offenses.   In
 8    New Jersey I'm not as familiar.  Do you have any idea
 9    like what -- what the I guess crime was that you
10    had -- have a conviction for in New Jersey?
11         A.    It was driving while -- so DWI, driving
12    while influence -- under the influence.  I don't
13    know what --
14         Q.    Okay.
15         A.    -- I don't know what it actually -- again,
16    it doesn't come up on my backgrounds when you
17    actually go through it I don't think, but it will say
18    in Pennsylvania's records, it will say second DUI
19    conviction because of that past one.
20         Q.    Yeah.  So it looks I'm going to show you a
21    document I'm going to mark as Exhibit we're at 3 and
22    4.
23              As far as you're aware, whatever happened
24    in New Jersey, the Pennsylvania courts treated
```

1   your -- your DUI in Pennsylvania as a second offense?

2       A.   Correct, yes.

3       Q.   Okay.

4       A.   Yeah, I don't know if this matters to you

5   guys or not, but this video hasn't been on like it

6   was.  So I don't know if it's not on or just making

7   sure you guys are aware of that.  So I don't have

8   to -- we don't have to go through it all again.

9            MR. MCFARLAND:  Did the Zoom close out?  I

10  don't know.  We can go off for a second while we mark

11  the exhibits anyway.

12           THE VIDEOGRAPHER:  We're going off the

13  record.  The time is 2:01 p.m.

14           (Discussion held off record.)

15           (Miller Deposition Exhibit Nos. 3 and 4

16  were marked for identification.)

17           THE VIDEOGRAPHER:  We're back on the

18  record.  The time is 2:03 p.m.

19  BY MR. MCFARLAND:

20      Q.   Thanks for bearing with us for those

21  technical difficulties, Ryan.  So you've been handed

22  Exhibits 3 and 4.  3 I'll represent to you is a court

23  summary and 4 is a docket sheet.  The information

24  that's included in here especially -- well, you can

Deposition of Ryan Miller                     John Doe v. Williamsport Area School District, et al.

```
1   look at both of them.  This is applying to you;

2   right?

3        A.   Yes, correct.

4        Q.   Okay.  This is the -- the DUI that you got

5   in Pennsylvania; correct?

6        A.   Correct.

7        Q.   Okay.  And then I just want to look at --

8   look at Exhibit 3 first.  It looks like as it has

9   there a conviction for DUI, highest rate of alcohol

10  BAC 0.16 plus, second offense, graded as an M1, which

11  is a misdemeanor of the first degree.  That's what

12  you pled guilty to; right?

13       A.   Correct.

14       Q.   Okay.  And then looking at the docket,

15  Exhibit 4, if you can go to I believe it's like the

16  third to last page -- no, yeah, fourth -- I'll just

17  say, one, two --

18            MS. BLANEY:  They're numbered.

19            MR. MCFARLAND:  Oh, fantastic.  Thank you,

20  Casy.

21            MS. BLANEY:  Near the top right of the

22  page.

23            MR. MCFARLAND:  Great.

24  BY MR. MCFARLAND:
```

1      Q.    So on page four of seven, if you can go to

2    that --

3      A.    Yep.

4      Q.    -- there's an entry that is there near the

5    bottom -- I'm sorry, near the middle that says order

6    scheduling hearing and then on July 9th of 2012 it

7    says order - sentence/penalty imposed; right?

8      A.    Yep.

9      Q.    So do you recall, was that the date that

10    you were actually sentenced for this DUI?

11      A.    I believe so.

12      Q.    And looking back at Exhibit 3, it has the

13    sentence being 90 days plus five years of IPP,

14    probation.  Did you have to do 90 days confinement?

15      A.    Yes.

16      Q.    Did you do that all at once or on the

17    weekends or how did you do that?

18      A.    I did it all at once.

19      Q.    Okay.

20      A.    I did work release through the prerelease

21    center.

22      Q.    Okay.

23      A.    So, I mean, I was out all days.  I would be

24    there all weekend, but all throughout the days I

Deposition of Ryan Miller                          John Doe v. Williamsport Area School District, et al.

```
 1    retained -- I kept my employment and just continued
 2    to work.
 3         Q.   Great.  And the plus five years, was that
 4    concurrent; meaning, that, you know, you started
 5    walking off some of that probation while you were
 6    doing the release stuff?
 7         A.   Yep.
 8         Q.   Do you recall when you got off of
 9    probation?
10         A.   It was halfway, so two and a half years.  I
11    don't know the exact date, but I only was on for two
12    and a half years.
13         Q.   Okay.  So that would be sometime if this is
14    2012 in July --
15         A.   2014.
16         Q.   Yeah, like the end of -- well, the end of
17    twenty -- yeah, end of 2014; right?
18         A.   Yep.
19         Q.   Okay.  Is that something that you applied
20    for like through your attorney or did the court
21    just --
22         A.   No, it was the court just -- it was just
23    for good -- good record once I was out.
24         Q.   No violations of probation?
```

```
 1        A.    No.

 2        Q.    No revocations; right?  Okay.  Great.

 3   Complied with all terms of that?

 4        A.    (Witness nods head.)

 5        Q.    And the only reason, Ryan, and I know you

 6   pled guilty, you served your sentence and I commend

 7   you for taking responsibility --

 8        A.    Yep.

 9        Q.    -- for that.  The only reason I'm bringing

10   it up at all is because there is a law in

11   Pennsylvania about your ability to be hired by a

12   public school with something like this on your

13   record.  You're saying that the school knew about it

14   through the background check and knew about it

15   through talking with you and still hired you; right?

