IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOHN DOE,

      Plaintiff,

      v.

WILLIAMSPORT AREA SCHOOL
DISTRICT,

      Defendant.

No. 4:22-CV-1387

(Chief Judge Brann)

**MEMORANDUM OPINION**

**JUNE 12, 2026**

## I.  BACKGROUND

John Doe[1] was the victim of his high school baseball teammates' indisputably inappropriate conduct while attending a school-sponsored trip to Myrtle Beach, South Carolina to play in an early season baseball tournament. One teammate, B.M., placed his genitals near or on Doe's face as he slept in a hotel room that he shared with other players. Another teammate, J.Z., recorded a video of the act on his cell phone. The evidence shows that other players and students at Doe's high school eventually saw the video, and that Doe was bullied as a result. Doe testified that this event caused him emotional distress necessitating his transfer to another school.

---

[1]  Doe was a minor during the events of this case and therefore proceeds by pseudonym. Several other individuals discussed herein were also minors and are addressed by their initials. In reviewing the summary judgment record, the Court found multiple instances in which the parties failed to properly redact minor names, including in the body of Plaintiff's brief in opposition. Doc. 168-1 at 9-10. Affected filings will therefore be sealed until properly redacted.

The Court agrees that B.M.'s behavior was repugnant and culpable. But B.M. is not—and has never been—a party to the case. The sole remaining defendant in this matter is Doe's high school, the Williamsport Area School District ("WASD"). Doe seeks to recover damages from WASD on the theory that its negligence created the circumstances that facilitated B.M.'s conduct and that it responded with deliberate indifference after it learned what happened in Myrtle Beach.

At prior stages of this litigation, Doe's allegations painted a concerning picture of WASD's actions. He claimed that WASD administrators knew that misbehavior (and sexual assault) was the norm on the Myrtle Beach trip and other athletic events. He alleged that WASD coaches and staff learned of B.M.'s conduct essentially immediately. And he suggested that they responded to those reports by hiding the evidence, ignoring additional misconduct, and doling out overly lenient punishments. Accordingly, the Court sustained Doe's complaint,[2] and the matter proceeded to discovery.

Now, WASD moves for summary judgment on all of Doe's remaining counts. The Court has carefully scrutinized the factual record and finds that the allegations of misconduct levied against WASD are largely baseless. Doe's most serious and inflammatory allegations find support only in hearsay accounts that are no more reliable than commonplace gossip and rumor. No testimony from any witness with

---

[2]    *Doe v. Williamsport Area Sch. Dist.*, 699 F. Supp. 3d 306 (M.D. Pa. 2023).

personal knowledge of the incident and investigation nor any documentary evidence supports the proposition that WASD engaged in a grand conspiracy to obscure the truth. Instead, the full and undisputed record establishes a timeline showing that WASD timely responded to the incident once it was reported and acted in a manner that was not clearly unreasonable. Moreover, Doe has not developed evidence to overcome WASD's immunity to tort liability under Pennsylvania law.

"Speculation and conjecture," no matter how specific or inflammatory, "may not defeat a motion for summary judgment."[3] Instead, a plaintiff must come forward with admissible evidence "that would allow a jury to rule in that party's favor."[4] Doe has not met this burden, so the Court grants WASD's motion for summary judgment.

## II.   DISCUSSION

### A.   Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[5] Material facts are those "that could alter the outcome" of the litigation, "and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person

---

[3]   *Wharton v. Danberg*, 854 F.3d 234, 244-45 (3d Cir. 2017) (quoting *Acumed LLC v. Adv. Surgical Servs., Inc.*, 561 F.3d 199, 228 (2009)).

[4]   *Bradley v. West Chester Univ. of Pa. State Sys. of Higher Educ.*, 880 F.3d 643, 650 (3d Cir. 2018) (citing Fed. R. Civ. P. 56(c)(1)); *Bender v. Norfolk S. Corp.*, 994 F. Supp. 2d 593, 600 (M.D. Pa. 2014).

[5]   Fed. R. Civ. P. 56(a).

with the burden of proof on the disputed issue is correct."[6] A defendant "meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[7] Conversely, to survive summary judgment, a plaintiff must "point to admissible evidence that would be sufficient to show all elements of a prima facie case under applicable substantive law."[8] "[A] party opposing summary judgment must present *affirmative* evidence—whether direct or circumstantial—to defeat summary judgment, and may not rely simply on the assertion that a reasonable jury could discredit the opponent's account."[9]

In assessing "whether there is evidence upon which a jury can properly proceed to find a verdict for the [nonmoving] party,"[10] the Court "must view the facts and evidence presented on the motion in the light most favorable to the nonmoving party,"[11] and draw "all justifiable inferences" in his favor.[12] Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address

---

[6]  *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010).

[7]  *Clark v. Mod. Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993).

[8]  *Id.*

[9]  *Estate of Smith v. Marasco*, 318 F.3d 497, 514 (3d Cir. 2003) (citing *Williams v. Borough of W. Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)) (emphasis in original); *see Sec. & Exch. Comm'n v. Antar*, 44 F. App'x 548, 554 (3d Cir. 2002) ("If a moving party has demonstrated the absence of a genuine issue of material fact—meaning that no reasonable jury could find in the nonmoving party's favor based on the record as a whole—concerns regarding the credibility of witnesses cannot defeat summary judgment." (quoting *Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 130 (3d Cir. 1998))); *Wharton v. Danberg*, 854 F.3d 234, 244-45 (3d Cir. 2017).

[10]  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 448 (1871)).

[11]  *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).

[12]  *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).

another party's assertion of fact as required by Rule 56(c)," the Court may "consider the fact undisputed for purposes of the motion."[13] Finally, although "the court need consider only the cited materials, . . . it may consider other materials in the record."[14]

## B.    Facts

With that standard outlining the Court's framework for review, I now turn to the facts. In his response to WASD's Statement of Undisputed Material Facts (SOUMF), Doe denies an enormous number of WASD's assertions. Indeed, his opposition to WASD's motion for summary judgment relies almost exclusively on his factual contentions. Yet Doe often fails to point to affirmative contradictory evidence, instead preferring to question the credibility of witnesses and speculate about the truth. At times, he asserts denials that directly contradict the only evidence in the record. Given the importance of the factual contentions to the resolution of this motion, as well as the volume and frequent insufficiency of Doe's disputes, I will address here the facts that *are* supported by the evidence, noting where there are *legitimate* disputes. I leave review of Doe's most important objections to the sections of the legal analysis where they are relevant, given that I ultimately find them insufficient and therefore dispositive of the summary judgment issue.

---

[13]    Fed. R. Civ. P. 56(e)(2); *see also Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613-14 (3d Cir. 2018).

[14]    Fed. R. Civ. P. 56(c)(3).

Before laying out the facts, however, Doe's denials require me to explain when a court can rely on deposition testimony to establish a summary judgment record. To wit, Doe repeatedly denies WASD's assertions of fact when the supporting testimony includes any remotely equivocal language.[15] He does not point to any affirmative evidence—documentary or testimonial—to contradict many of the statements he denies, and instead tends to cite the very same testimony while putting an emphasis on the qualifying terms, seemingly in the belief that the court must credit his speculation about what the contrary facts might be. That is not a sufficient basis to create a "genuine" dispute of fact.[16] It well established that a party with the burden of proof at trial "may not rely simply on the assertion that a reasonable jury could discredit the opponent's account" to survive summary

---

[15] *See, e.g.*, Doc. 167 (Pl.'s SOUMF) ¶ 19 (denying that "[c]oaches and the booster club organized the trips" because witness stated that "[t]he coach would work with the booster club usually, because I think the booster club helped, did the coordinating, housing and stuff" (emphasis in original)); *id.* ¶ 68 (denying that the coaches "tried to schedule team activities like mini-golf and a Coastal Carolina minor league baseball game" because witness testified "I think we went golfing one time. Miniature golfing. We would go to a Coastal Carolina minor league baseball game. I think we did that every year." (emphasis in original)); *id.* ¶ 97 (denying that incident happened only one time because witness testified "**I don't remember** it happening more than once" and "**I think** just once." (emphasis in original)).

[16] *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."); *Linda B. v. Shaw*, No. 2:21-CV-0578, 2025 WL 489666, at *7 (W.D. Pa. Feb. 13, 2025) ("Not recalling something doesn't create a dispute of fact." (collecting cases)).

judgment.[17] Without any affirmative evidence to support his version of these facts, the Court cannot conclude anything but that these facts are undisputed.[18]

In a similar vein, Doe several times highlights a lack of evidence or the absence of testimony from all potentially knowledgeable parties as if it helps him, denying certain assertions of fact because he is "without information sufficient to form a belief" about them.[19] "A non-moving party cannot defeat summary judgment simply by stating that it is not in possession of relevant evidence justifying its opposition. If a non-moving party needs more information to refute a motion for summary judgment, it must submit an affidavit or declaration setting forth the specific reasons why it cannot present facts that would defeat the motion."[20] If, for example, Doe believed that he needed to depose every single member of the WASD

---

[17] *Marasco*, 318 F.3d at 514 (citing *Williams*, 891 F.2d at 460-61) (emphasis in original); *see Antar*, 44 F. App'x at 554 ("If a moving party has demonstrated the absence of a genuine issue of material fact—meaning that no reasonable jury could find in the nonmoving party's favor based on the record as a whole—concerns regarding the credibility of witnesses cannot defeat summary judgment." (quoting *Schoonejongen*, 143 F.3d at 130)); *Wharton*, 854 F.3d at 244-45 ("Speculation and conjecture may not defeat a motion for summary judgment." (quoting *Acumed LLC*, 561 F.3d at 228)); *Bock v. Novartis Pharms. Corp.*, 137 F. Supp. 3d 802, 811-12 (W.D. Pa. 2015).

[18] *Marasco*, 318 F.3d at 514. Indeed, Doe himself asks the Court to accept multiple instances of his own equivocal testimony. *See, e.g.*, Doc. 167 ¶ 41 (citing Doe's testimony that he "believe[s]" the preseason meeting contained certain content); *id.* ¶ 91 (contending that incident took place at "approximately 10:00 p.m." citing Doe's testimony that it occurred at "I want to say like 10 something" (emphasis added)).

[19] Doc. 167 ¶ 142; *see id.* ¶ 116 ("den[ying] that no players came forward with any information about other alleged events" in Myrtle Beach without any evidence that other incidents were reported because "[d]epositions of all the players on the WAHS Baseball team were not taken").

[20] *Exline-Johnson v. Rosser Properties, LLC*, No. 22-CV-0475, 2025 WL 1908969, at *1 (N.D. Okla. July 10, 2025) (internal citations omitted).

baseball team to prove his claim,[21] he should have done so. He did not, and has not explained why he needs additional time to gather such evidence.[22]

Accordingly, the Court accepts the truth of slightly equivocal but otherwise uncontradicted testimony as well as propositions that are supported by the record as it exists before the Court. Based on that standard, I describe: (1) how the Myrtle Beach trip was planned and organized; (2) the events of the trip; (3) WASD's response; and (4) the aftermath.

### 1.    Pre-Trip

Each spring, WASD's High School baseball team (the "Millionaires") traveled to Myrtle Beach, South Carolina, to play in a week-long early season baseball tournament.[23] In 2018, the tournament was scheduled for the end of March.[24] Accommodations were arranged and paid for by the Millionaires' booster club, while WASD paid the tournament entry fee.[25] The team usually stayed at the Myrtlewood Villas, and the boosters made reservations to return there in 2018.[26]

---

[21]    As the Plaintiff, it is Doe's burden to prove his case. *Anderson*, 477 U.S. at 252 (quoting *Munson*, 81 U.S. at 448).

[22]    *See* Fed. R. Civ. P. 56(d); *Shelton v. Bledsoe*, 775 F.3d 554, 568 (3d Cir. 2015) ("An adequate [Rule 56(d)] affidavit or declaration specifies 'what particular information that is sought; how, if disclosed, it would preclude summary judgment; and why it has not been previously obtained.'" (quoting *Dowling v. City of Phila.*, 855 F.2d 136, 139-40 (3d Cir. 1988))).

[23]    Doc. 158 (Def.'s SOUMF) ¶¶ 15-16. Where facts are admitted, I cite only to WASD's statement of undisputed material facts. Where there are purported disputes of fact, I cite to the relevant exhibits.

[24]    *Id.* ¶¶ 15, 17; *see* Doc. 158-17 (Reservation Emails) at 3.

[25]    Doc. 158 ¶¶ 20, 22-23.

[26]    *Id.* ¶¶ 22-23.

Myrtlewood Villas overbooked.[27] As a result, shortly before the trip the local property manager moved the Millionaires to the Atlantica Resort Hotel, where the team's rooms were spread across several floors.[28] The record indicates that this transfer occurred at the end of February, approximately one month before the trip.[29] It is unclear when WASD staff learned about the room locations within the Atlantica. Testimony reflects that the coaches did not know about the room assignments until they arrived in Myrtle Beach,[30] but Doe asserts that the February date on the Atlantica Guest folios must be the date when WASD learned that the rooms were spread out.[31] There is no direct evidence in the record of communications between the Atlantica and WASD regarding the move between Myrtlewood Villas and the Atlantica. But when booking at Myrtlewood, the boosters had clearly communicated a desire that the reservations be "in the same area if possible."[32] Regardless, the format of the Atlantica meant that the team was significantly more spread out than they would have been at Myrtlewood.[33]

Before embarking on the trip, players on the team were given a set of "Rules and Regulations Governing Participation in Williamsport Area School District

---

[27]  *Id.* ¶ 24.
[28]  *Id.* ¶¶ 25-28; *see* Doc. 167 ¶ 83 (stating rooms were on 1st, 4th, 5th, 7th, 8th, 10th, 12th, and 13th floors).
[29]  *See* Doc. 167-23 (Atlantica Resort Guest Folios) (listing date of travelers check as "02/28/18")
[30]  Doc. 158 ¶ 27.
[31]  Doc. 167 ¶ 27.
[32]  Doc. 158-17 at 3.
[33]  Doc. 158 ¶¶ 29-31. Doe's denials of some of these paragraphs lack adequate support.