16        A.    Correct.

17        Q.    The date of your hiring at Williamsport

18   Area School District, again, this is after you

19   already worked for a public school in Montoursville;

20   right?

21        A.    Correct.

22        Q.    The law says that you're ineligible to be

23   hired until three years after you've finished your

24   sentence.  Were you aware of that law?
```

1    A.    No.

2    Q.    Okay.  If you got hired at some point in

3  2016 or in 2015 at Williamsport, that would be less

4  than three years from the end of your probation;

5  right?

6    A.    From the end of probation, yes.

7    Q.    Okay.  So if everything I said is true, if

8  it's true, would you agree with me that you actually

9  wouldn't even qualify to be hired under the law

10  because of what I just said about your DUI

11  conviction?

12    A.    Yes.  If that's the law, then that would be

13  correct.

14    Q.    And fair to say you assumed, honestly, I

15  mean, you're just applying, it's not your job to know

16  whether you're qualified.  It's the school's job to

17  know whether you're qualified?

18    A.    Well, correct, and I -- again, I -- that's

19  why I brought it to their attention because I wasn't

20  even going to apply if it was something that I would

21  be turned down for, so...

22    Q.    Right.  You would expect if there was some

23  disqualifying thing in your history, the school would

24  know about it, you made sure that was the case, and

 1    in the two categories I have it?

 2         A.    Not that I can recall.

 3         Q.    All right.  Thanks, Ryan.  You can put that

 4    aside.  I believe you said this earlier, but to

 5    confirm when you got, you know, elevated to the head

 6    coach position, did that come with a raise?  Did you

 7    ever get a raise at Williamsport?

 8         A.    I don't believe so.  Again, they may have

 9    bumped it up a couple hundred dollars, it's possible,

10    but I don't remember ever having a raise while I was

11    there.

12         Q.    Okay.  We already talked about, you know,

13    how kids need to be supervised at all times when in

14    the school district's care and custody; right?

15         A.    Uh-huh.

16         Q.    You agree with that?

17         A.    Correct.

18         Q.    And knew that at the time you were the

19    coach; right?

20         A.    Yes.

21         Q.    Did anyone at the school district, whether

22    it's a formal policy, whether it's sitting down and

23    talking, you know, one -- one on one or whatever,

24    ever inform you or provide guidance on how to

1    supervise kids properly, not only at practices,

2    games, but also on those types of trips you would

3    take, you know, like to Myrtle Beach?

4        A.    No, I did not.

5        Q.    Okay.  How about -- we talked about you

6    never received any training on bullying; right?

7        A.    Correct.

8        Q.    Did anyone ever inform you that that -- did

9    anyone ever define that term for you at any point?

10       A.    No.

11       Q.    Did anyone ever tell you if that sort of

12   behavior that, one, what it could look like, what

13   would be an example of bullying under the school

14   district's policies?

15       A.    No.

16       Q.    Is that something that anyone from the

17   school district told you was prohibited by members of

18   the team?

19       A.    Not that they -- they didn't specifically

20   tell me, no, other than, like I said, providing the

21   documentation for the conducts and stuff.

22       Q.    Well, did they provide you the code of

23   conduct or did you write it?

24       A.    Well, I wrote the code of conduct.  I mean

1    the conversation was pretty informal a lot of times

2    where we could just see him at the field because of

3    his son and we would speak and -- but nothing ever

4    that required an investigation that I'm aware of.

5         Q.    Fair to say then you yourself, you've never

6    been provided any training on how to do an

7    investigation; right?

8         A.    Correct.

9         Q.    Okay.   Meaning that no one ever told you

10   from the school district or otherwise hey, if you

11   hear a report of something that would be, you know,

12   in violation of the code of conduct, this is how you

13   talk to students, these are the questions that you

14   ask, this is how you do follow up, this is how you

15   document anything?

16        A.    No, and honestly I -- I don't think -- I

17   wouldn't have felt comfortable and prepared to have

18   those -- have that conversation.   I think in my mind

19   I felt that safety net that if there was an issue, I

20   would -- they would handle it if I reported it to

21   them.

22        Q.    Right.   Because you never were trained on

23   any of it?

24        A.    Right.

1    Q.    Right.   Okay.   So then fair to say then if

2    there was a report to you from a student, from a

3    parent, whatever, hey, my son's being bullied or, you

4    know, my son told me that this other kid, you know,

5    jumped him or whatever it is, your response would

6    then be to go to like Brandon or Sean and say hey, I

7    heard this from a parent, put it in his hands or

8    their hands and let them kind of figure it out?

9    A.    Yeah, I mean, it wasn't -- yeah, exactly,

10   but it wasn't like it was done because I didn't want

11   to deal with it.   It was just because I felt like I'm

12   a high school baseball coach, I report this to the

13   district.   They're responsible for figuring out what

14   along their guidelines and what they have to do and

15   what they would do.   So, yeah.

16   Q.    Okay.   So we've -- we've talked about

17   Principal Pardoe, Brandon Pardoe --

18   A.    Uh-huh.

19   Q.    -- he was the principal of the entire high

20   school; right?

21   A.    Yes.

22   Q.    Any sort -- I know you said that he had a

23   son on the team, so he -- you know, you would see him

24   pretty regularly, but I think I know the answer, but