Athletics" (the "Code of Conduct").[34] That document had to be signed and returned by players and their parents,[35] and establishes that "[a]ll Williamsport Area School District coaches are responsible for the behavior, safety, and welfare of the members of their teams during practice and games and during transportation of teams to and from away games. Players must be supervised at all times when under a coach's purview," and, further, that "[a]t athletic contests, in the absence of a principal or athletic director, the coach is the acting authority on behalf of the school district."[36]

The Code of Conduct provides, in relevant part, that "use of obscene or profane language or gestures is not permitted . . . and will be dealt with according to PIAA regulations and school district policy,"[37] that "smoking, drinking of alcohol or the illegal use of controlled substances is strictly forbidden and will be dealt with according to the school district's policy in these matters just as if the infraction had occurred in school,"[38] that "athletes" "shall not use or possess illegal alcohol, tobacco products or controlled substances," and "shall not indecently expose themselves at any time during their affiliation with a district athletic team."[39]

---

[34]  *Id.* ¶ 33; Doc. 158-19 (Athletics Code of Conduct). Doe meritlessly disputes this evidence, denying that "the general code of conduct was in effect in 2018." Doc. 167 ¶ 33. The Code of Conduct is dated 11/14/17—a logical date for the 2017-2018 school year—and testimony establishes that this document is the relevant Code of Conduct. *See* Doc. 158-6 (Miller Dep. vol. I) at 75:11-76:14. Doe conflates the availability of WASD's handbook with the veracity of this document, which he fails to adequately dispute. Doc. 167 ¶ 33.

[35]  Doc. 158 ¶ 36.

[36]  Doc. 158-19.

[37]  *Id.*

[38]  *Id.*

[39]  *Id.*

Violation of these rules could result in "suspension" or "elimination" from the team, "forfeiture of awards and banquet/ceremony attendance privileges," "banishment from any further interscholastic competition," or "other appropriate disciplinary action, to include suspension from school, or in the extreme, a request for expulsion from the district."[40] Before the season began, WASD Athletic Director Sean McCann met with the coaches to discuss these rules and their supervisory duties.[41]

Ryan Miller was the Millionaires' head coach. Doe notes that, before he was hired, Miller was twice charged with driving under the influence ("DUI"),[42] and his second sentence included up to five years of probation, which the state court discharged at the two-and-a-half year mark at the end of 2014.[43] He was hired by WASD in approximately 2016.[44] At the time, Miller brought his prior conviction to

---

[40]   *Id.* These rules applied to the Myrtle Beach trip. Doc. 158 ¶ 60; Doc. 167 ¶ 60.

[41]   Doc. 158 ¶ 39.

[42]   Doc. 158-6 at 112:15-120:8. Although not relevant in this opinion, Doe highlights this evidence in support of a specific theory of negligence based on negligent hiring. It is worth briefly noting that it is immediately apparent that this theory would fail for lack of causation: in a negligence case, the plaintiff must establish a "causal connection between the defendant's wrongful act . . . and his injuries." *Reott v. Asia Trend, Inc.*, 55 A.3d 1088, 1103 (Pa. 2012) (citing *Hamil v. Bashline*, 392 A.2d 1280, 1284 (1978)); *Pearson v. Phila. Eagles, LLC*, 220 A.3d 1154, 1159 (Pa. Super. Ct. 2019) (quoting *Lux v. Gerald E. Ort Trucking, Inc.*, 887 A.2d 1281, 1286 (Pa. Super. Ct. 2005)). There is absolutely no evidence to show that Miller was drinking or drunk during the incident, or that his prior intoxication otherwise contributed to the incident or its aftermath in any way, Doe's initial allegations notwithstanding. *See* Doc. 92 (Second Am. Compl.) ¶ 27 (alleging "upon information and belief" that Miller was "out in Myrtle Beach" during the trip, "leaving the rest of the team alone at the hotel . . . completely unsupervised").

[43]   Doc. 158-6 at 118:1-119:18.

[44]   *Id.* at 121:2-6.

the school's attention.[45] The school approved Miller's hiring with full knowledge of the conviction.[46]

In addition to the Code of Conduct, Miller testified that he had developed a baseball-specific set of rules.[47] Under Miller's system, serious offenses like alcohol or drug use or hazing would result in immediate dismissal from the team, moderate offenses like being late to practice or missing the bus could result in missing innings or a brief suspension, and low level offenses like forgetting uniform items had a three-strike system where multiple infractions could result in punishment.[48] Players and parents also had to sign and return the team-specific code of conduct.[49]

Other than these written rules, WASD did not provide any specific training or written policies to instruct coaches on how to manage an overnight trip.[50] WASD staff generally expected that the rules set forth in the code of conduct would continue

---

[45]  *Id.* at 121:14-122:5.
[46]  Doc. 158-37 (Hiring Advice Email).
[47]  Doc. 158 ¶ 34; *see* Doc. 167 ¶ 34 (admitting fact with extensive additional commentary).
[48]  Doc. 158-6 at 36:19-41:11. Although Doe technically admits this fact, he provides extensive commentary suggesting that this testimony is unreliable or should not be believed. Doc. 167 ¶ 34. As WASD notes, Doe himself testified that he recalled the three-strikes rule, which was a part of Miller's team-specific rules but not WASD's general code of conduct, so the existence of these rules and aspects of their content are fully admitted through Doe's own testimony. Furthermore, no record evidence indicates that the rules were not as Miller described. One of Doe's attorneys has been sanctioned for taking positions contrary to his clients' testimony before. Order, *Lauchle v. United Parcel Serv.*, No. 4:22-CV-0533 (M.D. Pa. May 19, 2025), Doc. 71. This is just one of several examples in this case where counsel is very close to crossing the line again.
[49]  Doc. 158 ¶ 36.
[50]  *Id.* ¶¶ 60, 64. WASD later asserts the coaches "were properly trained," *id.* ¶ 197, but none of the testimony on which it relies clearly supports that proposition. *See, e.g.*, Doc. 158-13 (McCann Dep.) at 68:22-77:20 (describing various trainings and noting that coaches "would have done . . . nothing along the harassment line").

to apply,[51] but the day-to-day process of applying and enforcing those rules was left to the coaches and the students' own sense of responsibility.[52] Coaches were expected to supervise players at all times,[53] but WASD personnel acknowledged that truly continuous supervision was impossible given the length of the trip, so they endeavored to "provide as much chaperoning as you can."[54] Where breaches of the rules occurred, coaches were to receive reports, investigate, and "take . . . appropriate action."[55]

Before the Myrtle Beach trip, the Millionaires had a meeting to discuss the trip itinerary and "ground rules."[56] Miller specifically testified that "[t]he ground rules essentially would be the same rules, you know, for the code of conduct" along with additional considerations given the multi-day nature of the trip.[57] Both Plaintiff

---

[51] Doc. 158 ¶ 61.
[52] Doc. 158-11 (Bowers Dep.) at 89:2-90:18.
[53] Doc. 158-13 at 78:7-24.
[54] Doc. 158-11 at 89:2-11. WASD describes the level of supervision as "reasonable," Doc. 158 ¶ 62, which Doe rejects, Doc. 167 ¶ 62. Whether WASD's actions were reasonable is quite plainly the ultimate legal question. *Davis ex rel. Lashonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648 (1999) (holding that school is liable for student-on-student harassment under Title IX "only where the recipient's response to the harassment or lack thereof is *clearly unreasonable* in light of the known circumstances." (emphasis added)); *Lanni v. Pa. R.R. Co.*, 88 A.2d 887, 888 (Pa. 1952) ("Negligence is the absence or want of care which a *reasonable* man would exercise under the circumstances." (emphasis added)).
[55] Doc. 158-11 at 89:2-7.
[56] Doc. 158 ¶¶ 40-41.
[57] Doc. 158-7 (Miller Dep. vol. II) at 27:14-28:3. Plaintiff complains that this information as given as "part of a long rambling answer." Doc. 167 ¶ 40. Miller gave that answer in response to the question: "What, if anything, for the trip, were you involved in or in charge of, I should say, at least as the head coach, of organizing?" Doc. 158-7 at 26:24-27:1. It is neither the Court's nor Defendant's fault that this question invited a discursive response. Plaintiff's counsel had the responsibility to ask more specific questions or at the very least follow up to clarify key points if they did not want to respond to lengthy answers. Failure to competently depose a witness is not a ground for rejecting that witness's unrebutted testimony.

13

John Doe[58] and B.M.,[59] the alleged assailant, attended this meeting. More generally, although players could not recall receiving as student handbook with WASD's school rules, several could recall attending anti-bullying assemblies.[60]

WASD had no reports of student-on-student abuse occurring on team trips before 2018.[61] Miller did not recall any discipline issues either with players or other coaches, physical incidents, indecent exposure, or any other inappropriate conduct.[62] Although Doe admits that there is no evidence in the record to suggest that there was a history of relevant misconduct on the Myrtle Beach (or any other) trip,[63] he denies WASD's statement that it "had no prior reports of student-on-student abuse during such trips."[64] Doe's denial is not supported by any record citation; instead, he states

---

[58]    Doc. 158-1 (Doe Dep.) at 68:15-70:10. Plaintiff "denie[s] that the team meeting had anything to do with Myrtle Beach or occurred just prior to the Myrtle Beach trip." Doc. 167 ¶ 41. Plaintiff's own testimony establishes that at the meeting they discussed "[w]hat to expect out of the season *along with the trip to Myrtle Beach*." Doc. 158-1 at 69:1-3; *see id.* at 69:24-70:10 ("[T]hat meeting did discuss a little bit about the trip."); *id.* at 172:18-173:13 (agreeing that start-of-season meeting included "a little about the Myrtle Trip, not great details but what to expect"). Moreover, documentary evidence indicates that this meeting occurred on March 7, 2018, Doc. 158-20 (Meeting Email), just over two weeks before the trip. Plaintiff's speculative denial is thus clearly refuted by the record and his own testimony. The fact is deemed admitted. Fed. R. Civ. P. 56(e)(2).

[59]    Doc. 158-3 (B.M. Dep.) at 127:20-128:3 ("Q. Prior to going on the trip, you—I believe you told Greg you believe there was some sort of meeting with the coaches about what the trip entailed and the logistics of the trip; right? A. Yeah."); *see id.* at 115:3-7. Plaintiff again denies this point, Doc. 167 ¶ 42, but B.M.'s testimony clearly establishes that he recalls a pre-trip meeting at which Myrtle Beach was discussed. Because Plaintiff does not point to contradictory evidence, I deem admitted that B.M. was at the meeting. Fed. R. Civ. P. 56(e)(2).

[60]    Doc. 158 ¶¶ 166-67; *see* Doc. 167 ¶¶ 166-67 (denying implication of specific rules or handbook but admitting assemblies).

[61]    Doc. 158 ¶ 43.

[62]    *Id.* ¶¶ 45-48.

[63]    *See* Doc. 167 ¶¶ 44-48.

[64]    Doc. 158 ¶ 43; Doc. 167 ¶ 43.

that he "is without information sufficient to form a belief or [sic] truth or falsity of averments contained in Paragraph 43" and complains that "Defendant [was] not . . . forthcoming in providing discovery."[65] That response is unacceptable on a motion for summary judgment.[66] As Doe's counsel has been explicitly and unambiguously informed:

> While this may be an appropriate response prior to the close of discovery, it is not at this late stage in the litigation. Summary judgment is the time for facts and evidence. [Plaintiff] cannot survive a motion for summary judgment because discovery failed to produce evidence sufficient for [him] to form a belief as to material facts regarding [his] claims or [WASD's] defenses.[67]

Doe's deficient response does not create a genuine dispute of fact. I therefore deem admitted that WASD had no record of prior incidents of student-on-student harassment on the Myrtle Beach or similar trips.[68]

---

[65]  Doc. 167 ¶ 43.

[66]  *Fireman's Ins. Co. of Newark, N.J. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982) ("Once the moving party has supplied sufficient affidavits in support of its motion, the opposing party must respond by supplementing the record in some manner—whether by its own affidavits or otherwise—setting forth specific facts demonstrating that there is a genuinely disputed factual issue for trial."); *Whitehurst v. 230 Fifth, Inc.*, 998 F. Supp. 2d 233, 248 (S.D.N.Y. 2014); *Bleistine v. Diocese of Trenton*, 914 F. Supp. 2d 628, 636-37 (D.N.J. 2012); *Stepheny v. Brooklyn Hebrew Sch. for Special Child.*, 356 F. Supp. 2d 248, 255 n.4 (E.D.N.Y. 2005) ("Parties are . . . prohibited from attempting to raise a material issue of fact by denying statements which the moving party contends are undisputed for lack of 'knowledge and information' because discovery allows the party opposing summary judgment to obtain the facts necessary to determine whether it must admit or deny them.").

[67]  *Lauchle v. United Parcel Serv.*, No. 4:22-CV-0533, 2024 WL 643293, at *4 (M.D. Pa. Feb. 15, 2024). Complaints about discovery should be addressed in discovery motions or a properly supported Fed. R. Civ. P. 56(d) affidavit.

[68]  Fed. R. Civ. P. 56(e)(2).

More specifically, Doe and B.M. did not have a history of conflict.[69] Indeed, "[e]veryone" on the team "got along with [Doe]."[70] It is worth noting that, at the time, both Doe and B.M. were freshman and the season had just begun.[71] B.M. had some record of minor misconduct while on the team which resulted in reprimands from the Junior Varsity Coach, Tariq Moore, although it is not clear when these incidents occurred.[72]

Coaches decided on the players' room assignments ahead of time.[73] The record reflects that there was no specific formula that went into these selections. Miller testified that he considered players' friendships, seniority, and efforts to establish team bonds, as well as avoiding conflicts between players who "don't like each other," and made sure that each room had a player "that's going to be responsible enough to . . . adhere to the rules and make sure that . . . you can confidently say that things are going to go okay."[74] The responsible players were assigned as room "leaders," and were placed on a text chain with the coaches to

---

[69]   Doc. 158 ¶¶ 49-50.
[70]   *Id.* ¶ 49.
[71]   *See* Doc. 158-7 at 24:15-22 (B.M. was a freshman in 2018); Doc. 158-1 at 155:4-6 (Doe was a freshman in "'17/'18").
[72]   Doc. 158 ¶ 52; *see* Doc. 158-7 at 17:23-19:9. Although the parties discuss B.M.'s behavioral issues at some length, the evidence of specific conduct all postdates the Myrtle Beach incident. *See* Doc. 158 ¶¶ 52-55; Doc. 167 ¶¶ 52-55 (noting that incident involving inappropriate comments and a rude gesture toward a girl at an away game occurred several weeks after the Myrtle Beach trip). Doe does not contend that B.M. continued to act improperly toward him after the Myrtle Beach trip, so B.M.'s post-trip conduct is entirely irrelevant to this matter.
[73]   Doc. 158 ¶¶ 56-57; *see* Doc. 158-7 at 44:13-19.
[74]   Doc. 158-7 at 46:18-49:21.

communicate about tournament logistics and daily schedules.[75] John Doe was in a room with N.M., J.Z., and B.M.-2 (not the assailant).[76]

## 2.   During the Trip

Once the team arrived in Myrtle Beach on March 24, 2018,[77] they began a relatively straightforward daily schedule of eating as a team, practicing, playing games, and sleeping, with a few extra team activities peppered in when time allowed.[78] Between the team events, players, including Doe, would spend time in each other's rooms.[79] They could also use the hotel facilities like the pool and hot tub, or visit the beach.[80] While the coaches were generally present at the hotel, they did not constantly supervise all players.[81]

---

[75]   Doc. 158 ¶ 58; Doc. 158-7 at 31:11-33:8.

[76]   Doc. 158 ¶ 59 & n.2.

[77]   Doc. 158-21 (Itinerary).

[78]   Doc. 158-9 (Moore Dep.) at 104:3-105:18. Plaintiff denies the truth of this statement because it is too "general" and "not necessarily based on the year 2018." Doc. 167 ¶ 67. The questions that led to this answer were: "Q. So like, tell me—walk me through a little bit, and if we can be specific to 2018, great—A. Uh-huh. Q.—but like how did—how did these trips usually go? You're there for like a week. Right? A. Yes, sir. We—Q. So walk me through like what is [sic] the tournament entail? You know, what does the team do when they're not actually on the field and stuff like that?" Doc. 158-9 at 103:22-104:5. Plaintiff's counsel clearly intended that the answer pertain to 2018 specifically. And Moore noted that he was talking about 2018 in his answer: "When we get there, we check into the hotel or wherever we at. We have villas or a hotel. The year of 2018, we was at a hotel. We wasn't at villas." *Id.* at 104:9-12. Thus, there is no doubt that Moore's statement applied to 2018. Moreover, Plaintiff points to no contradictory testimony or evidence showing that this was not the daily schedule. *See also* Doc. 158-21. This fact is deemed admitted. Fed. R. Civ. P. 56(e)(2).

[79]   Doc. 158 ¶¶ 71-72.

[80]   *See* Doc. 158-1 at 77:9-78:5.

[81]   *Id.*; *see* Doc. 158-7 at 75:12-77:2; Doc. 158 ¶ 86 (noting that coaches did not stay in the rooms with the players at all times). Whether constant supervision was necessary goes to reasonableness and is therefore a legal issue. *See id.* (disputing necessity and effectiveness of constant supervision).

At night, the coaches imposed a curfew sometime between 9:00 and 11:00 p.m. and performed room checks to make sure that players were in the rooms before curfew.[82] After curfew, the coaches did not continue to check in on the players throughout the night,[83] thus, there was nothing preventing players from leaving their rooms after curfew other than the threat of punishment if they were caught.[84] Nevertheless, there is no evidence that any players left their rooms after curfew.[85]

At some point during the week of the trip, B.M. put his bare penis and buttocks in the vicinity of Doe's face and mouth while J.Z. recorded video on his cell phone.[86] The incident occurred in Doe's hotel room,[87] and no adults were present at the time.[88] Doe testified that he was asleep when B.M. exposed his penis,[89] but that he woke up immediately after B.M. contacted him with his buttocks.[90] The two contacts were

---

[82]    Doc. 158 ¶¶ 73-74, 76.

[83]    *Id.* ¶ 82.

[84]    *Id.* ¶¶ 84-85. Plaintiff denies that the threat of punishment was effective because he contends that punishments were not enforced. Doc. 167 ¶ 85. That is a legal issue.

[85]    Doc. 158 ¶¶ 80-81.

[86]    *Id.* ¶¶ 87-88, 91-93; Doc. 158-16 (Video); *see* Doc. 158-4 (J.Z. Dep.) at 42:12-16.

[87]    Doc. 158-1 at 91:18-92:2.

[88]    Doc. 158 ¶ 89.

[89]    Doc. 158-1 at 91:24-92:11 ("Q. Can you tell me what you recall happening when B.M. came to your hotel room on one night during the trip? A. I don't know what time it was at, but I was sleep [sic]."); *id.* at 93:11-13 ("Q. You were asleep at the time? A. Yes. That first instance I was asleep."); *id.* at 174:1-6; *id.* at 177:12-21 ("Q. The incident itself, you were asleep, and I believe you stated you did not wake up after what you allege occurred, which was that B. put his genitals, you said, on your lips, right? A. I said in my—well, in between my lips, like in my mouth. Q. Okay. You did not wake up when that happened, correct? A. I did not."); *id.* at 182:18-183:3 (agreeing that he didn't wake up after the "first incident"); *see* Doc. 158-4 at 40:14-41:1 (J.Z. stating that "[John Doe] was sleeping and they started. He, B. started doing things. Like his butt—buttock in his face and his genitals."); *id.* at 42:17-21.

[90]    Doc. 158-1 at 93:21-94:11 (noting that a second instance of contact in which B.M.'s "butt . . . just kind of like brushed on [Doe's] face" woke him up); *see id.* at 95:3-12 ("Q. You said B. pulled his pants down, put his bare buttocks on your face. That woke you up, right? A. Yes. Q.

recorded in separate videos; only the first video is in the record, while the second

has never been located.[91]

The specific details of this incident are not clear. Because Doe was asleep, he

"[d]idn't know what was going on" and only learned "what actually happened" when

he saw the video.[92] Doe testified repeatedly that B.M. "put his penis in between my

lips,"[93] but his testimony clearly demonstrates that that assertion is based on what he

saw on the video and not his own affirmative recollection.[94] Neither of the other

witnesses who were deposed corroborated Doe's account.[95] Thus, Doe's evidence

reduces down to the video.[96] The Court has reviewed the video in detail, and finds

that it does not contain material that provides affirmative support for Doe's specific

---

What happened after that, after you woke up? A. After I woke up, I was in a deep sleep, and then I just felt something hit me. So, I kind of just sat up real fast. I didn't understand what was going on."); *id.* at 177:22-178:20 (agreeing that he did not wake up during the supposed penis contact but was awoken after the buttocks contact). Doe denies this point, but does not clarify what he is denying, instead questioning WASD's definition of the term "incident." *See* Doc. 167 ¶ 95. The Court's factual recitation should be sufficient to clear up any ambiguity: it is clear from Doe's own testimony when he was asleep and when he woke up.

[91] Doc. 158 ¶ 99 (noting different videos of the two contacts); *see* Doc. 167 ¶ 106 (describing different videos of the two incidents).

[92] Doc. 158-1 at 95:7-98:2; *id.* at 235:15-24 ("Q. It's what you said today, you didn't know—this says had a penis on his face—but either way you didn't know anything until they showed you the video, right? A. Correct."); *id.* at 93:2-13; *id.* at 98:3-99:11 (describing seeing the videos and reacting).

[93] *Id.* at 92:6-8, 93:3-8; *id.* at 177:12-18 ("[I]n between my lips, like in my mouth.").

[94] *Id.* at 235:15-24, 93:2-13; *see id.* at 95:7-99:11, 192:1-5.

[95] Doc. 158-4 at 42:21-43:2; *see id.* at 43:3-5 ("Q. Is it possible that he put his genitals on his face? A. Maybe. I don't remember."); *id.* at 67:21-68:20; Doc. 158 ¶¶ 102-03; Doc. 167 ¶¶ 102-03 (admitting the content of B.M.'s testimony but "specifically den[ying] that that is the truth"). The Court does not take B.M.'s testimony as true, but merely notes that it does not provide an independent evidentiary basis for Doe's version of events.

[96] Doc. 158-16.

account of the incident, for reasons I explain at length below.[97] While the Court cannot say what actually happened that night, the evidence in the record is insufficient for a reasonable jury to find by a preponderance of the evidence that B.M.'s genitals touched Doe's face or mouth.

When Doe woke up, he "was just confused as to what was going on."[98] He "sat up real fast" and saw B.M. on the ground and J.Z. recording with his phone.[99] The other players in the room "left laughing," while he remained in the living room area alone for the rest of the night.[100] At some point during the trip, J.Z. showed Doe the videos from that night and acted as if it had all been a joke.[101] Other players also commented on and laughed about the incident while in Myrtle Beach.[102]

Doe asserts that other misbehavior occurred during the Myrtle Beach trip. Another WASD student, B.R., testified that he saw several additional videos that were recorded on the trip: "one . . . involved a remote being—forcefully trying to be shoved up the victim's rectum. The two other ones kids were flashing genitalia, slapping them on other kids' faces while they're trying to sleep. And the other one,

---

[97]   *See infra* at 60-64.
[98]   Doc. 158-1 at 192:1-5; *id.* at 95:11-12.
[99]   *Id.* at 95:7-97:8.
[100]  *Id.* at 192:1-193:18.
[101]  *Id.* at 97:13-100:12; *see id.* at 101:23-102:11.
[102]  *Id.* at 100:23-101:18.

just kids running around the hotel room naked."[103] None of these videos has ever been recovered, and no witnesses provided a firsthand account of these events.

Another player on the trip was disciplined for purchasing illicit drugs.[104] Volunteer Coach Nick Caringi, whose son on the team, was approached by another parent who reported that a player had marijuana.[105] Caringi immediately informed Miller,[106] and Miller brought in Brandon Pardoe, a principal at WASD who was on the trip to watch his son play.[107] Although he was on the trip for vacation, he shifted into his administrator role "to assist in this particular thing."[108] Miller told Pardoe that drug possession was "an immediate dismissal from [the] team based on [the] code of conduct and [Pardoe] agreed."[109] Pardoe then discussed the issue with the player and his father, explained the consequence that was being imposed, and advised them that the player would not be permitted to stay with the team for the rest of the trip or play in any games.[110] Upon returning to Williamsport, Pardoe referred the student to the "Student Assistant Program" as provided in the school's code of

---

[103] Doc. 167-14 (B.R. Dep.) at 13:4-11; *see* Doc. 158-1 at 102:12-103:9, 104:17-22 (recalling hearing about the remote incident); *but see* Doc. 158-4 at 59:2-61:13 (J.Z. not recalling these events or videos); *id.* at 63:12-64:6 (same).

[104] Doc. 160-2 (Pardoe Dep.) at 50:17-51:9; *see* Doc. 158-1 at 188:16-190:8.

[105] Doc. 160-1 (Caringi Dep.) at 28:9-35:1; Doc. 160-2 at 52:3-7.

[106] Doc. 160-2 at 28:16-29:7; Doc. 158-6 at 57:20-65:23.

[107] Doc. 158-6 at 58:7-63:13. It is worth nothing that Miller's phone calls to volunteer coach Randy Zangara, which Doe initially implied were evidence that "employees were aware of Plaintiff's assault almost immediately," Doc. 92 ¶ 35, actually related to this incident. Doc. 158-6 at 64:22-65:23.

[108] Doc. 160-2 at 50:11-51:9.

[109] Doc. 158-6 at 62:7-20.

[110] *Id.* at 62:16-63:13; Doc. 160-2 at 56:21-58:2.

conduct, but did not report the issue to law enforcement.[111] Although the code of conduct required the discovery of controlled substances to be reported to law enforcement, Pardoe testified that he felt a report was not warranted because he never found the actual drugs and the student and his father were cooperating with WASD's disciplinary process.[112]

Doe did not report B.M.'s conduct to the coaches while on the Myrtle Beach trip.[113] None of the other players deposed in this matter told any of the coaches either.[114] Coach Miller testified that he did not learn about the incident while he was in Myrtle Beach, or even while he was a coach.[115] The other coaches deposed in the matter similarly testified that they did not hear anything about the incident while in Myrtle Beach.[116] Pardoe, McCann, and Dr. Timothy Bowers, WASD's

---

[111] Doc. 160-2 at 59:3-60:8.

[112] *Id.* at 60:4-62:16; *see id.* at 64:9-66:24.

[113] Doc. 158 ¶ 119; *see* Doc. 158-1 at 187:11-188:1; *see id.* at 184:20-185:1; Doc. 158-34 (Doe Interrogatory Responses) at 2 (stating that there were no communications between Doe and "any employee, volunteer, student, or parent of a student enrolled in Defendant WASD about the Incident").

[114] Doc. 158-4 at 54:19-55:5 ("Q. Did you ever talk—while you were in Myrtle Beach, did you ever talk to any of the coaches or chaperones about what happened? A. I did not."); Doc. 158 ¶¶ 128-30; Doc. 158-3 at 174:17-174:21 (B.M. stating that "[t]he only time I ever got talking about it was when I went in with Brandon and George and my parents"); Doc. 158-5 (N.M. Dep.) at 129:14-130:4; *see id.* at 78:19-79:9 (denying that there was any meeting about the incident while the team was in Myrtle Beach).

[115] Doc. 158 ¶ 121; *see* Doc. 167 ¶ 121 (admitting that "Coach Miller testified that he did not know about the incident while he was in Myrtle Beach" but "den[ying] that that is the truth."). Miller resigned later that spring due to an unrelated incident.

[116] Doc. 158 ¶¶ 125-26, 131; Doc. 160-1 at 103:17-20 (no knowledge of incident while in Myrtle Beach); *id.* at 107:20:23; Doc. 158-9 at 119:3-120:8.

superintendent, also testified that they were not aware of any reports made while the team was in Myrtle Beach.[117]

### 3. WASD's Knowledge and Response

Approximately a month after the trip, J.Z., who had recorded the video, approached Corey Burkholder, a trusted baseball coach from a non-school league, to report the incident.[118] It is not clear how far the video traveled in the interim. J.Z. at least showed Doe,[119] but testified that he did not show the video to anyone else, post it online, or otherwise share it until he reported the incident to Burkholder.[120] But at least one student testified that he saw videos taken on the Myrtle Beach trip in the lunchroom at WASD, and believes that they were on J.Z.'s phone.[121] The Court accepts for the purposes of summary judgment that the video was at least shown to other students beyond Doe and J.Z. In any event, J.Z. sent the video to Burkholder and then deleted it.[122]

---

[117] Doc. 160-2 at 95:14-96:7; Doc. 158-13 at 115:15-116:7 ("Q. When did you personally become aware that something had occurred between them on the Myrtle Beach trip? A. It was toward the end of May when Detective Weber showed me that video."); *id.* at 150:5-156:4 (discussing information WASD had and reports).

[118] Doc. 158-4 at 206:24-207:16; *id.* at 221:8-222:2 (four or six weeks later); *see also* Doc. 158-29 (Pardoe Notes).

[119] Doc. 158 ¶ 99.

[120] *Id.* ¶¶ 113-14.

[121] Doc. 167 ¶ 112; Doc. 167-14 at 13:4-14:6; *see* Doc. 158-29 (McCann Interview Notes) ("Shared with others on the team—video."); Doc. 167 ¶ 173 (noting that name-calling by students who were not on the trip "is clear evidence that the videos of his sexual assault were being passed around the school").

[122] Doc. 158 ¶ 115; *see* Doc. 158-29 ("Sent to Corey Burkholder (asked for it) Deleted Video").

Burkholder worked for Children and Youth Services ("CYS"), and apparently submitted the video along with a ChildLine report about the incident.[123] CYS then sent the report and video to William Weber, who was Lycoming County's Chief Detective,[124] sometime in May.[125]

On May 21, 2018, Weber contacted Pardoe about the ChildLine report.[126] Doe's mother called the school the same day and asked them to check on Doe, but she declined to explain why other than to say it involved the baseball team.[127] A few days later,[128] Weber came to WASD and showed Pardoe, McCann, and Roger Freed (who was the ninth grade principal) the video.[129] It does not appear that he ever provided WASD with the actual ChildLine report.[130] Weber then set up a time for himself, Doe, Doe's mother, and the school administrators to meet.[131] In the meantime, Pardoe began the school's own investigation into the incident.[132] WASD's policy in instances of indecent exposure was for a principal to investigate and handle violations on a case-by-case basis.[133]

---

[123] *See* Doc. 158-4 at 151:23-25.
[124] Doc. 158 ¶ 13.
[125] Doc. 158-14 (Weber Dep.) at 26:25-27:14.
[126] Doc. 158 ¶ 135.
[127] *See* Doc. 158-22 (Freed Interview Notes) (noting call from Doe's mother on "5/21/2018").
[128] *See* Doc. 160-2 at 103:5-13; *see* Doc. 158-23 at 1 (recording meeting on May 24, 2018).
[129] Doc. 158 ¶ 137.
[130] *Id.* ¶ 143; *see id.* ¶ 142.
[131] *Id.* ¶ 138.
[132] *Id.* ¶ 139
[133] *Id.* ¶¶ 140-41.

Pardoe, Weber, Freed, and McCann met with Doe and his mother on May 30, 2018.[134] At the meeting, Doe and his mother expressed concern about the video being spread around the student body.[135] Pardoe, McCann, and Weber all recall that Doe downplayed the incident in these interviews, and testified that Doe described it as a "prank," or "play[ing]," "messing," or "funning" around.[136] Doe testified that he never made those statements and denied downplaying the incident.[137]

By May 31, 2018, B.M. had apparently learned that the incident was under investigation. That day, his attorney, George F. Lepley, sent a letter to Pardoe and McCann titled "Re: Misconduct Myrtle Beach," in which he acknowledged that B.M.'s conduct was "inappropriate," but expressed an intent to pursue criminal or civil liability against "any and all individuals who forwarded [the] videos and engaged similar [sic] conduct," with the "ultimate goal [of] mak[ing] sure that one person is not singled out for conduct committed by a substantial number of team members."[138] Lepley requested to be present at any meeting between the school and B.M. and his parents.[139]

---

[134] *Id.* ¶ 144.
[135] *Id.* ¶ 145.
[136] *Id.* ¶¶ 154-55. For completeness, I note that these witnesses' testimony about Doe's statements does not involve hearsay. Fed. R. Evid. 801(c)(2) (statement is hearsay if it is offered to prove the truth of the matter asserted); *id.* (d)(2)(A) (statement of party opponent is not hearsay).
[137] Doc. 167 ¶¶ 154-55.
[138] Doc. 167-32 (Lepley Letter).
[139] *Id.*

Pardoe, Bowers, and McCann met with B.M., his parents, and Lepley, on June 5, 2018.[140] Weber was not present at this meeting, nor did he ever interview B.M., because Lepley advised him not to do so.[141] At that meeting, B.M. admitted to his conduct as it appeared in the video.[142] B.M. has always maintained that his penis did not touch Doe's face.[143]

School administrators also questioned J.Z.[144] J.Z. admitted that he had possessed the video and that he showed it to Burkholder, but denied recording it.[145] By that point, J.Z. had deleted the video from his phone.[146] Pardoe advised J.Z. not to tell anyone about the video and incident "in order to stop any rumors and possible posting,"[147] and advised J.Z. and potentially others involved to delete the video.[148] He testified that he did so "to mitigate the spreading of it," and acknowledged that, at that point, "law enforcement already had the video."[149] Weber approved this

---

[140] Doc. 158-23 (Pardoe Interview Notes); *see* Doc. 158 ¶ 146.

[141] Doc. 158-14 at 70:24-72:23.

[142] Doc. 158 ¶ 146.

[143] *See id.*; Doc. 167 ¶ 146 (questioning truth of testimony by noting that B.M. gave lengthy false testimony before being confronted with the video).

[144] Doc. 158 ¶¶ 147-48. Doe's roommate N.M. was also questioned but does not appear to have provided any relevant information. *Id.*

[145] *Id.* ¶ 148; Doc. 158-23.

[146] Doc. 158 ¶ 149. Doe denies "that J.Z. had deleted the video by that time" but cites no contrary evidence, so the Court deems the fact admitted. Fed. R. Civ. P. 56(e)(2). In any event, Doe admitted that "J.Z. deleted the video after he sent it to Corey Burkholder." Doc. 158 ¶ 115; Doc. 167 ¶ 115. Doe also appears to conflate the video in the record with the unrecovered second video depicting B.M. jumping on Doe, *see* Doc. 167 ¶ 149, but it is clear that WASD's statement refers to the video in the record.

[147] Doc. 158 ¶ 150; *see* Doc. 167 ¶ 150.

[148] Doc. 158 ¶ 151; *see* Doc. 167 ¶ 151.

[149] Doc. 160-2 at 208:8-209:11.

course of action because he "had a copy of the video" and "did not want the videos, and neither did the school district, floating around the school, so immediately get rid of them."[150]

After interviewing Doe, B.M., J.Z., and several other students, Pardoe concluded that, although B.M.'s actions were "inappropriate," the incident had not involved sexual harassment,[151] or that it was at least uncertain whether the conduct constituted hazing or harassment.[152] Pardoe's conclusion about sexual harassment was based on the context of the incident, including the actions at "the beginning and the end of that video and how [Doe] was made aware of it," and the statements given in the interviews that provided no evidence that B.M. acted for sexual gratification.[153] Pardoe did not find evidence of other, similar incidents on the Myrtle Beach trip during his investigation.[154] Ultimately, Pardoe concluded that the incident "did not appear to meet [the] threshold" for Title IX reporting.[155]

---

[150] Doc. 158-14 at 54:23-55:15.

[151] Doc. 158 ¶ 153; *see* Doc. 160-2 at 152:1-153:15.

[152] Doc. 158 ¶¶ 155-56. Doe denies this but merely restates Pardoe's testimony without explanation. I have stated the essence of the testimony here.

[153] *Id.* ¶ 157; *see* Doc. 160-2 at 146:10-15. Doe denies this point because he does not understand "the use of the word 'contextually.'" Doc. 167 ¶ 157. I have no problem understanding that "contextually" means the "setting or environment" of the incident. *Context*, Black's Law Dictionary (11th ed.); *Context*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/context ("The situation in which something happens").

[154] Doc. 158 ¶ 152. Doe denies "that Dr. Pardoe did not discover evidence of other students exposing genitalia or running naked in Myrtle Beach," but cites to deposition testimony from the mother of a player in which she stated that her son told her that B.M. had been "parading around naked." Doc. 167 ¶ 152 (citing Doc. 167-15 (Morrone Dep.) at 22:10-25, 23:3-5). Not only is this testimony hearsay, Fed. R. Evid. 801(c), it also has nothing to do with what Pardoe knew. The fact is deemed admitted. Fed. R. Civ. P. 56(e)(2).

[155] Doc. 158 ¶ 158.

Pardoe and McCann imposed discipline on B.M. and J.Z. for their involvement in the incident.[156] They suspended both players from the team indefinitely,[157] but that suspension ultimately lasted only two games because the season ended shortly thereafter.[158] B.M. was required to complete an online hazing/bullying program before he could participate in sports again.[159]

### 4.    Aftermath

After the trip, several students at the school called Doe "dick lips."[160] Doe testified that it was about "five or six" "random kids," none of whom were on the baseball team.[161] The name calling lasted for "a couple-week span" but "it kind of died down" before the end of the school year.[162] Doe testified that this conduct was "hurtful," left him feeling "embarrassed," and was, in his mind, "bull[ying]."[163] Doe did not report the name calling to staff at WASD.[164] Nor did he tell any of the

---

[156] *Id.* ¶¶ 160-61, 163.

[157] *Id.* ¶¶ 160-61.

[158] *See infra* at 50-55. This discussion resolves Doe's objections to these paragraphs.

[159] Doc. 158 ¶ 162. WASD states that J.Z. also had to complete this course, but the evidence it cites only clearly shows that B.M. had to complete the course. *See* Doc. 167 ¶ 162 (admitting that B.M. had to complete the course but denying the same for J.Z.).

[160] Doc. 158 ¶ 172.

[161] *Id.* ¶ 173; *see* Doc. 158-34 at 3 (stating that "approximately five to ten people called him that name").

[162] Doc. 158-1 at 115:5-17.

[163] *Id.* at 114:1-16; *id.* at 198:4-9.

[164] Doc. 158 ¶¶ 171, 182. Although he admits that he did not report the name calling, *see* Doc. 167 ¶ 171, Doe argues that WASD staff must have known about it because "many students were referring to him that way and videos of his sexual assault were being shown the cafeteria." *Id.* Evidence of what several students knew is not evidence of what administrators knew, and there is no affirmative evidence that administrators were aware of the name calling. *See* Doc. 158 ¶ 182 (McCann did not know); Doc. 167 ¶ 182 ("Admitted").

coaches.[165] While other students deposed in this matter did not recall this name calling,[166] one individual recalled that B.M. was called derogatory names based on the same incident.[167]

It does not appear that Doe received significant emotional or other support from WASD during the remainder of that school year. Administrators testified that, because they recalled Doe downplaying the incident,[168] they did not believe that counseling or other support was necessary.[169] He finished out the remainder of the school year as normal.[170] The following year, Doe requested and received a homebound education,[171] which he testified was at least partly due to the incident.[172] The year after that, Doe transferred to St. John Neumann Regional Academy,[173] where he continued to play baseball.[174] At Neumann, Doe discontinued an individualized education plan ("IEP") he had received at WASD,[175] and his grades

---

[165] Doc. 158 ¶¶ 183-84. Doe's denial of paragraph 183 does not contradict the proposition that Doe did not report that he was bullied.

[166] *Id.* ¶¶ 177-80.

[167] *Id.* ¶ 181.

[168] *See supra* at 25.

[169] Doc. 158-11 at 219:13-222:17.

[170] Doc. 158 ¶ 185.

[171] *Id.* ¶ 170.

[172] Doc. 158-1 at 128:177-130:11.

[173] Doc. 158-1 at 130:23-131:4; Doc. 158 ¶ 187.

[174] Doc. 158-1 at 215:24-216:10. WASD's statement about this issue is hearsay and does not currently appear to be admissible, so the Court will disregard it. Doc. 158 ¶ 186.

[175] Doc. 158 ¶ 188.

and baseball skills improved.[176] Doe was eventually admitted to college, where he continued to play baseball.[177]

After the incident, Doe sought out counseling. He met with two different counselors for a few sessions each.[178] He is not currently in therapy, and has not sought therapy for several years.[179]

Three years after the incident, B.M. was charged in South Carolina State Court with assault and battery in the second degree.[180] The only record evidence on the ultimate resolution of this case is B.M.'s testimony that he never pled guilty or served any sentence for this matter.[181]

### C.    Procedural History

Doe commenced this suit on September 6, 2022, bringing claims against WASD, Lycoming County, McCann, Miller, Pardoe, Weber, Freed, Fred Holland (WASD's solicitor), and up to 20 unnamed employees of WASD and Lycoming County.[182] The various defendants moved to dismiss, and the Court granted those

---

[176] Doc. 158-1 at 217:3-15; *id.* at 216:6-10.
[177] *Id.*
[178] *See* Doc. 158 ¶¶ 189-91; Doc. 158-1 at 157:4-164:13.
[179] Doc. 158 ¶ 192; Doc. 158-1 at 226:8-228:1.
[180] *See* Doc. 167-17 (Juvenile Complaint) at 2.
[181] Doc. 158-3 at 85:21-87:5. WASD included a letter from the relevant South Carolina Solicitor's Office stating that "there may be information stored by our office but protected under state law," Doc. 158-31 (Horry County Solicitor Letter), while Doe submitted the criminal complaint and a victim impact statement, Doc. 167-17 (Horry County Juvenile Complaint), but neither document indicates how the case was ultimately resolved.
[182] Doc. 1 (Compl.).

motions in part on April 27, 2023.[183] Specifically, the Court held that Doe's Title IX claims could not be asserted against individual defendants,[184] his federal civil rights claims failed because he had not pled a relevant violation of his constitutional rights,[185] and his state law claims were insufficient for a variety of reasons as to various defendants.[186] Significantly, the Court held that a number of state-employee defendants were immune from liability on Doe's negligence-based claims pursuant to the Pennsylvania Political Subdivision Tort Claims Act because Doe had not alleged sufficient facts to show that any of the exceptions to that statute applied.[187]

Doe filed his First Amended Complaint on May 11, 2023, restating many of his claims against the same defendants.[188] The defendants again filed various motions to dismiss, and, shortly thereafter, Doe voluntarily dismissed his claims against all of the individual defendants.[189] Given that significant change in the scope of the case, Doe was permitted to file a Second Amended Complaint to clarify the remaining claims and defendants.[190] WASD and Lycoming County, the two

---

[183] *Doe v. Williamsport Area Sch. Dist.*, No. 4:22-CV-1387, 2023 WL 3136409 (M.D. Pa. Apr. 27, 2023).

[184] *Id.* at *5.

[185] *Id.* at *5-7.

[186] *Id.* at *7-14.

[187] *Id.* at *12-13.

[188] Doc. 64 (First Am. Compl.).

[189] *See* Docs. 77-82 (Notices of Voluntary Dismissal).

[190] Doc. 92 (Second Am. Compl.).

enduring defendants, then filed new motions to dismiss. The Court resolved those motions on October 19, 2023, granting them in part and denying them in part.[191]

In the October decision, the Court found that Doe had plausibly alleged a Title IX claim against WASD based only on "WASD's post-assault conduct."[192] The Court considered Doe's allegations regarding WASD's pre-incident knowledge of a pattern of similar conduct on prior trips, and found them unduly speculative and, ultimately, implausible.[193] The Court also dismissed Doe's section 1983 claims, finding that Doe had not pled sufficient facts from which the a jury could find that his constitutional rights were violated.[194] Finally, the Court determined that Doe had alleged sufficient facts to plead an exception to the immunity bar of the Pennsylvania State Tort Claims Act,[195] but that many of his negligence claims nevertheless failed on the merits;[196] only the negligence, negligent infliction of emotional distress, and negligent failure to rescue claims against WASD survived dismissal, primarily because WASD focused its motion almost exclusively on immunity.[197]

Following that ruling, Doe declined the opportunity to amend his complaint for a third time, resulting in Lycoming County's dismissal from the case with

---

[191] *Doe v. Williamsport Area Sch. Dist.*, 699 F. Supp. 3d 306 (M.D. Pa. 2023).
[192] *Id.* at 321.
[193] *Id.* at 318-20.
[194] *Id.* at 323-27.
[195] *Id.* at 327-28.
[196] *Id.* at 328-32.
[197] *Id.* at 332.

prejudice.[198] WASD answered Doe's surviving claims,[199] and discovery ensued. Following several extensions and discovery disputes, WASD filed its motion for summary judgment on all of Doe's remaining claims on October 1, 2025.[200] The motion is fully briefed and ripe for disposition. For the following reasons, it is granted.

### D.     Analysis

Doe's claims against WASD are best divided into his federal Title IX claim and his state law negligence claims. The Court takes each in turn, and finds Doe lacks evidence from which a jury could find in his favor on any of them.

### 1.     Title IX

A student can recover damages from his publicly funded school if he is harmed by student-on-student harassment that resulted from the school's deliberate indifference to known acts of such harassment.[201] Courts in this Circuit apply a six-factor test to determine whether the school can be liable. To succeed, a plaintiff must prove that: "(1) the defendant receives federal funds; (2) sexual harassment occurred; (3) the harassment occurred under 'circumstances wherein the [school] exercised substantial control over both the harasser and the context in which the

---

[198] *See* Doc. 121 (Order) ¶ 6.
[199] Doc. 123 (Answer).
[200] Doc. 156 (Mot.).
[201] *Davis ex. rel. LaShonda D. v. Monroe Cnty. Bd of Educ.*, 526 U.S. 629 (1999); *see Doe v. Williamsport Area Sch. Dist.*, 699 F. Supp. 3d 306, 320 (M.D. Pa. 2023) (quoting *Davis*, 526 U.S. at 632).

known harassment occurred'; (4) the [school], or an 'appropriate person,' had 'actual knowledge' of the harassment; (5) the [school] was 'deliberately indifferent' to the harassment; and (6) the harassment was 'so severe, pervasive, and objectively offensive that it could be said to have deprived the victims of access to the educational opportunities or benefits provided by the school.'"[202]  The plaintiff must prove each and every element; meeting this standard is a "high bar."[203]

Here, elements (1), (2), and (3) are not substantially disputed.[204] Doe's theory intertwines elements (4) and (5): he contends that appropriate personnel at WASD learned of the incident and attendant video shortly after they were taken, such that their failure to stop circulation of the video, investigate, and take significant disciplinary action against B.M. and J.Z. amounts to deliberate indifference. But there is no evidence to support Doe's theory as to immediate knowledge, and, with that foundation removed, his position as to deliberate indifference crumbles, too. Accordingly, the Court need not address element (6). I also briefly discuss a point not raised by the parties that likely provides an additional basis for granting WASD summary judgment on the Title IX count in this matter.

---

[202] *Doe*, 699 F. Supp. 3d at 320-21 (quoting *Davis*, 526 U.S. at 643) (original alternations omitted and new alterations added); *Hall v. Millersville Univ.*, 22 F.4th 397, 408 (3d Cir. 2022) (citing *Davis*, 526 U.S. at 645-50); *see McAvoy v. Dickinson Coll.*, 115 F.4th 220, 227 (3d Cir. 2024) (quoting *Davis*, 526 U.S. at 650).

[203] *McAvoy*, 115 F.4th at 227; *Hall*, 22 F.4th at 407.

[204] *See Doe*, 699 F. Supp. 3d at 321 (noting at dismissal stage that "it is undisputed that WASD receives federal funds, and Doe was sexually assaulted"); *id.* at 321 (reasoning that WASD had "substantial control" over a school-sanctioned field trip and school). The Court briefly revisits element 2 below. *Infra* at 56-57.

### a.      Actual Knowledge

To survive summary judgment on actual knowledge, Doe must provide evidence from which a reasonable jury could conclude that "an official of the [school] with authority to take corrective action to end the discrimination," i.e., an "appropriate person," was aware of "the underlying facts, indicating sufficiently substantial danger to students, and was therefore aware of the danger."[205] The evidence available to the appropriate person must "indicat[e] a danger of future abuse" that is greater "than a mere possibility of abuse."[206] A school cannot be liable for harassment that predated its actual knowledge;[207] at that point, it can only be liable for a deficient response.[208] The Court will review each stage at which Doe offers some theory to contend that WASD had actual knowledge: (i) before the incident; (ii) while the team was in Myrtle Beach or shortly after returning; and (iii) in late May.

### i.      Pre-Incident

Some courts have approved of Title IX claims for sexual harassment that occurred after the school knew that there was an "obvious need" for preventative policies or under circumstances where such harassment was "highly predictable,"

---

[205] *Hall*, 22 F.4th at 410 (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 291 (1998) and *Bostic v. Smyrna Sch. Dist.*, 418 F.3d 355, 361 (3d Cir. 2005)); *see Does v. Se. Delco Sch. Dist.*, 272 F. Supp. 3d 656, 688 (E.D. Pa. 2017) (citing *Bostic*, 418 F.3d at 361).

[206] *B.W. v. Career Tech. Ctr. of Lackawanna Cnty.*, 422 F. Supp. 3d 859, 880-81 (M.D. Pa. 2019) (citing *Does*, 272 F. Supp. 3d at 688-89).

[207] *M.S. ex rel. Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 128-29 (3d Cir. 2020).

[208] *See McAvoy*, 115 F.4th at 233 (citing *Gebser*, 524 U.S. at 290).

even where there was not a specific reason to suspect the harasser or protect the victim.[209] Generally, such circumstances are shown with evidence establishing a history of harassment in contexts similar to the harassment at issue.[210] The Court previously reviewed Doe's allegations on this issue, and found that they were insufficient to state a claim.[211] Doe did not amend his complaint, so any claim to this effect is dead. And, in any event, he has produced no relevant evidence of a pattern of similar harassment in discovery.[212]

There is also no evidence from which a jury could conclude that WASD knew about a particular pre-incident risk of harassment by B.M., or of Doe. On the contrary, the record instead reflects that Doe was generally well-liked by his teammates before and through the incident,[213] and, as Doe points out in his own statement of facts but contravenes in his brief, B.M.'s other disciplinary issues did not arise until after the incident.[214] Moreover, B.M.'s infractions (other than the incident), though at times sexually inappropriate, were not so obviously threatening

---

[209] *Simpson v. Univ. of Colo. Boulder*, 500 F.3d 1170, 1177-79 (10th Cir. 2007); *see Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1112-13 (9th Cir. 2020).

[210] *Simpson*, 500 F.3d at 1181 (noting record evidence regarding likelihood of sexual assaults during recruiting trips); *Karasek*, 956 F.3d at 1112-13 (allegations that university system was aware of high percentage of inadequately resolved Title IX complaints).

[211] *Doe*, 699 F. Supp. 3d at 318-20.

[212] Doc. 158 ¶¶ 45-48; Doc. 167 ¶¶ 44-48; *supra* at 14-16, 27-28.

[213] Doc. 158 ¶¶ 49-50.

[214] Doc. 167 ¶¶ 52-55 (noting that specific incident occurred several weeks after Myrtle Beach trip).

as to put WASD on notice that he posed a "substantial danger" to other students.[215]

So even if all of the evidence of B.M.'s behavioral issues had pre-dated the incident,

the evidence would still be insufficient to establish actual knowledge. Finally, the

fact—if true—that WASD knew the players' rooms would be spread out does not

provide notice of a specific and impending risk of sexual harassment as opposed to

general misbehavior, which is insufficient to establish actual knowledge.[216]

Accordingly, there is no basis for holding the school liable for pre-incident

knowledge.[217]

### ii.      Myrtle Beach

Doe contends that "WASD had actual knowledge of the assault while in

Myrtle Beach."[218] In support of that position, he cites three pieces of evidence.[219]

None is sufficient to create a dispute of fact on this point, and the only evidence in

---

[215] *Bostic*, 418 F.3d at 361 (holding that knowledge of a "possibility" of violative conduct is insufficient); *M.S.*, 969 F.3d at 128-29 (citing *Bostic*, 418 F.3d at 361).

[216] *See M.S.*, 969 F.3d at 129 (citing *Bostic*, 418 F.3d at 360-61).

[217] Doe's fleeting point that WASD "knew it had hired Coach Miller in violation of 24 P.S. § 1-111," Doc. 168-1 at 4, is entirely irrelevant to whether WASD knew of a substantial danger of sexual harassment.

[218] Doc. 168-1 at 5; *see* Doc. 167 ¶¶ 116-18, 121, 124, 129, 132-34.

[219] Doe also briefly cites his own testimony in which he states that the coaches had a conversation with the team about the incident, but his statement was in response to the question: "Did anyone tell you, *whether it be on the trip or afterwards*, that the coaches had a conversation with members of the team about the assault?" Doc. 158-1 at 111:2-8. He also notes that he recalled a conversation on the trip, but that simply focused on "anything . . . anything regarding inappropriate behavior or a reminder about what to do, how to act, things like that[.]" *Id.* at 110:15-111:1. Neither of these comments supports the proposition that the coaches knew about the incident while in Myrtle Beach. As to the second, Doe himself points out that a meeting occurred regarding a teammate's drug use—a different disciplinary issue. Doc. 167 ¶ 128.

the record establishes that no WASD personnel learned of the incident during the Myrtle Beach trip or immediately thereafter.

First, and most frequently, Doe cites a note written by Chief Detective Weber during his investigation of the ChildLine report that arose from the incident, which states: "school district was aware in Myrtle Beach."[220] Weber testified that the statement came from someone that he interviewed, although he could not recall who with specificity.[221] Doe agrees that the statement "would have come from someone else."[222] The statement was made out of court and Doe seeks to use it to prove that the school did in fact know about the incident while the team was in Myrtle Beach.[223] It is therefore hearsay,[224] and the court cannot see any possible path to admissibility.[225] "Hearsay statements that would be inadmissible at trial may not be

---

[220] Doc. 167-33 (Weber Investigation Notes).

[221] Doc. 158-14 at 50:10-51:2, 51:11-17 ("Q. [W]hy did you make this note in your own handwriting? A. Because that would have come from somebody else. Q. So this is just an initial note from someone? A. Someone, correct."). Weber also immediately stated that he did not believe the statement was true. *Id.* at 51:4-7.

[222] Doc. 167 ¶ 116.

[223] *See e.g., id.* ¶ 117 ("It is specifically denied that no one reported the incident on the trip. Willie Weber's notes state, 'School District was aware in Myrtle Beach.'").

[224] Fed. R. Evid. 801(c).

[225] In fact, the statement is double or possibly triple hearsay. Weber wrote the note out of court, so he is the first declarant. His statement is arguably admissible under Fed. R. Evid. 801(d)(2)(D) as non-hearsay. But he testified that he was told this information by another, unknown person outside of court, adding a second layer of hearsay. Because there is no evidence about that declarant or the circumstances of the statement, there is no ground for applying a hearsay exception. Furthermore, the only potential person Weber identified as making the statement was neither a coach nor a player, so she likely would have had to learn that information from yet another unknown out of court source, adding a third layer of hearsay.

considered for purposes of summary judgment."[226] Thus, Weber's note cannot create a dispute of fact.

Second, Doe points to testimony from David Scicchitano (an investigator in Pennsylvania's Office of the Attorney General who investigated the incident in 2020)[227] which he claims demonstrates that Scicchitano "concluded based on his investigation that the school district knew about the sexual assault while the team was still in Myrtle Beach,"[228] and thus "corroborates" Weber's note. But that is simply not what Scicchitano said. He stated that it was his "opinion" that the administration was aware of the video "before Matt Wood made his call to Willie Weber on May 18, 2018."[229] He then confirmed that, in his "opinion," administrators knew about the video "sometime between March and May 18th."[230]

---

[226] *Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009); *Philbin v. Trans Union Corp.*, 101 F.3d 957, 961 n.1 (3d Cir. 1996) ("Philbin is unable to identify the person who relayed this information to him, and he did not include any such person as a witness in the Joint Pre-Trial Order. Thus, the hearsay statement by this unknown individual is not 'capable of being admissible at trial,' and could not be considered on a motion for summary judgment." (internal citations omitted)).

[227] *See* 158 ¶ 14.

[228] Doc. 167 ¶ 132 (citing Doc. 167-8 (Scicchitano Dep.) at 224:9-25).

[229] Doc. 167-8 at 224:9-16.

[230] *Id.* at 224:17-25. Doe also selectively cites Scicchitano's testimony "that somebody associated with Williamsport Area School District would've known about that video being passed around among the players in Myrtle Beach," *see* Doc. 167 ¶ 134 (citing Doc. 167-8 at 142:1-21), but Doe fails to include the immediately following question and answer: "Q. The only question today is, we just don't know whether that statement was made in Myrtle Beach or whether it was made in Pennsylvania? A. Right." Doc. 158-15 (Scicchitano Dep.) at 142:22-143:1.

There are at least two critical problems with Scicchitano's testimony.[231] First, it is expressly his opinion, which he formed based on his *ex post* investigation of the evidentiary record. But Doe has never offered or qualified Scicchitano as an expert witness.[232] As a lay witness, Scicchitano can only offer opinion testimony "when []he has some personal knowledge of th[e] incident."[233] Scicchitano became involved in this matter two years after the fact, and his knowledge of the events of this case is invariably second- or third-hand, so he cannot opine on these issues.[234] And even if he could offer such an opinion, he never stated with specificity when WASD gained knowledge of the incident within an approximately two-month window. Speculation cannot narrow that broad timeframe to the few days of the trip itself or the period immediately thereafter (or any other point).

Finally, Doe cites testimony that he says shows that other players knew about the incident while on the trip, with the comment that the coaches "had to have known. There is no way something like that doesn't get back to them."[235] First, N.M.'s testimony about the coaches' knowledge was not specific to the Myrtle

---

[231] A third is that essentially all of Scicchitano's testimony about the actual facts of the case is hearsay, given that he was not present for any of the relevant events.

[232] Doc. 171 (Expert Disclosure) (not listing Scicchitano); *see* Fed. R. Evid. 702.

[233] *United States v. Fulton*, 837 F.3d 281, 291 (3d Cir. 2016); Fed. R. Evid. 701(a).

[234] Fed. R. Evid. 701; *United States v. Evans*, __ F.4th __, 2026 WL 1393261, at *5 (3d Cir. 2026) ("Rule 701's first requirement, . . . [is] that the witness 'have firsthand knowledge of the factual predicates that form the basis for the opinion.'" (quoting *Gov't of V.I. v. Knight*, 989 F.2d 619, 629 (3d Cir. 1993))); *see* Fed. R. Evid. 602. If Scicchitano's opinion is based on some compelling evidence, that evidence is not in this Court's record.

[235] Doc. 168-1 at 5 (quoting Doc. 158-5 at 79:14-15).

Beach trip, and came in response to the question: "You're aware that at the very least the coaches in the school knew about it *at some point during the baseball season*, right?"[236] So, like Scicchitano's comment, it does nothing to establish a specific date for WASD's knowledge. Second, what the *players* knew cannot be attributed to the *coaches* in the absence of evidence showing that that information was shared.[237] And, third, testimony about what the coaches "had to have known," without any direct or circumstantial evidence of particularized knowledge, is entirely speculative and conclusory and cannot create a genuine dispute of fact.[238] Moreover, to the extent that rumors, comments, or jokes about the incident were exchanged by players within earshot of coaches,[239] that kind of loose talk, unaccompanied by specific reports, is "insufficient to establish actual notice under Title IX, even assuming that [the school] was aware of [them]."[240]

In contrast to Doe's protestations, not a single witness deposed in this case testified that the coaches had knowledge of the incident while in Myrtle Beach or shortly thereafter. All of the players, including Doe, testified that they did not report

---

[236] Doc. 158-5 at 79:10-13.

[237] Also consider that the coaches may not even be "appropriate persons." *Swanger v. Warrior Run Sch. Dist.*, 346 F. Supp. 3d 689, 706 (M.D. Pa. 2018) (citing authority that teachers or "low-level administrative staff" are not appropriate persons).

[238] *See Payne v. Butts*, No. 22-2210, 2022 WL 16916347, at *1 (3d Cir. Nov. 14, 2022) (unpublished per curiam) ("A mere hypothesis about a defendant's knowledge will not suffice." (citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1207-08 (3d Cir. 1988))).

[239] That this occurred is speculation, but the point is worth refuting given the nature of Doe's position.

[240] *Swanger*, 346 F. Supp. 3d at 709 n.6 (discussing *Johnson v. Elk Lake Sch. Dist.*, 283 F.3d 138, 144 n.1 (3d Cir. 2002)).

it.[241] All of the coaches testified that they did not hear about it until late May.[242] Notably, Doe's primary circumstantial evidence of WASD's knowledge from the dismissal stage—that Pardoe "ordered the students to delete" the videos "on the night of the incident,"[243] is entirely absent from this stage of the case because it is unsupported by the record, which instead shows that Pardoe advised students to delete the video months later, in late May or early June.[244]

On this record, Doe cannot prove that WASD knew about the incident at Myrtle Beach or shortly after the trip.

### iii.    Late May

WASD agrees that "appropriate people" gained knowledge of the incident on or around May 24, 2018.[245] That timing is amply supported by the evidence. Because Doe has failed to produce evidence to show that WASD knew about the incident at an earlier time,[246] the Court accepts as true that WASD acquired actual knowledge of the incident as of late May 2018.

---

[241] *See supra* at 22-23.
[242] *Id.*
[243] *Doe*, 699 F. Supp. 3d at 321.
[244] *See supra* at 26-27.
[245] Doc. 160-2 at 103:5-13. Weber and Doe's mother both contacted school personnel on May 21, 2018, Doc. 158 ¶ 135; Doc. 158-22, but there is no evidence to suggest that either communicated the facts of the incident at that time. The difference between these dates is not significant.
[246] *See* Doc. 168-1 at 5-6 (following argument that WASD gained knowledge during Myrtle Beach trip with argument that "[a]dditional school officials gained actual knowledge in May 2018").

### b.    Deliberate Indifference

With the timing of WASD's actual knowledge of the incident established, I turn next to whether its subsequent actions constitute deliberate indifference. A school is deliberately indifferent when it makes "an official decision not to remedy the Title IX violation."[247] Of course, "schools should not be tasked with purging all peer harassment, and . . . courts should not be tasked with second-guessing the disciplinary decisions of school administrators."[248] This Court's duty is not to determine whether WASD proceeded in an ideal manner, or even a good one; instead, I must determine whether a jury could conclude from the evidence in the record that "the Title IX recipient's response '[was] clearly unreasonable in light of the known circumstances.'"[249] As noted, this is a "high bar,"[250] and the Supreme Court has expressly stated that "[i]n an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not 'clearly unreasonable' as a matter of law."[251]

The school's insufficient response must "cause students to undergo harassment or make them liable or vulnerable to it," so "harassment, or the likelihood or vulnerability of a student to be subjected to it, must occur subsequent to an

---

[247] *See McAvoy*, 115 F.4th at 233 (citing *Gebser*, 524 U.S. at 290).
[248] *See id.* at 227-28 (citing *Davis*, 526 U.S. at 648).
[249] *Id.* at 228 (citing *Hall*, 22 F.4th at 410-11).
[250] *Hall*, 22 F.4th at 407.
[251] *Davis*, 526 U.S. at 649.

official's decision not to remedy a known violation."[252] Case law establishes that a school makes a victim vulnerable to further harassment and is deliberately indifferent if it "turn[s] a blind eye" once it "has actual knowledge of sexual harassment that is severe, pervasive and objectively offensive enough to deprive a student of access to the educational benefits and resources [it] offers."[253] "Under some circumstances, a school's motivation to minimize an incident may provide evidence of deliberate indifference."[254] Moreover, a "delayed response [to a report of harassment] constitutes deliberate indifference if it prejudices the plaintiff or if the delay was a 'deliberate attempt to sabotage [the p]laintiff's complaint or its orderly resolution.'"[255]

Before considering Doe's arguments that WASD was deliberately indifferent, I review the administrators' actions after they learned of the incident. As noted above,[256] appropriate persons at WASD had actual knowledge of the incident as of late May 2018, at which point they reviewed the video. On May 30, multiple administrators met with Doe and his mother and listened to their account of the

---

[252] *Swanger*, 346 F. Supp. 3d at 705 (quoting *Davis*, 526 U.S. at 644-45); *see Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1296 (11th Cir. 2007) ("[W]e hold that a Title IX plaintiff at the motion to dismiss stage must allege that the Title IX recipient's deliberate indifference to the initial discrimination subjected the plaintiff to further discrimination.").

[253] *Farmer v. Kansas State Univ.*, 918 F.3d 1094, 1103-04 (10th Cir. 2019) (citing *Davis*, 526 U.S. at 633, 641, 650-51).

[254] *McAvoy*, 115 F.4th at 232 (citing *Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 273 (4th Cir. 2021)).

[255] *Karasek*, 956 F.3d at 1106 (quoting *Oden v. N. Marianas Coll.*, 440 F.3d 1085, 1089 (9th Cir. 2006)).

[256] *Supra* at 42.

incident and heard their concerns about the video's spread. On June 5, several of the same administrators met with B.M. and his parents and attorney and gathered his side of the story. Around the same time they also questioned J.Z. and N.M. During the investigation, Brandon Pardoe told at least some of the students to delete the video. After watching the video and interviewing the victim, perpetrator, and several witnesses, Pardoe concluded that the incident did not constitute sexual harassment requiring Title IX reporting. He nevertheless punished both B.M. and J.Z. by suspending them from the team indefinitely; the season ended two games later. Both B.M. and J.Z. were permitted to play the next season, but B.M. first had to complete an online bullying course.

Facially, WASD's response is not "clearly unreasonable."[257] Once it learned of the incident, WASD conducted an investigation and imposed disciplinary consequences. WASD administrators did not delay or ignore potential witnesses; it appears they interviewed everyone known to be present and reached a final decision within just a few weeks of learning of the incident. Courts considering similar responses have consistently held that schools were not deliberately indifferent as a matter of law.[258] That is true even where the school ultimately concluded—against

---

[257] *Davis*, 526 U.S. at 649.

[258] *McAvoy*, 115 F.4th at 228-233 (affirming summary judgment for college when it "put a no-contact directive in place, provided McAvoy with support and resources, and conducted an in-depth investigation ultimately ending with the imposition of sanctions on TS"); *Jauquet v. Green Bay Area Catholic Educ. Inc.*, 996 F.3d 802, 807-09 (7th Cir. 2021); *Karasek*, 956 F.3d at 1105-09; *Johnson v. Ne. Sch. Corp.*, 972 F.3d 905, 912-15 (7th Cir. 2020); *Sauls v. Pierce*

the victim's interpretation—that a complaint of harassment was unfounded or not as severe as initially reported.[259] In contrast, courts have determined that summary judgment is inappropriate only where a school failed to investigate an incident at all, conducted an investigation after significant delay, or declined to take additional action in the face of multiple reports of harassment.[260] That is not what happened here.

Doe nevertheless presses an undefined jumble of actions that he argues show that WASD was deliberately indifferent. Two of his points are clearly insufficient and can be dealt with quickly. First, Doe contends that WASD was deliberately indifferent when it failed to increase supervision at the Atlantica after learning of the room layout,[261] but that contention fails because the distance between the rooms was insufficient to put WASD on notice of a serious threat of *sexual harassment*, as is

---

*Cnty. Sch. Dist.*, 399 F.3d 1279, 1285-87 (11th Cir. 2005); *Davis v. DeKalb Cnty. Sch. Dist.*, 233 F.3d 1367, 1373-75 (11th Cir. 2000).

[259] *See Davis*, 233 F.3d at 1375.

[260] *See Hall*, 22 F.4th at 411 (finding genuine dispute of fact when school administrators did not escalate report, contact victim, or respond to additional corroborating reports); *Fairfax Cnty.*, 1 F.4th at 271-73 (reasoning that jury could find deliberate indifference when administrators learned about incident at beginning of field trip but did not address it during the five-day trip, asked victim pointed questions during interview, made jokes about incident, did not interview several potential witnesses, and imposed no discipline); *Doe v. Sch. Dist. of Broward Cnty., Fla.*, 604 F.3d 1248, 1260-62 (11th Cir. 2010) (reasoning that lackluster investigation of first complaint likely was not deliberate indifference but that failure to more stringently investigate after subsequent complaint created genuine dispute of fact); *Williams*, 477 F.3d at 1296 (unexplained delay of more than eight months before imposition of punishment established issue of fact on deliberate indifference).

[261] Doc. 168-1 at 6.

necessary for a Title IX claim.[262] And second, Doe complains that "Weber 'put Pardoe in charge of investigating the Child Line Report,'" and did not himself interview the parties involved, which resulted in a "sham investigation."[263] But nothing in the record indicates that Weber was an employee or agent of WASD, so, as WASD points out,[264] it cannot be liable for the shortcomings in his investigation, whatever they may have been.

Doe also points to three potentially cognizable issues he contends demonstrate WASD's conscious decision to either cover up or not remedy the Title IX violation, although he does not offer legal citation to support his arguments. First, he contends that "Pardoe instructed students to delete videos—tampering with evidence rather than protecting victims."[265] Second, he argues that "WASD threatened players to prevent reporting."[266] Third, he takes issue with WASD's "conclu[sion that] the incident did not constitute harassment or meet Title IX thresholds," which "contradicts the ChildLine report."[267] Additionally, although he does not make the point in this discussion, Doe also clearly believes the punishments issued to B.M. and J.Z. were unreasonable, a point that I consider with the prior contention about

---

[262] *See supra* at 35 & nn.205-06. Additionally, even if the coaches knew about the room layout well in advance, there is no indication that that information made it to "appropriate persons" before the trip.

[263] Doc. 168-1 at 6.

[264] Doc. 170 at 8.

[265] Doc. 168-1 at 6.

[266] *Id.*

[267] *Id.* at 7

WASD's conclusion. Doe seemingly contends that harassment continued based on other students calling him rude names after the trip.[268] These points are all either factually unsupported or lose significance based on the timeline of events established by the undisputed record and fail to raise a question of fact that WASD was deliberately indifferent. I take each in turn, and then consider the cumulative effect of all of the issues.

### i.        Video Deletion

Pardoe did not tell players to delete the video in a context that indicates he intended to destroy evidence or cover up the incident. It is true that Pardoe told players that they should delete the video, but he did so *after* Weber reported the incident to the school, and with full knowledge that law enforcement already possessed a copy of the video.[269] Pardoe explained that he advised students to delete the video in order to stop its spread within the school.[270] It is unreasonable to conclude that Pardoe was attempting to destroy evidence or hide the truth under such circumstances.[271] Instead, the only fair inference is that Pardoe attempted to remove the video from devices he could not control with the knowledge that a copy was

---

[268] Doc. 168-1 at 8.

[269] *Supra* at 26-27 & nn.149-50. In his Complaint, Doe alleged that Pardoe made the deletion comments shortly after the incident and well before the ChildLine report and Weber's investigation. *See Doe*, 699 F. Supp. 3d at 315, 321-22. The facts adduced in discovery show a very different timeline.

[270] *Supra* at 26-27 & n.149.

[271] *Cf. GenOn Mid-Atlantic, LLC v. Stone & Webster, Inc.*, 282 F.R.D. 346, 359 (S.D.N.Y. 2012) (citing *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003) and *Orbit One Comm'ns, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 442 (S.D.N.Y. 2010)).

being preserved by law enforcement. That act is far from "clearly unreasonable" in light of the relevant circumstances, which include the fact that Doe and his mother both expressed concern to Pardoe about the video circulating.[272] To the extent Doe is suggesting that Pardoe wanted to destroy any evidence of *other*, similar misbehavior in Myrtle Beach,[273] there is no evidence in the record to suggest that Pardoe was aware of any videos other than the one that was submitted with the ChildLine report, nor that he knew of any other sexual misconduct.[274] Accordingly, this point does not support a finding of deliberate indifference.

### ii. Threatening Students

It is similarly factually untrue that Pardoe threatened students to discourage reporting. Doe's only evidence in support of that contention is J.Z.'s agreement with the question that "the only threat that you were really concerned about as it related to this incident and the investigation, so called of it, was the threat that you might not play again on team [sic]. Correct?"[275] J.Z. responded "that's basically it, yeah."[276] But, on J.Z.'s own testimony, that "threat" was not made to discourage reporting or anything of the sort. Instead, J.Z. stated that he was concerned about being suspended from the team as punishment for recording the video.[277] It is true that J.Z. recalled

---

[272] Doc. 158 ¶ 145; Doc. 167 ¶ 145.

[273] *See* Doc. 168-1 at 6 (referring to deletion of "video<u>s</u>" (emphasis added)); Doc. 167 ¶¶ 149, 152 (referring to second video).

[274] *Supra* at 27-28.

[275] Doc. 158-4 at 222:8-13.

[276] *Id.* at 228:14

[277] Doc. 158-4 at 115:7-118:3.

Pardoe telling him not to talk about the incident, but J.Z. explicitly stated that he "wouldn't say [he] felt threatened" by that comment,[278] and the comment was made after J.Z. had already reported the incident to Burkholder, significantly undermining the likelihood Pardoe was attempting to discourage reporting. Moreover, the Court does not agree with Doe that Pardoe's statements that J.Z. should not talk about the incident, that the issue "[wa]sn't going to go any[where]," and that J.Z. "ha[d] nothing to worry about" are sufficient evidence to demonstrate that the entire investigation was a sham or cover up,[279] given that there is no other evidence of inadequate investigation by WASD in the record.

### iii.    Investigatory Conclusion and Punishments

Doe's disagreement with WASD's ultimate conclusion and the punishments issued to B.M. and J.Z. is not a sufficient basis for finding deliberate indifference. The Supreme Court has directed that courts should "refrain from second guessing the disciplinary decisions made by school administrators" in Title IX cases.[280] Accordingly, "*Davis* makes clear that Title IX liability does not give victims license to demand particular remedial actions from the school."[281] Of course, "a 'minimalist response is not within the contemplation of a reasonable response,'" but the possibility that the school could have "taken more aggressive action" does not

---

[278] *Id.* at 114:15-115:12.
[279] *See* Doc. 168-1 at 7.
[280] *Davis*, 526 U.S. at 648-49.
[281] *Jauquet*, 996 F.3d at 809 (citing *Davis*, 526 U.S. at 648).

establish deliberate indifference.[282] So "even if [the school] could have done more,"
as long as its response "was not clearly unreasonable under the known circumstances
. . . [it] was not deliberately indifferent."[283] Here, the undisputed record establishes
that WASD's response was not clearly unreasonable.

Although it did not find that B.M.'s conduct violated Title IX, WASD did
conclude that B.M. and J.Z. had acted improperly and punished both of them. The
parties cast the punishments in starkly different terms. WASD states that "B.M. [and
J.Z.] w[ere] suspended/dismissed from the team and all sports indefinitely."[284] Doe
states that "B.M. was suspended for just two games and required to attend a hazing
program," and asserts that both players "w[ere] allowed to continue playing after the
Myrtle Beach trip" and received a medal for the team's district championship "after
being involved in the sexual abuse of John Doe."[285]

Both statements are true and entirely compatible, and Doe's framing
suggesting otherwise is disingenuous for two reasons. First, there is no insidious
element to the fact that B.M. and J.Z. remained on the team for a time after the Myrtle
Beach trip because WASD and the coaches did not know about the incident until
approximately two months later.[286] Second, the record reflects, and no one disputes,

---

[282] *Escue v. Northern OK College*, 450 F.3d 1146, 1155 (10th Cir. 2006) (quoting *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 260 (6th Cir. 2000)).

[283] *McAvoy*, 115 F.4th at 233-34 (citing *Davis*, 526 U.S. at 648).

[284] Doc. 158 ¶¶ 160-61.

[285] Doc. 167 ¶¶ 160-61.

[286] *See* supra at 23-25.

that the punishments were imposed at the end of May/beginning of June,[287] a day or two after the administrators' meeting with Doe. As Pardoe explained in his deposition, the district championship Doe complains about was played on "the 29th or 28th" of May, several days *before* the administrators spoke with Doe, and also before B.M. and J.Z. were suspended.[288] After B.M.'s suspension was imposed, he remained suspended until he and his parents met with administrators, "and then he was done for the year."[289] But, by that point, B.M.'s suspension had only lasted for one game, and the Millionaires lost their next playoff game two days later, ending their season.[290] So both things are true: B.M. and J.Z. were permitted to participate in the district championship and receive a medal, and they were suspended *after* that game for the rest of the season, which lasted only two more games.

---

[287] Doc. 158-23 at 3 ("June 1, 2018 @10:45AM – Met with Z. in my office to inform him that he is suspended from the baseball team until investigation is complete," "June 1, 2018 @11:00AM – Called B.M.'s mother . . . I informed her that the he [sic] was suspended from the team."); Doc. 158-35 (Discipline Report) (reflecting "loss of privilege" imposed on B.M. on "May 31, 2018"); Doc. 158-36 (Discipline Report) (reflecting "loss of privilege" imposed on J.Z. on "May 31, 2018"); Doc. 158-3 at 82:17-83:7 (B.M. stating that he was suspended for "two or three" games "during the playoff time"); Doc. 158-4 at 93:25-96:17 (J.Z. stating that he was suspended for several games during the playoffs including "the playoff game . . . at the end where we lost"); Doc. 160-2 at 166:4-168:10.

[288] Doc. 160-2 at 166:1-167:3 (discussing district playoff game); *see* Doc. 92 ¶ 75 (noting that district championship occurred on May 28, 2018).

[289] Doc. 160-2 at 169:19-175:13; *see* Doc. 158-23 at 4 (notes of June 5 meeting with B.M.: "I extended the suspension for the remainder of the year"); *cf.* Doc. 158-1 at 125:16-18 ("Q. Did they play in any games after that meeting you had with the school? A. That, I'm not sure.").

[290] *See 2018 PIAA Baseball Championships Information and Results*, Pa. Interscholastic Ath. Ass'n, http://www.piaa.org/news/details.aspx?ID=3662 (select "6A Championship" under "Championship Brackets" heading) (showing that Williamsport defeated Downingtown East in a first round game on Monday, June 4, 2018, and lost to Bensalem in a quarterfinal game played on Thursday, June 7, 2018); Fed. R. Evid. 201(b)(1), (2).

That those suspensions were brief because of the end of the season does not render them obviously deficient. "What is appropriate remedial action will necessarily depend on the particular facts of the case—the severity and persistence of the harassment and the effectiveness of any initial remedial steps."[291] And, as stated, the remedy is forward looking: it must be sufficiently tailored to "end the harassment."[292] Here, the record is devoid of evidence showing that B.M. persistently harassed Doe. Nor is there anything to show that B.M. posed a continuing threat to Doe. Indeed, Doe stated that "the dynamic of the team was pretty much the same" after the incident.[293] By the time Doe discussed the incident with administrators, two months had passed during which B.M. and Doe remained teammates, yet Doe did not report any additional incidents of harassment.[294] Under those circumstances, there is nothing to suggest that drastic intervention was necessary to "end the harassment." Doe may believe that a permanent suspension from athletics would have been a more appropriate sanction, but that is not his call to make.[295]

---

[291] *Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648, 660-61 (5th Cir. 1997) (quoting *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 479 (5th Cir. 1989)).

[292] *Escue*, 450 F.3d at 1155 (quoting *Wills v. Brown Univ.*, 184 F.3d 20, 25 (1st Cir. 1999)).

[293] Doc. 158-1 at 188:2-15.

[294] Based on the record, there were no additional incidents to report.

[295] *Jauquet*, 996 F.3d at 809-10 (acknowledging that Plaintiffs wanted assailant to be expelled and were unsatisfied by "'coached' . . . apology" but holding that such punishment was not clearly unreasonable).

Doe's argument that he was called "dick lips" after the incident cannot contribute to the deliberate indifference analysis for three reasons. First, "[d]amages are not available for simple acts of teasing and name-calling among school children."[296] Second, Doe admitted in deposition that he never reported the name calling to WASD, and no WASD personnel testified that they learned of the name calling, so WASD never had actual knowledge of *that* harassment; thus, its failure to respond to it cannot be deliberately indifferent as a matter of law.[297] Doe's speculation that administrators must have known about the name calling because it was happening with regularity is insufficient to establish actual knowledge, as previously noted.[298] Third, all of the name calling occurred within a few weeks following the trip, and was over before the end of the school year,[299] so by the time WASD had actual knowledge of the initial incident, this follow-on harassment had essentially ceased.

The cumulative effect of Doe's contentions does not show deliberate indifference. Instead, the record reflects that WASD administrators promptly investigated a report of sexual harassment, concluded that it was not particularly severe, and issued punishments to the perpetrators. That Pardoe at times appeared interested in tamping down the spread of information about the incident between

---

[296] *Davis*, 526 U.S. at 652.
[297] *See supra* at 28–29 & n.164; *B.W.*, 422 F. Supp. 3d at 881 (internal citations omitted).
[298] *Supra* 41 & n.240; *see Swanger*, 346 F. Supp. 3d at 709 n.6.
[299] *Supra* at 28–29.

students and parents is not insidious; it is instead an appropriate response to control potentially inflammatory and damaging rumors and gossip.[300] Accordingly, the Court finds that Doe has failed to adduce evidence from which a jury could find that WASD's response to the incident was clearly unreasonable under the circumstances, and summary judgment is appropriate on this issue.

### iv.    Additional Title IX Problem

Doe's Title IX claim likely also fails for an additional reason that the parties have not clearly addressed. As it stands now, there is no evidence in the record from which a jury could find that B.M. targeted Doe *because of his sex*. As I have explained in a case involving strikingly similar conduct, a Title IX plaintiff bringing claims regarding same-sex harassment must show that "the harasser was motivated by sexual desire, the harasser was expressing a general hostility to the presence of one sex in the workplace, or the harasser was acting to punish the victim's noncompliance with gender stereotypes."[301] Importantly, the Supreme Court "[has] never held that . . . harassment . . . is automatically discrimination because of sex merely because [it involves] sexual content or sexual connotations."[302] In cases where the harasser and victim are of opposite sexes, sexual desire is easily inferred

---

[300] *Cf. Johnson*, 283 F.3d at 144 n.1 (noting that "the high school setting . . . is notoriously rife with adolescent gossip").

[301] *Humphries v. Pa. State Univ.*, 2021 WL 4355352, at *24 (M.D. Pa. Sept. 24, 2021) (quoting *Bibby v. Phila. Coca Cola Bottling Co.*, 260 F.3d 257, 264 (3d Cir. 2000)), *aff'd* 2026 WL 1021527 (3d Cir. Mar. 16, 2026).

[302] *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998).

from sexual content because of the prevalence of heterosexuality.[303] But in same-sex incidents, the plaintiff must provide "credible evidence that the harasser was homosexual" or other incident-specific evidence of sexual desire (or some version of the other *Bibby* examples).[304] The mere fact that "the conduct at issue was . . . tinged with offensive sexual connotations" is not enough.[305] Doe has adduced no evidence to show that B.M. has any sexual interest in men or was otherwise motivated by sexual desire during the incident. Nor is either of the other *Bibby* paths remotely implicated. Accordingly, although Doe experienced harassment, that harassment did not constitute "discrimination" "on the basis of sex," as is necessary for a Title IX claim.[306]

## 2. Negligence Claims

WASD also moves for summary judgment on Doe's remaining negligence claims under Pennsylvania state law.[307] Having determined that summary judgment is appropriate on Doe's only federal claim, I may decline to exercise supplemental

---

[303] *Id.* at 80 (noting that "the inference of discrimination [is] easy to draw in most male-female sexual harassment situations, because the challenged conduct typically involves explicit or implicit proposals of sexual activity"); *see also* Jeffrey M. Jones, *LGBTQ+ Identification in U.S. Now at 7.6%*, Gallup (Mar. 13, 2024) (noting that 85.6% of survey respondents identified as heterosexual).

[304] *Oncale*, 523 U.S. at 80; *see Bibby*, 260 F.3d at 264.

[305] *Oncale*, 523 U.S. at 81; *see Humphries*, 2021 WL 4355352, at *2-3, 23-25 (finding harassment where sports teammates would "'place' or 'smack' [their] genitals on the victim's face" or "place their penises on the pinned player's buttocks or face and 'stroke [their] genitalia simulating the action of ejaculation'" was not sex discrimination), *aff'd*, 2026 WL 1021527.

[306] 20 U.S.C. § 1681(a).

[307] The remaining claims are for negligence (Count IV), negligent infliction of emotional distress (Count VI), and negligent failure to rescue (Count VII). *See* Doc. 92; *Doe*, 699 F. Supp. 3d at 332.

jurisdiction over these claims.[308] In most cases, this is the appropriate course of action.[309] Nevertheless, a court retains discretion to exercise supplemental jurisdiction over state-law claims even "after dismissing every claim over which it had original jurisdiction."[310] In exercising that discretion, the court should retain jurisdiction only when "considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so."[311] Here, those factors convince me that I should continue to exercise jurisdiction: discovery is complete and the summary judgment issues are fully briefed and ripe for resolution. Ultimately, I grant WASD's motion, resolving these claims in their entirety. It is in the interest of all parties to bring this case to a full resolution now, rather than remanding these claims for a new round of proceedings in state court and creating further delay.

WASD's challenge to the negligence claims takes two flavors. First, it contends that it is entitled to immunity under Pennsylvania's Political Subdivision Tort Claims Act ("PSTCA"), and that all of the negligence counts must therefore fail. Second, it challenges each negligence count on the merits. After reviewing the record and the briefs, I conclude that WASD is entitled to immunity because Doe

---

[308] 28 U.S.C. § 1367(c)(3).

[309] *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.").

[310] *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009).

[311] *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (quoting *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995)); *Talley v. Wetzel*, 15 F.4th 275, 281 (3d Cir. 2021).

has not adduced sufficient evidence from which a jury could find that a statutory exception applies. Accordingly, I grant WASD's motion for summary judgment on all of the negligence counts without reaching the merits.

The PSTCA provides that "[e]xcept as otherwise provided in this subchapter, no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person."[312] WASD—a public school—is a "local agency" protected by the Act.[313] So WASD is immune from tort liability unless the statute provides an exception to that immunity.[314] One exception may apply: the PSTCA does not bar liability for "sexual abuse," defined as "conduct which constitutes an offense enumerated under section 5551(7)," "if the injuries to the plaintiff were caused by actions or omissions of the local agency which constitute negligence."[315] Section 5551(7), in turn, enumerates a series of criminal offenses, several of which may apply here.[316] The relevant point is that application of any of the criminal offenses that would abrogate immunity requires that "some penetration however slight" occurred.[317] The

---

[312] 42 Pa. Cons. Stat. § 8541. Notably, Doe does not seek declaratory or injunctive relief on any of the negligence counts. *See* Doc. 92 at 38-54.

[313] *Sanford v. Stiles*, 456 F.2d 298, 315 (3d Cir. 2006) ("Under the PPSTCA, local agencies such as school districts are given broad tort immunity."); *Vicky M. v. Ne. Educ. Intermediate Unit 19*, 486 F. Supp. 2d 437, 459 (M.D. Pa. 2007).

[314] *Sanford*, 456 F.2d at 315 (noting statutory exceptions).

[315] 42 Pa. Cons. Stat. § 8542(b)(9).

[316] 42 Pa. Cons. Stat. § 5551(7).

[317] 18 Pa. Cons. Stat. §§ 3121, 3123, 3124.1 (all requiring "sexual intercourse" or "deviate sexual intercourse"); *id.* § 3101 (defining "deviate sexual intercourse" as "sexual intercourse per os or per anus between human beings" and "sexual intercourse" as "intercourse per os or per anus,

requirement of penetration is met if there is "contact between an attacker's genitalia and a victim's lips."[318]

Doe contends that this exception applies because there is evidence in the record from which a jury could conclude that B.M.'s penis touched his lips. WASD responds that the evidence in the record is insufficient to support such a finding under a preponderance standard. I agree with WASD.

In his deposition, Doe repeatedly testified that B.M. "put his penis in between my lips."[319] However, Doe also affirmatively stated that he did not have firsthand knowledge of this fact (because he was asleep), and that he instead learned it when he saw the video of the incident.[320] In his response to WASD's SOUMF, Doe "specifically denie[s] that [his] assertion is based only on seeing the video," but does not cite any contradictory evidence and instead merely states that "the video speaks for itself."[321] Accordingly, the Court must conclude that Doe's evidence on this point is limited to the video.[322]

---

[  ] with some penetration however slight"); *see Doe*, 699 F. Supp. 3d at 327-28 (discussing requirement of penetration).

[318] *See Doe*, 699 F. Supp. 3d at 328 (collecting state law cases).

[319] Doc. 158-1 at 92:6-8, 93:3-8, 177:12-18 ("[I]n between my lips, like in my mouth.").

[320] *Id.* at 235:15-24 ("Q. It's what you said today, you didn't know—this says had a penis on his face—but either way you didn't know anything until they showed you the video, right? A. Correct."); *id.* at 93:2-13; *see id.* at 95:7-98:2 (Doe stating that when he woke up he "[d]idn't know what was going on" and learned "what actually happened" when he saw that video); *id.* at 192:1-5 ("After it happened, I was just confused as to what was going on."); *id.* at 98:3-99:11 (describing seeing the videos and reacting).

[321] Doc. 167 ¶ 98.

[322] The Court further notes that it is strongly arguable that Doe should be precluded from testifying about this part of the incident except to the extent that he is describing the video. Federal Rule of Evidence 602 prohibits a witness from testifying about a matter unless "evidence is

Video footage can sometimes be so clear that it can stand as its own evidence.[323] "Of course, videos are sometimes unclear, incomplete, and fairly open to varying interpretations."[324] On summary judgment, "[a] blurry video that does not depict much of anything cannot give rise to issues of fact about what did or did not happen on a particular occasion."[325] In such cases, a party's interpretation of the video "amounts to mere speculation."[326] Of course, if there is conflicting testimony which the video simply fails to illuminate, the court should interpret the video "in the light most favorable to the non-moving party."[327] But a party cannot rest solely

introduced sufficient to support a finding that the witness has personal knowledge of the matter." To have personal knowledge of events, the witness must have "sensory perception of them" and "comprehen[d]" that perception. 27 Charles A. Wright & Victor J. Gold, Federal Practice & Procedure: Evidence § 6023 (2d ed. 2007). "In order to satisfy the requirement that testimony is based on sensory perception, it is necessary to show that the witness had the ability to perceive and in fact perceived the matters described in her testimony." *Id.* Doe repeatedly testified that he was asleep during the incident and therefore did not know what happened. Because he did not sensorily perceive the events depicted the video, he may not directly testify about those events. *See Landon v. City of North Port*, 745 F. App'x 130, 133-34 (11th Cir. 2018) (affirming exclusion of plaintiff's testimony about his actions at a time when he stated he was unconscious); *Monroe v. Mullooley*, No. 10-CV-1208, 2012 WL 4056075, at *4 (W.D. Pa. Sept. 14, 2012) ("Fed. R. Evid. 602 requires sufficient evidence to support a finding of personal knowledge on a matter before a witness may testify to it. . . . The request will be granted and Plaintiff is precluded from testifying to anything that occurred while he was unconscious."); *Huntimer v. Young*, No. 4:23-CV-4005, 2025 WL 834583, at *9 (D.S.D. Mar. 17, 2025) ("[B]ecause Huntimer claims he was unconscious during the events in question, . . . this Court cannot rely on any of his statements about these events because he lacks personal knowledge."); *Schultz v. Johnson*, No. 10-CV-581, 2012 WL 12888027, at *3 (W.D. Wis. Jan. 30, 2012) ("If plaintiff was unconscious during the relevant time, he would have no personal knowledge of what happened to him."); *Wysong v. City of Heath*, No. 2:03-CV-0269, 2005 WL 8168719, at *2 (S.D. Ohio Feb. 24, 2005).

[323] *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018) (citing *Scott v. Harris*, 550 U.S. 372, 378-81 (2007)).

[324] *Id.*

[325] *Prosper v. Martin*, 989 F.3d 1242, 1252-53 (11th Cir. 2021).

[326] *Id.* at 1252.

[327] *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017) (citing *Godawa v. Byrd*, 798 F.3d 457, 462-63 (6th Cir. 2015)).

on video footage that neither "corroborates [n]or contradicts" the only admissible testimony in the record in order to create a genuine dispute of material fact.[328] Instead, the nonmovant must "point to some record evidence—inside or outside the video—that would allow a reasonable jury to accept [his] interpretation of the video."[329]

The Court has reviewed the video and finds it inconclusive as to the issue of penetration.[330] Doe correctly describes that it "depicts Plaintiff recoiling from *something* touching his face," but it is impossible to discern what that something is.[331] It is also impossible to determine where on Doe's face the contact occurred.[332] No other testimony provides clarity on this point: J.Z. repeatedly stated that he "d[id]n't remember if it touched his face fully."[333] B.M. testified that his penis never touched Doe.[334]

---

[328] *Ames v. City of Tempe*, 665 F. Supp. 3d 1013, 1017 (D. Ariz. 2023); *see Williams v. City of York*, 967 F.3d 252, 260-61 (3d Cir. 2020) (holding that plaintiff's denial of testimony that she did not complain of pain from handcuffs was insufficient to create a genuine dispute of fact when "her only support for that denial was the dashcam footage" in which "she said nothing about pain from her handcuffs").

[329] *Early ex. rel. Kowalewski v. Oakwood Healthcare, Inc.*, No. 23-CV-12475, 2026 WL 787526, at *7 (E.D. Mich. Mar. 20, 2026).

[330] Doc. 158-16.

[331] Doc. 167 ¶ 98 (emphasis added); *see* Doc. 158-16. Doe incorrectly states that B.M.'s hands are "on his hips" at the moment of the apparent contact; his right hand is extended against the wall or couch for balance, and his left hand cannot be seen. *Id.*

[332] Doc. 158-16.

[333] Doc. 158-4 at 42:21-43:2; *see id.* at 43:3-5 ("Q. Is it possible that he put his genitals on his face? A. Maybe. I don't remember."); *id.* at 67:21-68:20.

[334] Doc. 158 ¶¶ 102-03; Doc. 167 ¶¶ 102-03 (admitting the content of B.M.'s testimony but "specifically den[ying] that that is the truth"). The Court does not take B.M.'s testimony as true, but merely notes that it does not provide an independent evidentiary basis for Doe's version of events.

With an inconclusive video and no supporting testimony, a factfinder could only reach Doe's conclusion about the incident through a series of inferences. The Court is cognizant of the requirement that it draw all "reasonable inferences" in Doe's favor at this stage of the litigation.[335]   But "[t]he line between reasonable inferences and impermissible speculation is often 'thin,'" and properly drawing it "is critical because 'an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment.'"[336] Reasonable inferences are those that "flow *directly* from admissible evidence."[337] Based on the video, it would be reasonable to infer that something in the area of B.M.'s genitals touched some part of Doe's face. But there is simply no evidence in the record to reasonably support *any* secondary and more specific inference about what either point of contact was.[338] One could easily infer that B.M.'s shirt or pants touched Doe, and it is similarly possible that Doe's nose or cheek or chin was touched. Nothing in the record tips the scale in Doe's direction on either of those points other than his own testimony, which recursively derives from the video.

---

[335] *Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014) (citing *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013)).

[336] *Id.* (quoting *Fragale & Sons Beverage Co. v. Dill*, 760 F.2d 469, 474 (3d Cir. 1985) and *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990)).

[337] *Id.* (citing *Anderson*, 477 U.S. at 255) (emphasis added).

[338] *See In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 860 (3d Cir. 1990) ("[T]he court must ask whether, on the summary judgment record, reasonable jurors could find facts that demonstrated, by a preponderance of the evidence, that the nonmoving party is entitled to a verdict."); *see Carter v. City of Phila.*, 417 F. Supp. 3d 639, 644 (E.D. Pa. 2019) (quoting *Anderson*, 477 U.S. at 248).

"The mere possibility that something occurred in a particular way is not enough, as a matter of law, for a jury to find it probably happened that way,"[339] and the Court must conclude that any finding as to the particulars of the contact between B.M. and Doe could only be the result of impermissible speculation. Ultimately, "the evidence is merely colorable," and that is not enough to survive summary judgment.[340]

Doe has not adduced sufficient evidence to show that the sexual abuse exception to the PSTCA could apply. Accordingly, WASD is immune from tort liability, and its motion for summary judgment is granted.

## III.    CONCLUSION

The Court reiterates its sympathy for Doe. B.M.'s conduct in Myrtle Beach was wholly inappropriate, and the Court does not doubt that Doe was emotionally distressed as a result. But the record as developed by Doe's counsel does not contain evidence from which a reasonable jury could impose liability for that harm against a more attenuated party—WASD. Accordingly, WASD's motion for summary judgment is granted, and judgment is entered in its favor on all remaining counts.

---

[339] *Saldana v. Kmart Corp.*, 260 F.3d 228, 234-35 (3d Cir. 2001).
[340] *Anderson*, 477 U.S. at 249-50.

An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge